IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

RONALD F. DANTOWITZ,

Plaintiff,

v.

DEXTER SOUTHFIELD, INC., CARMEN ALIBER, and STEWART TUCKER,

Defendants.

CIVIL ACTION NO. 20-CV-10540-AK

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Defendants Dexter Southfield, Inc. (the "School"), Carmen Aliber ("Ms. Aliber") and Stewart Tucker ("Mr. Tucker") (collectively, "Defendants") submit this Statement of Undisputed Material Facts.

**Defendants**

1. Dexter Southfield is an independent school located at 20 Newton Street, Brookline, Massachusetts. (Pl. Complaint, ¶ 2).

2. In May 2017, the School hired Ms. Aliber as the Director of Human Resources, a newly-created position. (Pl. Complaint, ¶ 12). Ms. Aliber is responsible for all aspects of human resources, including hiring, performance management, compensation, employee relations, benefits and professional development. (Exh. A at 13: 11-24, 14: 1).[1]

3. Mr. Tucker is the Assistant Head of School. (Pl. Complaint, ¶ 9). Mr. Tucker is responsible for overseeing academic and student life programs and the recruitment, professional development and supervision of faculty. (Exh. B at 12: 20-24, 13: 1-5).

[1] Referenced exhibits ("Exh.") are attached to the Declaration of Anthony L. DeProspo, Jr., filed herewith.

**<u>The School's Employment Policies</u>**

4. The School's 2018-2019 Employee Handbook included the following relevant policies: Equal Employment Opportunity, Nature of Employment, Employee Conduct, Insubordination, Reasonable Accommodations for Qualified Individuals With Disabilities, Vacation Time, Family and Medical Leave, and Personal Leave of Absence. (Exh. C).

5. Plaintiff testified that he understood that he was expected to adhere to the policies in the School's Employee Handbook. (Pl. Dep.[2], Exh. D at 284: 13-17).

**<u>Plaintiff's Employment With The School</u>**

6. The School hired Plaintiff in 2000 in connection with the School's plan to build and establish the Clay Center Observatory (the "CCO"), an astronomical observatory including a large flagship telescope. (Pl. Dep., Exh. D at 116: 1-9).

7. Plaintiff's testified that he understood that his employment at the School was "'at will,' meaning that either [Plaintiff] or the School may terminate [his] employment at any time, with or without notice, for any reason or for no reason." (Pl. Dep., Exh. D at 283: 20-24, 284: 1-6; Exh. F). Plaintiff understood that he was free to resign at any time if he was unhappy with his job, and that the School was free to end Plaintiff's employment if the School was unhappy with his performance. (Pl. Dep., Exh. D at 284: 7-12).

8. The School built the CCO to be a "beacon of science and to excite the school about science and technology." (Pl. Dep., Exh. D at 119: 17-20). Plaintiff stated that "[a]stronomy and science literally runs straight through the building, and it was meant to elevate the school and get it where it's going to go." (<u>Id.</u> at 120: 17-19). Plaintiff also stated that the flagship telescope is "special," "it's larger than any telescope that any high school has probably

---

[2] "Pl. Dep." refers to Plaintiff's deposition transcript.

in the country ... . Maybe one or two have something bigger, but nobody has anything that's better. ... It's really high quality." (Id. at 135: 21-24, 136: 1).

9. Once the School established the CCO, Plaintiff served as its Director. (Pl. Dep., Exh. D at 121: 19-20).

10. In that capacity, Plaintiff acknowledged that he was responsible for creating and delivering programming for the CCO, including programming for students and members of the surrounding community; teaching stand-alone and semester-long courses, including a semester-long astronomy course; and maintaining the School's large flagship telescope. (Pl. Dep., Exh. D at 122: 5-7, 126: 15-24, 127: 1-21, 133: 7-8, 135: 7-24, 136: 1-24, 140: 5-23).

11. Plaintiff initially reported directly to the then-Head of School William Phinney. (Pl. Dep., Exh. D at 155: 11-14). Mr. Phinney did not provide Plaintiff with any formal or documented oversight or feedback on his job performance. (Id. at 161: 7-14).

12. In 2007, Plaintiff began reporting to the Chair of the School's Science Department and the Head of the Upper School. (Pl. Dep., Exh. D at 163: 9-13). Plaintiff did not receive any formal or written performance evaluations from Science Department Chairs Ellen Hinman, Linda McIntosh or William Pine, or Head of the Upper School Brian Bloomfield. (Id. at 174: 10-17, 179: 20-24).

**2017: Ms. Aliber Initiates Job Description Requirements**

13. In November 2017, shortly after she began working at the School, Ms. Aliber implemented a new job description mandate. (Exh. A at 59: 3-17).[3]

14. In 2017, as part of that initiative, Plaintiff testified that he drafted a job description for his position, as all School employees did. (Pl. Dep., Exh. E at 325: 10-16, 326:

[3] In late August 2018, Ms. Aliber implemented a new performance management appraisal system that included documenting each employee's responsibilities, performance expectations, and establishing a formalized process for performance evaluations. (Exh. A at 37: 23-24, 38: 1-12).

16-22). According to the job description for his CCO Director position that Plaintiff drafted, Plaintiff was responsible for "managing the operations" of the CCO "to maximize its impact and effectiveness for student use," maintaining, operating, and upgrading the CCO's "university-level scientific equipment," maintaining and operating the School's "6.5-meter digital planetarium," "developing an annual budget for review and approval for operation and maintenance" of the CCO, hosting "weekly open houses" at the Clay Center (seasonal and subject to weather), and teaching astronomy at the Upper School. (Exh. G).

15. As part of Plaintiff's job, Plaintiff acknowledged the following responsibilities:

- To perform quality work within deadlines;
- To interact professionally with other employees, including administrators;
- To communicate and coordinate work efforts with other employees including administrators; and
- To inform an administrator if a particular deadline could not be met.

(Pl. Dep., Exh. E at 328: 3-22).

**Early 2018: Plaintiff Shares A 2014 Medical Evaluation In Response To Ms. Aliber's Performance Tracking Initiatives**

16. In early 2018, Ms. Aliber inquired about activities taking place at the CCO and whether those activities aligned with the School's broader mission and goals. (Exh. A at 64: 2-24, 65: 1-8).

17. On January 19, 2018, almost simultaneously with Ms. Aliber's review of the CCO, Plaintiff provided Ms. Aliber with a letter from Dr. Pamela Friedman dated January 17, 2018. (Exhs. H, I). Dr. Friedman is a Board Certified Clinical Neuropsychologist. (Exh. H). Plaintiff specifically requested that Dr. Friedman draft the letter in 2018. (Pl. Dep., Exh. D at 263: 17-24).

18. According to the letter, Dr. Friedman had evaluated Plaintiff three and one-half years earlier, on August 5, 2014. (Exh. H). Dr. Friedman found that Plaintiff presented with "a number of symptoms that are consistent with a mild autism spectrum disorder." (Id.) Dr. Friedman also noted in 2014 that Plaintiff had "demonstrated remarkable compensatory strategies" and that he was "extremely intelligent and committed to improving himself, both of which have enabled him to compensate for his difficulties and function well in multiple roles." (Id.)

19. Dr. Friedman's 2014 letter did not recommend that Plaintiff seek accommodations at the School, nor did Dr. Friedman suggest that Plaintiff should seek additional time to complete his work. (Exh. H).

20. Dr. Friedman's 2014 letter recommended that Plaintiff work with a clinician with experience in autism spectrum disorders. (Exh. H). Plaintiff, however, admittedly did not seek treatment from Dr. Friedman again following his 2014 evaluation, nor did Plaintiff see any other health care provider for treatment after his 2014 evaluation, nor did Plaintiff follow Dr. Friedman's 2014 recommendation that he work with a clinician. (Pl. Dep., Exh. D at 243: 1-4, 246: 5-23, 267: 12-17).

21. Upon receiving the letter, Ms. Aliber requested a meeting with Plaintiff. (Exh. I). Having not heard from Plaintiff, Ms. Aliber emailed Plaintiff on February 5, 2018 to request that they meet to discuss the letter. (Id.) Plaintiff responded via email, agreed to meet, and stated:

> I have no doubts about my ability to communicate or teach astronomy, and am confident that I do my job well! I am not complaining but communicating to you so that you might understand my challenges, ***all of which I have overcome.***

(Id.) (emphasis added).

22. Plaintiff, faced with departmental oversight for the first time in almost 20 years, advised Ms. Aliber that "I figured this was a good time to discuss [the letter] with you. If I have additional different duties this coming year I want to do them to the best of my abilities as always – just need the time to learn how to do them." (Exh. I).

23. Previously, when asked to teach physics in or around 2016 (a course Plaintiff had not previously taught), Plaintiff testified that he believed he had an "easy out" and could avoid the assignment if he disclosed the results of Dr. Friedman's evaluation. (Pl. Dep., Exh. D at 198: 6-24, 199: 1-8). Plaintiff, however, chose not to disclose Dr. Friedman's evaluation at that time. (Id. at 198: 9-10).

24. On February 14, 2018, Ms. Aliber met with Plaintiff to discuss Dr. Friedman's evaluation. (Pl. Dep., Exh. D at 269: 3-4). Ms. Aliber asked Plaintiff if he needed any accommodations to do his job, and Plaintiff told her that he did not need any accommodations. (Id. at 275: 16-21). Following his meeting with Ms. Aliber on February 14, 2018, Plaintiff never again discussed with the School his alleged mild autism spectrum disorder, nor did he provide the School with additional documentation about it. (Id. at 261: 13-24).

25. Plaintiff has testified that for almost twenty (20) years, he granted himself his own accommodations which he believed allowed him to perform "exceptionally well" in his role as CCO Director, even after Dr. Friedman's 2014 evaluation. (Pl. Dep., Exh. D at 241: 10-12). The School offered Plaintiff employment for the 2018-19 school year, four (4) months ***after*** Plaintiff disclosed his alleged condition. (Exh. F).

**Summer 2018: Plaintiff Fails To Ensure That The School's Flagship Telescope Is Ready For Returning Students For The Fall 2018 Semester**

26. On or about May 30, 2018, Plaintiff met with Ms. Aliber and Mr. Tucker to discuss Plaintiff's summer plans to prepare the CCO or the 2018-2019 school year. (Pl. Dep.,

Exh. D at 288: 4-18). It was Plaintiff's responsibility to ensure that the flagship telescope was properly maintained and in good order. (Id. at 302: 12-15).

27. On June 19, 2018, Plaintiff created a list of 36 items in the CCO that were "in need of maintenance, repair, or replacement before we welcome back students in the fall." (Exhs. J, K).

28. Plaintiff's list of items included various maintenance and repairs to the School's flagship telescope and the CCO's planetarium. (Exh. K).

29. Also on June 19, 2018, Plaintiff advised Mr. Tucker that the flagship telescope's "control system has possibly had its end of life event," but that Plaintiff was "pretty certain" he could "solve the problem, if only temporarily." (Exh. J)

30. During the summer, Plaintiff did not express any concerns about the flagship telescope or otherwise provide the School with any updates regarding his progress at the CCO; rather, Plaintiff waited until August 30, 2018, days before classes would begin, to inform the School of his failure to get the flagship telescope working again. (Pl. Dep., Exh. E at 357: 24, 358: 1-6).

31. Specifically, on August 30, 2018, Plaintiff informed Head of School Todd Vincent that the flagship telescope was not operational, that it would remain non-operational for at least another three months, and that it would cost $37,000 to repair. (Pl. Dep., Exh. E at 362: 11-17, 364: 7-24, 365: 1).

32. Although Plaintiff himself knew that the telescope had suffered a possible "end of life event" in June 2018, nonetheless, he did nothing to confirm whether or not the telescope was operational until August 30, 2018, the last day of summer break, when he informed

administration for the first time that the telescope was not working. (Pl. Dep., Exh. D at 306: 14-21).

33. Plaintiff admittedly did not complete several of the 36 job tasks that Plaintiff himself identified as needing to be done at the CCO before the start of the 2018-2019 school year. (Pl. Dep., Exh. D at 303: 5-8).

34. Plaintiff has conceded that the School's flagship telescope was not operational at the start of the 2018-2019 school year. (Pl. Dep., Exh. D at 306: 9-13).

35. The planetarium was not fully repaired and ready for use at the start of the 2018-2019 school year. (Exh. B at 57: 17-24, 58: 1-18).

36. Because the CCO did not operate at full capacity, the School was unable to offer several academic experiences to its students. (Exh. B at 56: 18-24, 57: 1-8).

**Summer 2018: Plaintiff Pursues Outside Ventures Rather Than Preparing The Observatory For The Fall Semester**

37. During the summer of 2018, Plaintiff has testified that he actively worked for his own company, Celestial Computing, Inc., an astronomical high-resolution imaging company, that Plaintiff founded in 1994 ("CCI"). (Pl. Dep., Exh. D at 77: 11-23, 88: 17-18). Plaintiff admittedly operated CCI while employed at the School and he continues to do so. (Id. at 73: 4-8, 78: 17-24, 85:15-24, 86: 15-22, 87: 12-17).

38. In July 2018, while the School's flagship telescope lay in pieces, Plaintiff testified that he spent at least eight days on two trips for CCI, admittedly working 10-12 hours per day. (Pl. Aff.[4], Exh. L, p. 1).

[4] "Pl. Aff." refers to Plaintiff's affidavit dated September 28, 2021.

39. In August 2018, Plaintiff testified that he spent at least five days on trips to Texas and California to generate business and/or complete work for CCI. (Pl. Aff., Exh. L, p. 2.) During Plaintiff's trip to California, Plaintiff worked "approximately 10-12 hours per day." (Id.)

40. On August 31, 2018, one day after notifying the School that the flagship telescope was non-operational, Plaintiff registered CCI to do business in the state of Colorado. (Exh. M).

41. In May or June, 2018, Plaintiff and his wife offered to purchase a new home in Chestnut Hill, Massachusetts, for more than $900,000. (Pl. Dep. Exh. D at 21: 22-24, 22: 1-16, Pl. Dep. Exh. E at 352: 9-15). They closed on the purchase in August 2018. (Pl. Dep. Exh. D at 21: 22-24, 22: 1-16).

**On The Same Day Plaintiff Delivers The News That The Flagship Telescope Is Non-Operational, Plaintiff Requests A Leave Of Absence**

42. On August 30, 2018, the same day Plaintiff advised Head of School Todd Vincent that the flagship telescope was non-operational, Plaintiff requested an immediate leave of absence to care for his son. (Pl. Dep., Exh. E at 358: 19-24, 359: 1-24, 360: 1-13). Plaintiff testified that, in general, Plaintiff did not discuss his son, or his son's medical condition, with employees at the School. (Pl. Dep., Exh. D at 223: 5-24, 224: 1-24, 225: 1-11). Plaintiff testified that he does not recall anyone ever saying anything disparaging or negative about his son or his condition. (Id. at 223: 20-24, 224: 1).

43. Mr. Tucker did not discipline Plaintiff on August 30th, when Plaintiff advised the School for the first time that the flagship telescope was non-operational. (Exh. B at 69: 10-12). Mr. Tucker's focus was on supporting Plaintiff's need to take leave. (Exh. A at 135: 13-15). Mr. Tucker had to ensure that academic programming was in place. (Id. at 135: 7-10).

44. Mr. Vincent advised Ms. Aliber that Plaintiff needed a leave of absence. (Exh. A at 50: 13-16). Ms. Aliber called Plaintiff immediately and advised him that depending on the

reasons for his leave he could either take personal leave pursuant to the Family and Medical Leave Act ("FMLA"), or he could take leave pursuant to the School's personal leave of absence policy. (Pl. Dep., Exh. E at 366: 12-24, 367: 14-17).

45. After speaking with Ms. Aliber, Plaintiff researched his leave options with his wife. (Pl. Dep., Exh. E at 373: 15-20). Shortly thereafter, Ms. Aliber provided Plaintiff with the applicable FMLA forms, and requested that he clarify his intent to take leave. (Id. at 411: 16-24, 412: 1-18; Exh. N).

46. Plaintiff did not clarify his request until September 14, 2018, when he emailed Mr. Vincent and Ms. Aliber that he had retained counsel and, in bold text, stated: **"I need to take FMLA leave to care for my son, beginning on or before October 1, preferably from my perspective as soon as possible, and continuing for 12 weeks thereafter."** (Pl. Dep., Exh. E at 395: 16-24, 396: 1-5; Exh. O) (emphasis in original).

47. The School granted Plaintiff a personal leave of absence effective that day, September 14, 2018, and Ms. Aliber provided Plaintiff with instructions on how to convert his personal leave to FMLA leave, which Plaintiff ultimately did. (Pl. Dep., Exh. E at 411: 16-24, 412: 1-18).

48. While on FMLA leave, from September 14, 2018 to December 13, 2018, Plaintiff testified that he took at least four business trips (for a total of more than two weeks) to Virginia and various locations in California to generate business for and/or to complete work for CCI. (Pl. Aff., Exh. L, pp. 2-3). During his three trips to California, Plaintiff admittedly worked "10-12 hours a day" for CCI. (Id.)

49. While on leave, Plaintiff testified that his activities included "a mixture of family things and house things," including unpacking boxes from his family's recent move into a new

home, and "sleeping." (Pl. Dep., Exh. E at 418: 21-24, 419: 1-15, 420: 22-23). His son attended school five days per week. (Id. at 420: 2-23). Plaintiff has stated that he "enjoyed not having to get up and put on a tie and go to work." (Id. at 419: 20-21).

50. Plaintiff returned home from one of his trips to California on behalf of CCI on December 13, 2018, one day before he was scheduled to return to work at the School. (Pl. Aff., Exh L, p. 3).

51. CCI reported $595,518 in gross income for 2018. (Exh. P).

**The School's Efforts To Cover Plaintiff's Duties In Fall 2018**

52. After learning about Plaintiff's need for a leave of absence, Mr. Vincent advised Mr. Tucker that the School should prepare to cover Plaintiff's responsibilities for the Fall 2018 semester, which was scheduled to begin Tuesday, September 4, 2018. (Exh. B at 50: 3-14).

53. Plaintiff was the only employee at the School who knew how to do complicated maintenance and repairs on the CCO's flagship telescope. (Pl. Dep., Exh. D at 302: 12-23, Pl. Dep., Exh. E at 417: 10-24). In Plaintiff's absence, no employee at the School could do that work on the telescope. (Pl. Dep., Exh. E at 417: 10-24)

54. Ultimately, current School employees taught Plaintiff's Fall 2018 astronomy course until the School temporarily hired a former faculty member, Mr. Kelly Beatty, to teach the course for the semester. (Pl. Dep., Exh. E at 415: 24, 416: 1-5; Exh. A at 33: 3-24, 34: 1-20, 36: 1-13, 96: 19-22, 111: 3-14). Mr. Beatty agreed to teach astronomy for the rest of the Fall 2018 semester or until the School could find someone else to cover the class, whichever came sooner. (Exh. A at 34: 8-20).

55. In October 2018, the School publicly posted an ad for an "astronomy teacher," seeking candidates who could provide additional coverage for the operations of the CCO and teach astronomy. (Exh. A at 98: 6-14).

56. In November 2018, Clay Center Director Robert Phinney left the School. (Pl. Dep., Exh. E at 415: 14-20; Exh. A at 34: 2-7). Robert Phinney was one of the only other School employees with some working knowledge of how to operate or do basic maintenance on the flagship telescope, and he was one of the few faculty members who, like Plaintiff, taught astronomy and physics. (Pl. Dep., Exh. E at 417: 10-24; Exh. B at 26: 6-20.)

57. The astronomy teacher job posting yielded a qualified candidate, Dr. Felipe Santos, who joined the School's faculty in January 2019. (Exh. A at 98: 6-14). Dr. Santos replaced Mr. Phinney; the School did not hire Dr. Santos to replace Plaintiff. (Id. at 97: 1-2; 99: 5-14).

58. In September 2018, the School arranged for a third-party telescope manufacturer to repair the flagship telescope while Plaintiff was on leave. (Exh. B at 80: 11-24). The repairs were completed in early December 2018. (Id.)

**Plaintiff Returned To Work For One Day And Then Expected To Take Off The Remainder Of The Year**

59. Upon Plaintiff's request for leave, Ms. Aliber stated that the School's focus "shifted to supporting Mr. Dantowitz in his request for a leave," and only later did the School seek to "resume conversations around" performance when Plaintiff returned. (Exh. A at 135: 13-22). Thus, Ms. Aliber and Mr. Tucker did not address Plaintiff's failure to have the flagship telescope operational until after he returned from leave. (Id. at 136: 3-15; Exh. B at 69: 2-12).

60. On November 20, 2018, Plaintiff confirmed that his first day back at the School would be December 14, 2018. (Exh. Q). On December 13, 2018, Plaintiff emailed Ms. Aliber

and requested, "in connection with [his] disability," to record his initial meeting with Ms. Aliber and Mr. Tucker the next day on December 14, 2018, or in the alternative, to bring another faculty member to the meeting with him to take notes. (Id.)

61. Ms. Aliber responded that she did not understand Plaintiff to have a disability or to have requested an accommodation previously, but that she would be happy to talk about accommodations if Plaintiff wanted to request one. (Exh. Q). Ms. Aliber further stated that she and Mr. Tucker would not agree to the meeting being recorded or another faculty member being present, but that Plaintiff could take breaks during the meeting as needed to take notes. (Id.)

62. In her December 13, 2018 email to Plaintiff, Ms. Aliber summarized Plaintiff's job expectations upon his return to work, and offered to discuss the expectations at the meeting planned for the following day. (Exh. Q). Plaintiff stated that he had "no problem" completing the tasks that Ms. Aliber had summarized for him. (Pl. Dep., Exh. E at 447: 3-4).

63. Plaintiff returned to work on Friday, December 14, 2018, and met with Ms. Aliber and Mr. Tucker that day as planned. (Pl. Dep., Exh. E at 443: 20-24). Plaintiff did not request any breaks or take any notes during the meeting. (Id. at 453: 2-7).

64. In the meeting, Plaintiff objected to working during the School's winter break. (Pl. Dep., Exh. E at 446: 21-24, 447: 1-18).

65. Plaintiff, however, specifically admitted that he was a year-round employee:

> I worked through the summers and did astronomy and – yeah.
> I never took vacations. I was always there.

(Pl. Dep., Exh. D at 286: 2-4).

66. Ms. Aliber emailed Plaintiff on December 19, 2018 to provide additional information about making vacation requests and requesting disability accommodations, among

other topics, and she directed Plaintiff to the relevant policies in the School's employee handbook. (Exh. R).

67. Plaintiff admittedly did not look at the policies in the employee handbook, he admittedly did not request to take any vacation in December 2018, and he admittedly did not request any accommodations. (Pl. Dep., Exh. E at 447: 19-21, 455: 20-24, 460: 2-24, 469: 1-3).

68. Plaintiff testified that he "worked some" during the 2018 winter break, and he did not complete on time the tasks assigned to him in December 2018. (Pl. Dep., Exh. E at 445: 18-23; Exh. S).

**Plaintiff's Counseling Meetings**

January 2, 2019 Meeting

69. Plaintiff met with Ms. Aliber and Mr. Tucker on January 2, 2019 to discuss his job expectations and the tasks that needed to be completed promptly. (Pl. Dep., Exh. E at 473: 10-24, 474: 1-24, 475: 1-3; Exh. S). Ms. Aliber took notes during the meeting. (Pl. Dep., Exh. E at 475: 4-7).

70. Plaintiff asked if he was expected to commence Open Telescope Nights that month, and Mr. Tucker responded that he was, as the School had communicated to Plaintiff in Ms. Aliber's December 13, 2018 email setting forth Plaintiff's job expectations. (Exh. Q; Exh. S). Mr. Tucker then reminded Plaintiff that he might also receive job-related requests over the phone and through voicemail messages, ***and Plaintiff responded that he had not checked his voicemail messages since 2017.*** (Exh. S).

71. When asked about the requirement that he provide a step-by-step operations manual to guide users on the location and use of specialized equipment in the CCO by January 2, 2019, ***Plaintiff stated that he did not have it and said "I will get to it when I can."*** (Exh. S).

After being reminded that it was due that day, January 2nd, Plaintiff asked "why is this critical?" (Id.) Ms. Aliber asked Plaintiff to suggest a realistic completion date for this task, and he silently stared at her. (Id.) Ms. Aliber then offered to extend the due date, to which ***Plaintiff responded by requesting that Ms. Aliber email him all job expectations.*** (Id.) Plaintiff said, "if you tell me things, I may forget." (Id.) Ms. Aliber then reminded Plaintiff that she had already emailed him his job expectations. (Id.) ***Plaintiff stated that he does not always read his emails.*** (Id.)

72. Mr. Tucker informed Plaintiff that his ongoing failure to complete his job expectations, including those identified by Plaintiff himself in June 2018, and those identified by the School in December 2018, suggested a refusal to do his job. (Exh. S).

73. Ms. Aliber and Mr. Tucker did not talk about Plaintiff's son or autism at the January 2nd meeting. (P. Dep., Exh. E at 477: 22-24, 478: 1-18).

January 10, 2019 Meeting

74. Plaintiff next met with Ms. Aliber and Mr. Tucker on January 10, 2019 in Ms. Aliber's office. (Pl. Dep., Exh. E at 481: 9-24, 482: 1-7). Ms. Aliber took notes during the meeting. (Id. at 482: 22-24, 483: 1-5).

75. When asked if he was ready to resume teaching astronomy (which was scheduled to begin in four days, on January 14, 2019), ***Plaintiff stated that he had not focused on teaching, and Plaintiff asked if teaching was still one of his job expectations.*** (Exh. T).

76. Plaintiff asked for clarification on the dates of his employee self-appraisal through the new Trakstar system, and Ms. Aliber reminded him that the information had already been emailed to him. (Exh. T). ***Plaintiff responded that he did not always read his emails, especially when he thought they were "too long."*** (Id.)

77. At the conclusion of the meeting, Plaintiff refused to leave Ms. Aliber's office after Mr. Tucker left. (Exh. T). Mr. Tucker, upon observing that Plaintiff was still in Ms. Aliber's office, returned to the room, at which point Plaintiff finally stood up and left. (Id.)

78. Plaintiff has admitted that Ms. Aliber and Mr. Tucker did not talk about Plaintiff's son or autism at the January 10th meeting. (Pl. Dep., Exh. E at 489: 12-19).

January 18, 2019 Meeting

79. On January 15, 2019, in advance of their next meeting, Plaintiff provided Mr. Tucker and Ms. Aliber with a written status update. (Exh. U). In that update, Plaintiff admitted that he had not completed several assigned tasks, and that others had been completed after the assigned due date. (Pl. Dep., Exh. E at 506: 6-24, 519: 1-18). Plaintiff did not request additional time to complete those tasks. (Id. at 513: 18-22, 515: 11-21, 517: 19-24, 518: 1-8).

80. Plaintiff then met with Ms. Aliber and Mr. Tucker as scheduled on January 18, 2019 to review his assigned tasks and work progress. (Pl. Dep., Exh. E at 494: 13-24, 495: 1-9). Ms. Aliber took notes at this meeting. (Id. at 495: 11-23).

81. After Mr. Tucker identified several areas where Plaintiff failed to complete a task by a set due date, ***Plaintiff repeatedly asked "how late is late?" and refused to answer questions directly.*** (Pl. Dep., Exh. E at 497: 2-5, 498: 17-24).

82. ***Plaintiff repeatedly asked for clarification of basic job responsibilities that a director-level employee was expected to understand.*** (Exh. V; Pl. Dep., Exh. E at 499: 13-16). For example, ***Plaintiff asked repeatedly if he should open the flagship telescope and/or hold Open Telescope Nights during inclement weather.*** (Exh. V; Pl. Dep., Exh. E at 499: 13-16). ***When advised that such a decision would be at the discretion of the CCO Director, i.e.,***

***Plaintiff, Plaintiff demanded a "yes or no" answer and asked "or would that be considered poor performance?"*** (Exh. V; Pl. Dep., Exh. E at 501: 2-6).

83. Following his meeting with Ms. Aliber and Mr. Tucker on January 18, 2019, which Plaintiff claims he "didn't mean to make unpleasant," but admittedly did, he was "concerned that [he] would not have access to his [e]mail," and so he watched a "YouTube video" about how to copy his email account onto a thumb drive. (Pl. Dep., Exh. D at 52: 9-24, 53: 1-24, 54: 1-6). Plaintiff thus transferred all of his work-related emails onto a personal thumb drive, and he placed a password on the file which he later allegedly forgot. (Id. at 53: 18-21).

**On The Basis Of Poor Performance And Insubordination, The School Terminated Plaintiff's Employment**

84. In the course of his discussions with Ms. Aliber and Mr. Tucker, Ms. Aliber noted that Plaintiff "demonstrated extremely unprofessional behavior. He was insubordinate, and [the School] made the determination that his employee conduct did not align with the expectations of the School." (Exh. A at 153: 3-9; Pl. Dep., Exh. D at 74: 5-7).

85. In light of Plaintiff's performance failures and his unprofessional and insubordinate behavior, Ms. Aliber and Mr. Tucker recommended to Head of School, Mr. Vincent, that Plaintiff's employment be terminated. (Exh. A at 153: 3-13; Exh. B at 88: 2-22).

86. The School terminated Plaintiff's employment on January 22, 2019. (Pl. Dep., Exh. E at 536: 4-20).

87. Mr. Tucker explained that the School terminated Plaintiff's employment for "[n]ot completing work that was both expected of him and to which he committed [to perform] on time and completely, and not communicating about the status of the projects he was working on." (Exh. B at 89: 2-9). According to Mr. Tucker, Plaintiff "objected to [the School] asking about his performance. And he was distracting and unprofessional, and obfuscating, and

redirecting the conversation away from his responsibilities and accountability. He was condescending and dismissive. ... [H]e was combative in his manner of discussing his performance." (Id. at 96: 22-24, 97: 1-10).

88. Ms. Aliber confirmed that the School terminated Plaintiff's employment "due to poor performance, his failure to complete the essential functions of his job, and ... for insubordination and unprofessional behavior." (Exh. A at 162: 11-16).

**CCI Has Reported Gross Income Of Nearly $3,000,000 Since His Termination**

89. Plaintiff has testified that he never applied for a single job following his termination. (Pl. Dep., Exh. D at 72: 24, 73: 1-3).

90. Plaintiff has stated that he applied for and was deemed eligible for unemployment benefits, but he declined to collect them. (Pl. Dep., Exh. D at 73: 20-24, 74: 1-24, 75: 1-14).

91. Rather, since January 2019, Plaintiff admittedly has continued "really working hard" on his own company, CCI. (Pl. Dep., Exh. D at 93: 19-21).

92. Plaintiff has testified that in March 2019, CCI sold a telescope mount for $1,050,000. (Pl. Dep., Exh. D at 76: 2-4).

93. CCI reported $991,707.00 in gross income for 2019. (Exh. W). Plaintiff reported $694,637 in adjusted gross income on his individual 2019 federal tax return, which included proceeds from the company's sale of the telescope mount. (Pl. Dep., Exh. D at 98: 20-24, 99: 1-21). This amount constitutes more than six times Plaintiff's annual salary at the School at the time of his termination in January 2019 ($106,500). (Id. at 99: 18-21).

94. In 2020, among other work, Plaintiff testified that CCI completed and received payment for work on behalf of the National Aeronautics and Space Administration ("NASA"),

including a project that required Plaintiff to travel to Australia for two weeks in December 2020. (Pl. Dep., Exh. E at 557: 24, 558: 1-24, 559: 1-6).

95. CCI reported $1,781.966 in gross income on its 2020 federal tax return. (Exh. X).

96. CCI applied for and received a PPP loan in 2020 in the amount of approximately $49,000. (Pl. Dep., Exh. D at 97: 12-16, 98: 1-19). Plaintiff stated that he intends to seek forgiveness of the PPP loan. (Id.) CCI reported five jobs on its PPP loan application. (Exh. Y)

97. As of April 2021, Plaintiff testified that he paid two CCI employees collectively approximately $120,000 per year. (Pl. Dep., Exh. E at 553: 19-24, 554: 1-12).

December 15, 2021

Respectfully submitted,

DEXTER SOUTHFIELD, INC.,
CARMEN ALIBER, and
STEWART TUCKER,

By their attorneys,

/s/Anthony L. DeProspo, Jr.
William E. Hannum III (BBO No. 643155)
(whannum@shpclaw.com)
Anthony L. DeProspo, Jr. (BBO No. 644668)
(adeprospo@shpclaw.com)
SCHWARTZ HANNUM PC
11 Chestnut Street
Andover, MA 01810
Telephone: (978) 623-0900
Facsimile: (978) 623-0908

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document, filed through the ECF system will be served electronically upon all registered participants as identified in the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered parties this 15th day of December 2021.

Suzanne L. Herold (*counsel for Plaintiff*)
Herold Law Group, P.C.
50 Terminal Street
Building 2, Suite 716
Charlestown, MA 02129
suzie@heroldlawgroup.com

/s/Anthony L. DeProspo, Jr.
Anthony L. DeProspo, Jr.