IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
)
RONALD F. DANTOWITZ,                    )
                                        )
                    Plaintiff,          )
v.                                      )
                                        )   CIVIL ACTION NO. 20-CV-10540-AK
DEXTER SOUTHFIELD, INC.,                )
CARMEN ALIBER, and                      )
STEWART TUCKER,                         )
                                        )
                    Defendants.         )
_____)

## PLAINTIFF'S RESPONSES TO DEFENDANTS' STATEMENT OF MATERIAL FACTS

Plaintiff disputes or otherwise responds to Defendants' Statements of Material Fact as follows:

### Defendants

1.      Dexter Southfield is an independent school located at 20 Newton Street, Brookline, Massachusetts.  (Pl. Complaint, ¶ 2).

Response:      Admitted.

2.      In May 2017, the School hired Ms. Aliber as the Director of Human Resources, a newly-created position.  (Pl. Complaint, ¶ 12).  Ms. Aliber is responsible for all aspects of human resources, including hiring, performance management, compensation, employee relations, benefits and professional development.  (Exh. A at 13: 11-24, 14: 1).[1]

Response:      Admitted.

---

[1] Referenced exhibits ("Exh.") are attached to the Declaration of Anthony L. DeProspo, Jr., filed herewith.

3.     Mr. Tucker is the Assistant Head of School.  (Pl. Complaint, ¶ 9).  Mr. Tucker is responsible for overseeing academic and student life programs and the recruitment, professional development and supervision of faculty.  (Exh. B at 12: 20-24, 13: 1-5).

Response:     Admitted.

## The School's Employment Policies

4.     The School's 2018-2019 Employee Handbook included the following relevant policies: Equal Employment Opportunity, Nature of Employment, Employee Conduct, Insubordination, Reasonable Accommodations for Qualified Individuals With Disabilities, Vacation Time, Family and Medical Leave, and Personal Leave of Absence.  (Exh. C).

Response:     Admitted.

5.     Plaintiff testified that he understood that he was expected to adhere to the policies in the School's Employee Handbook.  (Pl. Dep.[2], Exh. D at 284: 13-17).

Response:     Admitted.

## Plaintiff's Employment With The School

6.     The School hired Plaintiff in 2000 in connection with the School's plan to build and establish the Clay Center Observatory (the "CCO"), an astronomical observatory including a large flagship telescope.  (Pl. Dep., Exh. D at 116: 1-9).

Response:     Admitted.  Further responding, Plaintiff was hired as the Director of the Clay Center Observatory that came with it only a requirement to teach astronomy.  Exh. Z.

7.     Plaintiff's testified that he understood that his employment at the School was "'at will,' meaning that either [Plaintiff] or the School may terminate [his] employment at any time,

---

[2]     "Pl. Dep." refers to Plaintiff's deposition transcript.

with or without notice, for any reason or for no reason."  (Pl. Dep., Exh. D at 283: 20-24, 284: 1-6; Exh. F).  Plaintiff understood that he was free to resign at any time if he was unhappy with his job, and that the School was free to end Plaintiff's employment if the School was unhappy with his performance.  (Pl. Dep., Exh. D at 284: 7-12).

>    Response:      Denied in part.  The School utilized a progressive discipline policy to
>    counsel employees prior to termination, unless the employee engaged in a severe act of
>    bad-faith, such as stealing.  Tucker Dep. Exh. B at pg. 66: 3 – pg. 67: 19; pg. 90: 7 – pg.
>    92: 22.

8.      The School built the CCO to be a "beacon of science and to excite the school about science and technology."  (Pl. Dep., Exh. D at 119: 17-20).  Plaintiff stated that "[a]stronomy and science literally runs straight through the building, and it was meant to elevate the school and get it where it's going to go."  (Id. at 120: 17-19).  Plaintiff also stated that the flagship telescope is "special," "it's larger than any telescope that any high school has probably in the country … .  Maybe one or two have something bigger, but nobody has anything that's better. …  It's really high quality."  (Id. at 135: 21-24, 136: 1).

>    Response:      Admitted.

9.      Once the School established the CCO, Plaintiff served as its Director.  (Pl. Dep., Exh. D at 121: 19-20).

>    Response:      Admitted.

10.      In that capacity, Plaintiff acknowledged that he was responsible for creating and delivering programming for the CCO, including programming for students and members of the surrounding community; teaching stand-alone and semester-long courses, including a semester-

long astronomy course; and maintaining the School's large flagship telescope.  (Pl. Dep., Exh. D at 122: 5-7, 126: 15-24, 127: 1-21, 133: 7-8, 135: 7-24, 136: 1-24, 140: 5-23).

Response:      Admitted.

11.      Plaintiff initially reported directly to the then-Head of School William Phinney. (Pl. Dep., Exh. D at 155: 11-14).  Mr. Phinney did not provide Plaintiff with any formal or documented oversight or feedback on his job performance.  (Id. at 161: 7-14).

Response:      Denied.  Plaintiff testified that Mr. Phinney and Plaintiff would often sit down and discuss his performance.  Id. at 161.  Plaintiff further testified he continued to have weekly meetings with Todd Vincent, the successor Head of School.  Id. at 163-164.

12.      In 2007, Plaintiff began reporting to the Chair of the School's Science Department and the Head of the Upper School.  (Pl. Dep., Exh. D at 163: 9-13).  Plaintiff did not receive any formal or written performance evaluations from Science Department Chairs Ellen Hinman, Linda McIntosh or William Pine, or Head of the Upper School Brian Bloomfield.  (Id. at 174: 10-17, 179: 20-24).

Response:      Admitted.

## 2017: Ms. Aliber Initiates Job Description Requirements

13.      In November 2017, shortly after she began working at the School, Ms. Aliber implemented a new job description mandate.  (Exh. A at 59: 3-17).[3]

Response:      Denied.  Ms. Aliber asked all employees to bullet point what they believed were their top 10 essential functions.  Ms. Aliber specifically testified that she did not expect employees to write their own job descriptions.  Id.

---

[3]      In late August 2018, Ms. Aliber implemented a new performance management appraisal system that included documenting each employee's responsibilities, performance expectations, and establishing a formalized process for performance evaluations.  (Exh. A at 37: 23-24, 38: 1-12).

14.     In 2017, as part of that initiative, Plaintiff testified that he drafted a job description for his position, as all School employees did.  (Pl. Dep., Exh. E at 325: 10-16, 326: 16-22).  According to the job description for his CCO Director position that Plaintiff drafted, Plaintiff was responsible for "managing the operations" of the CCO "to maximize its impact and effectiveness for student use," maintaining, operating, and upgrading the CCO's "university-level scientific equipment," maintaining and operating the School's "6.5-meter digital planetarium," "developing an annual budget for review and approval for operation and maintenance" of the CCO, hosting "weekly open houses" at the Clay Center (seasonal and subject to weather), and teaching astronomy at the Upper School.  (Exh. G).

Response:     Admitted in part.  Plaintiff admits that he authored the document known as Exh. G.  However, to the extent that Statement of Fact 14 seeks to confirm that these duties actually became Plaintiff's job description, Statement of Fact 14 is denied on the basis that, on the body of the document itself, it is labeled a draft and that, at the end of the document Plaintiff wrote, "I am still not sure what you want for the rest of this, but I think it's a good start?"  Further responding, it was still not in Plaintiff's job description to teach physics.  Id.

15.     As part of Plaintiff's job, Plaintiff acknowledged the following responsibilities:

- To perform quality work within deadlines;

- To interact professionally with other employees, including administrators;

- To communicate and coordinate work efforts with other employees including administrators; and

- To inform an administrator if a particular deadline could not be met.

(Pl. Dep., Exh. E at 328: 3-22).

Response:       Denied in part.  In February 2018 Plaintiff communicated to Ms. Aliber

that he has a cognitive disability commonly known as Autism Spectrum Disorder and as the

result of his disability are a "significantly reduced processing speed" and "his difficulty

interpreting social behaviors and reading social cues".  Exhs. H, I.

### Early 2018: Plaintiff Shares A 2014 Medical Evaluation In Response To Ms. Aliber's Performance Tracking Initiatives

16.     In early 2018, Ms. Aliber inquired about activities taking place at the CCO and

whether those activities aligned with the School's broader mission and goals.  (Exh. A at 64: 2-

24, 65: 1-8).

Response:       Admitted.

17.     On January 19, 2018, almost simultaneously with Ms. Aliber's review of the

CCO, Plaintiff provided Ms. Aliber with a letter from Dr. Pamela Friedman dated January 17,

2018.  (Exhs. H, I).  Dr. Friedman is a Board Certified Clinical Neuropsychologist.  (Exh. H).

Plaintiff specifically requested that Dr. Friedman draft the letter in 2018.  (Pl. Dep., Exh. D at

263: 17-24).

Response:       Denied in part. Admitted that on January 19, 2018 Plaintiff informed Ms.

Aliber of his diagnosis and cognitive challenges.  To the extent Statement of Fact seeks to

represent to this Court that Plaintiff's disclosure of his disability and cognitive challenges

was "almost simultaneously" with Ms. Aliber's review of the CCO, Statement of Fact 17

is denied, as Ms. Aliber only testified that her review "probably" began in "early 2018"

and Defendants' attempt to mistake the record and weave in conjecture violates the letter

of Rule 56.  Exh. A at 64: 2-24, 65: 1-8

18.     According to the letter, Dr. Friedman had evaluated Plaintiff three and one-half

years earlier, on August 5, 2014.  (Exh. H).  Dr. Friedman found that Plaintiff presented with "a

number of symptoms that are consistent with a mild autism spectrum disorder." (Id.) Dr.

Friedman also noted in 2014 that Plaintiff had "demonstrated remarkable compensatory

strategies" and that he was "extremely intelligent and committed to improving himself, both of

which have enabled him to compensate for his difficulties and function well in multiple roles."

(Id.)

> Response:      Admitted that Statement of Fact 18 accurately requotes portions of Dr.
>
> Friedman's letter.

19.     Dr. Friedman's 2014 letter did not recommend that Plaintiff seek

accommodations at the School, nor did Dr. Friedman suggest that Plaintiff should seek additional

time to complete his work. (Exh. H).

> Response:      Denied in part. Plaintiff admits that *the letter* did not specify a request for
>
> a reasonable accommodation but to the extent Statement of Fact 19 seeks to communicate
>
> that the letter, as submitted to Defendants, did not put them on notice of Plaintiff's
>
> disability and the duty to engage in the interactive process, Statement of Fact 19 is
>
> denied.

20.     Dr. Friedman's 2014 letter recommended that Plaintiff work with a clinician with

experience in autism spectrum disorders. (Exh. H). Plaintiff, however, admittedly did not seek

treatment from Dr. Friedman again following his 2014 evaluation, nor did Plaintiff see any other

health care provider for treatment after his 2014 evaluation, nor did Plaintiff follow Dr.

Friedman's 2014 recommendation that he work with a clinician. (Pl. Dep., Exh. D at 243: 1-4,

246: 5-23, 267: 12-17).

> Response:      Denied in part. Plaintiff's wife is an Applied Behavioral Technician and
>
> works not only with Plaintiff but their autistic son, Emmett, as well.

21.     Upon receiving the letter, Ms. Aliber requested a meeting with Plaintiff.  (Exh. I).
Having not heard from Plaintiff, Ms. Aliber emailed Plaintiff on February 5, 2018 to request that
they meet to discuss the letter.  (Id.)  Plaintiff responded via email, agreed to meet, and stated:

> I have no doubts about my ability to communicate or teach astronomy,
> and am confident that I do my job well!  I am not complaining but
> communicating to you so that you might understand my challenges,
> **all of which I have overcome**.

(Id.) (emphasis added).

Response:     Denied in part.  Plaintiff admits that portions of his email were accurately
transcribed.  To the extent Statement of Fact 21 seeks to communicate that Plaintiff had
permanently overcome his disability, Statement of Fact 21 is denied.  Exh. H.

22.     Plaintiff, faced with departmental oversight for the first time in almost 20 years,
advised Ms. Aliber that "I figured this was a good time to discuss [the letter] with you.  If I have
additional different duties this coming year I want to do them to the best of my abilities as
always – just need the time to learn how to do them."  (Exh. I).

Response:     Denied in part.  Statement of Fact 22 misstates the record, as Plaintiff
testified he reported to, over the years, Bob Phinney, Ellen Hinman, Linda McIntosh, William
Pine and Brian Bloomfield.  Pl. Dep., Exh. D at 155: 161-164. Furthermore, Plaintiff had weekly
meetings with Todd Vincent, Head of School. Exd. D at 163-164.  Plaintiff admits that Exh I is
accurately quoted in Statement of Fact 22.

23.     Previously, when asked to teach physics in or around 2016 (a course Plaintiff had
not previously taught), Plaintiff testified that he believed he had an "easy out" and could avoid
the assignment if he disclosed the results of Dr. Friedman's evaluation.  (Pl. Dep., Exh. D at 198:
6-24, 199: 1-8).  Plaintiff, however, chose not to disclose Dr. Friedman's evaluation at that time.
(Id. at 198: 9-10).

Response:      Denied in part.  Teaching physics was not, nor was it ever, a requirement

of Plaintiff's position.  Exh. Z.

24.      On February 14, 2018, Ms. Aliber met with Plaintiff to discuss Dr. Friedman's

evaluation.  (Pl. Dep., Exh. D at 269: 3-4).  Ms. Aliber asked Plaintiff if he needed any

accommodations to do his job, and Plaintiff told her that he did not need any accommodations.

(Id. at 275: 16-21).  Following his meeting with Ms. Aliber on February 14, 2018, Plaintiff never

again discussed with the School his alleged mild autism spectrum disorder, nor did he provide

the School with additional documentation about it.  (Id. at 261: 13-24).

Response:      Denied.  Plaintiff testified that he needed the accommodations of a dark,

quiet office without a roommate, a door that closes and extra time to complete

assignments, but that at his February 14, 2018 meeting with Ms. Aliber, the School was

actively providing him those accommodations.  Plaintiff testified, "I let [Ms. Aliber]

know all of the accommodations".  Exh D. at 276: 23-24.

25.      Plaintiff has testified that for almost twenty (20) years, he granted himself his own

accommodations which he believed allowed him to perform "exceptionally well" in his role as

CCO Director, even after Dr. Friedman's 2014 evaluation.  (Pl. Dep., Exh. D at 241: 10-12).

The School offered Plaintiff employment for the 2018-19 school year, four (4) months **after**

Plaintiff disclosed his alleged condition.  (Exh. F).

Response:      Denied.  The School offered Plaintiff employment on March 8, 2018, a

document that was pre-printed from years prior.  Exh. Z.  There is no record evidence

that Ms. Aliber communicated to Mr. Vincent that Plaintiff had disclosed his disability.

Further responding, Statement of Fact 25 blatantly misstates the record as **nowhere**

within his testimony did Plaintiff state that he "granted himself his own

accommodations" but rather he testified that he had accommodations in place within the School and they allowed him to do "exceptionally well".  Exh. D at 241-242.  Further responding, Plaintiff avvered at length his communications with Ellen Hinman, Plaintiff's direct supervisor and head of the Upper School about his reasonable accommodations, all of which has been ignored in Defendants' summary judgment papers.  Exh. AA, Response 8.

### Summer 2018: Plaintiff Fails To Ensure That The School's Flagship Telescope Is Ready For Returning Students For The Fall 2018 Semester

26.     On or about May 30, 2018, Plaintiff met with Ms. Aliber and Mr. Tucker to discuss Plaintiff's summer plans to prepare the CCO or the 2018-2019 school year.  (Pl. Dep., Exh. D at 288: 4-18).  It was Plaintiff's responsibility to ensure that the flagship telescope was properly maintained and in good order.  (Id. at 302: 12-15).

Response:     Admitted.

27.     On June 19, 2018, Plaintiff created a list of 36 items in the CCO that were "in need of maintenance, repair, or replacement before we welcome back students in the fall." (Exhs. J, K).

Response:     Denied.  Plaintiff testified, in part, "I just want to say, I never said: I am going to do every single one of these, or didn't intend to say that, because some of them, Like 1.1, was never meant to be used, which is the telescope replacement.  These are the areas of attention, things that needed attention."  Ex. D pg. 303:5 – pg. 305: 21.  Further responding, on the list itself, item 1.11 specifically says "defer GAM replacement until 2019" – specifically emphasizing that this list want not meant to be completed before the start of the 2018 academic year.  Exh. K.

28.     Plaintiff's list of items included various maintenance and repairs to the School's flagship telescope and the CCO's planetarium.  (Exh. K).

Response:     Admitted.

29.     Also on June 19, 2018, Plaintiff advised Mr. Tucker that the flagship telescope's "control system has possibly had its end of life event," but that Plaintiff was "pretty certain" he could "solve the problem, if only temporarily."  (Exh. J)

Response:     Denied.  At that time, Plaintiff also sent Mr. Tucker a quote for approximately $37,000 for a total repair that Plaintiff could not perform himself, should he not be able to repair the telescope.  Exh. K.  At that time, Mr. Tucker was fully aware that the telescope may need a much larger repair, and that, as of June 7, 2018 the parts could not be delivered for 6 months, although the Company would attempt to expedite the parts, if ordered.  Exh. K pg DXSF00234 (delivery within 6 months).

30.     During the summer, Plaintiff did not express any concerns about the flagship telescope or otherwise provide the School with any updates regarding his progress at the CCO; rather, Plaintiff waited until August 30, 2018, days before classes would begin, to inform the School of his failure to get the flagship telescope working again.  (Pl. Dep., Exh. E at 357: 24, 358: 1-6).

Response:     Denied.  Plaintiff communicated with Mr. Phinney, Mr. Moorehouse and Mr. Tucker and another individual about the telescope over the course of the summer. Exh. E, pg. 357:24 – pg. 365 l. 9.   Plaintiff also communicated with Mr. Tucker or Ms. Aliber over the summer except if he saw them in passing on campus, as there was no expectation on anyone's behalf that he would provide them updates. Exh. E, pg. 357-358. Further responding, Plaintiff did not have concerns that the telescope would be non-

operational until later in the summer when he completed his cleaning and repairs on the

telescope and, when he went to turn it on, discovered that it was not powering up. Exh. E,

pg. 357:24 – pg. 365 l. 9.  It is critical to understand that nobody, not even Plaintiff could

repair the telescope, which is why he obtained the quote.  Plaintiff could only operate and

maintain the telescope.  As described by Plaintiff, having the quote was "the band-aid

you hope not to use" that, in this case, ended up needing to be used. Ex. D pgs. 301: 19 –

pg. 303: 4.  Exh. II, paras. 1-9

31.     Specifically, on August 30, 2018, Plaintiff informed Head of School Todd

Vincent that the flagship telescope was not operational, that it would remain non-operational for

at least another three months, and that it would cost $37,000 to repair.  (Pl. Dep., Exh. E at 362:

11-17, 364: 7-24, 365: 1).

Response:     Denied. This was not "new news" to the School, as Defendants would

have Statement of Fact 31 reflect.  Plaintiff had provided the quote to Mr. Tucker in June

2018, which clearly indicated a six-month lead time but that Plaintiff would first try to fix

the issues himself, to which Mr. Tucker agreed.  Exhs J, K; Exh. E, pg. 357:24 – pg. 365

l. 9.  It is critical to understand that nobody, not even Plaintiff could repair the telescope,

which is why he obtained the quote.  Plaintiff could only operate and maintain the

telescope.  As described by Plaintiff, having the quote was "the band-aid you hope not to

use" that, in this case, ended up needing to be used. Ex. D pgs. 301: 19 – pg. 303: 4.

32.     Although Plaintiff himself knew that the telescope had suffered a possible "end of

life event" in June 2018, nonetheless, he did nothing to confirm whether or not the telescope was

operational until August 30, 2018, the last day of summer break, when he informed

administration for the first time that the telescope was not working.  (Pl. Dep., Exh. D at 306: 14-21).

        Response:      Denied. Exhs J, K; Exh. E, pg. 357:24 – pg. 365 l. 9; Ex. D pgs. 301: 19 – pg. 303: 4.

33.     Plaintiff admittedly did not complete several of the 36 job tasks that Plaintiff himself identified as needing to be done at the CCO before the start of the 2018-2019 school year.  (Pl. Dep., Exh. D at 303: 5-8).

        Response:      Denied.  Plaintiff testified, in part, "I just want to say, I never said: I am going to do every single one of these, or didn't intend to say that, because some of them, Like 1.1, was never meant to be used, which is the telescope replacement.  These are the areas of attention, things that needed attention." Ex. D pg. 303:5 – pg. 305: 21.  Further responding, on the list itself, item 1.11 specifically says "defer GAM replacement until 2019" – specifically emphasizing that this list want not meant to be completed before the start of the 2018 academic year.  Exh. K.

34.     Plaintiff has conceded that the School's flagship telescope was not operational at the start of the 2018-2019 school year.  (Pl. Dep., Exh. D at 306: 9-13).

        Response:      Admitted that the telescope was not operational at the start of the 2018-2019 school year.

35.     The planetarium was not fully repaired and ready for use at the start of the 2018-2019 school year.  (Exh. B at 57: 17-24, 58: 1-18).

        Response:      Denied.  Ex. D pg. 303:5 – pg. 305: 21.

36.     Because the CCO did not operate at full capacity, the School was unable to offer several academic experiences to its students.  (Exh. B at 56: 18-24, 57: 1-8).

Response:      Admitted.

## Summer 2018: Plaintiff Pursues Outside Ventures Rather Than
## Preparing The Observatory For The Fall Semester

37.      During the summer of 2018, Plaintiff has testified that he actively worked for his

own company, Celestial Computing, Inc., an astronomical high-resolution imaging company,

that Plaintiff founded in 1994 ("CCI").  (Pl. Dep., Exh. D at 77: 11-23, 88: 17-18).  Plaintiff

admittedly operated CCI while employed at the School and he continues to do so.  (Id. at 73: 4-8,

78: 17-24, 85:15-24, 86: 15-22, 87: 12-17).

Response:      Admitted.  Further responding, Dexter welcomed and monetarily

benefitted from Plaintiff's work with CCI.  Plaintiff used CCI satellite tracking

telescopes, equipment and software and incorporated them into various lessons at Dexter.

The work drew so much attention that MIT's Lincoln Lab paid Dexter (and not Plaintiff)

$91,000 in exchange for Plaintiff giving two lectures to MIT.  Exh D. pg. 87:7—pg.88:

18.  Defendants should not be rewarded for misrepresenting the fact that it knew *and*

*profited* from CCI.  Further responding, in the Clay Center Observatory hangs pictures of

pictures CCI took including pictures with Dexter students and Richard Branson and the

Virgin Galactic Spaceship which brought additional public relations buzz and prestige to

Dexter.  Exh. BB.  Further responding, the School has known, at least since 2012 of

Plaintiff's work for NASA, given that it filled out and signed a "Investigative Request

For Employment" from the U.S. government so that Plaintiff could perform said work.

Exh.  HH.

38.     In July 2018, while the School's flagship telescope lay in pieces, Plaintiff testified

that he spent at least eight days on two trips for CCI, admittedly working 10-12 hours per day.

(Pl. Aff.[4], Exh. L, p. 1).

> Response:     Denied.  There is absolutely no record evidence that the telescope "lay in
>
> pieces" which violates the letter of Rule 56.  Defendant is extrapolating, making a fine
>
> effort to weave fiction into reality and should not be rewarded.  Plaintiff admits that he
>
> took two trips, totaling eight days, in July, and one-quarter of them fell on weekdays.
>
> Further responding, Plaintiff always worked his full time schedule for Dexter.   Exh D.
>
> pg. 87:7-11.  Further responding, Plaintiff had a flexible schedule, which is literally
>
> written into his contracts permitted him to travel, particularly in the summer when he had
>
> no teaching requirements. Exh. Z.

39.     In August 2018, Plaintiff testified that he spent at least five days on trips to Texas

and California to generate business and/or complete work for CCI.  (Pl. Aff., Exh. L, p. 2.)

During Plaintiff's trip to California, Plaintiff worked "approximately 10-12 hours per day."  (Id.)

> Response:     Plaintiff admits that he took two trips, totaling five days, in August, and
>
> two of the five days fell on weekdays.  Further responding, Plaintiff always worked his
>
> full time schedule for Dexter.   Exh D. pg. 87:7-11.  Further responding, Plaintiff had a
>
> flexible schedule, which is literally written into his contracts permitted him to travel,
>
> particularly in the summer when he had no teaching requirements. Exh. Z.

40.     On August 31, 2018, one day after notifying the School that the flagship telescope

was non-operational, Plaintiff registered CCI to do business in the state of Colorado.  (Exh. M).

---

[4]      "Pl. Aff." refers to Plaintiff's affidavit dated September 28, 2021.

Response:        Denied.  Again, Defendants blatantly misstate the record.  Plaintiff

testified, which has not been provided by Defendants, that a third party contractor,

Richard von Reisen, filled out and submitted the paperwork marked as Exhibit M.  Exh.

E, pg. 557:3-12. ***Plaintiff did not register any paperwork and the record is crystal clear***

***on this issue.***

41.        In May or June, 2018, Plaintiff and his wife offered to purchase a new home in

Chestnut Hill, Massachusetts, for more than $900,000.  (Pl. Dep. Exh. D at 21: 22-24, 22: 1-16,

Pl. Dep. Exh. E at 352: 9-15).  They closed on the purchase in August 2018.  (Pl. Dep. Exh. D at

21: 22-24, 22: 1-16).

Response:        Immaterial and irrelevant.  To the extent Statement of Fact 41 requires a

response, admitted.

### On The Same Day Plaintiff Delivers The News That The Flagship Telescope Is Non-Operational, Plaintiff Requests A Leave Of Absence

42.        On August 30, 2018, the same day Plaintiff advised Head of School Todd Vincent

that the flagship telescope was non-operational, Plaintiff requested an immediate leave of

absence to care for his son.  (Pl. Dep., Exh. E at 358: 19-24, 359: 1-24, 360: 1-13).  Plaintiff

testified that, in general, Plaintiff did not discuss his son, or his son's medical condition, with

employees at the School.  (Pl. Dep., Exh. D at 223: 5-24, 224: 1-24, 225: 1-11).  Plaintiff

testified that he does not recall anyone ever saying anything disparaging or negative about his

son or his condition.  (Id. at 223: 20-24, 224: 1).

Response:        Denied. Plaintiff did not express to Mr. Vincent an immediate need for

medical leave.  Further, Plaintiff did discuss his family and his personal needs with Mr.

Vincent as he had known Mr. Vincent for many years and Mr. Vincent knew his family

member.  Exh. E, pg. 357:24 – pg. 365 l. 9.

43.     Mr. Tucker did not discipline Plaintiff on August 30th, when Plaintiff advised the

School for the first time that the flagship telescope was non-operational.  (Exh. B at 69: 10-12).

Mr. Tucker's focus was on supporting Plaintiff's need to take leave.  (Exh. A at 135: 13-15).

Mr. Tucker had to ensure that academic programming was in place.  (Id. at 135: 7-10).

> Response:     Denied in part. Plaintiff informed the School that the telescope may have
>
> significant issues in June 2018 and that a third party to come fix it could take up to six-
>
> months.  Exhs J, K; Exh. E, pg. 357:24 – pg. 365 l. 9; Ex. D pgs. 301: 19 – pg. 303: 4.
>
> Further responding, the fact that the telescope was broken did not warrant discipline.

44.     Mr. Vincent advised Ms. Aliber that Plaintiff needed a leave of absence.  (Exh. A

at 50: 13-16).  Ms. Aliber called Plaintiff immediately and advised him that depending on the

reasons for his leave he could either take personal leave pursuant to the Family and Medical

Leave Act ("FMLA"), or he could take leave pursuant to the School's personal leave of absence

policy.  (Pl. Dep., Exh. E at 366: 12-24, 367: 14-17).

> Response:     Admitted.

45.     After speaking with Ms. Aliber, Plaintiff researched his leave options with his

wife.  (Pl. Dep., Exh. E at 373: 15-20).  Shortly thereafter, Ms. Aliber provided Plaintiff with the

applicable FMLA forms, and requested that he clarify his intent to take leave.  (Id. at 411: 16-24,

412: 1-18; Exh. N).

> Response:     Denied.  Ms. Aliber did not provide Plaintiff with FMLA paperwork until
>
> 12 days after learning of his need to leave.  Exh.  KK.

46.     Plaintiff did not clarify his request until September 14, 2018, when he emailed

Mr. Vincent and Ms. Aliber that he had retained counsel and, in bold text, stated: **"I need to take

FMLA leave to care for my son, beginning on or before October 1, preferably from my**

**perspective as soon as possible, and continuing for 12 weeks thereafter."** (Pl. Dep., Exh. E at 395: 16-24, 396: 1-5; Exh. O) (emphasis in original).

> Response:    Denied.  Pl. Dep., Exh. E at 358: 19-24, 359: 1-24, 360: 1-13.

47.    The School granted Plaintiff a personal leave of absence effective that day, September 14, 2018, and Ms. Aliber provided Plaintiff with instructions on how to convert his personal leave to FMLA leave, which Plaintiff ultimately did.  (Pl. Dep., Exh. E at 411: 16-24, 412: 1-18).

> Response:    Denied.  Plaintiff had a 9 a.m. appointment to discuss his schedule for
>
> leave, which Ms. Aliber unilaterally cancelled, placing Plaintiff on leave effective
>
> immediately and cutting off his ability to complete his tasks.  Exh. KK.

48.    While on FMLA leave, from September 14, 2018 to December 13, 2018, Plaintiff testified that he took at least four business trips (for a total of more than two weeks) to Virginia and various locations in California to generate business for and/or to complete work for CCI. (Pl. Aff., Exh. L, pp. 2-3).  During his three trips to California, Plaintiff admittedly worked "10-12 hours a day" for CCI.  (Id.)

> Response:    Admitted.  Further responding, while on FMLA leave the School also
>
> knew, and required, Plaintiff to perform work for it as well, which he did.  Tucker Dep.
>
> Ex. B at pg. 75 l. 2-10.  Exh. CC.  Further responding, Plaintiff's work for CCI at this
>
> time could not have been a factor for Plaintiff's termination as it was not privy to this
>
> information until September 28, 2021 – years after his termination.  Exh. L.

49.    While on leave, Plaintiff testified that his activities included "a mixture of family things and house things," including unpacking boxes from his family's recent move into a new home, and "sleeping."  (Pl. Dep., Exh. E at 418: 21-24, 419: 1-15, 420: 22-23).  His son attended

school five days per week.  (Id. at 420: 2-23).  Plaintiff has stated that he "enjoyed not having to get up and put on a tie and go to work."  (Id. at 419: 20-21).

> Response:   Admitted.  Further responding, Plaintiff's work for CCI at this time could not have been a factor for Plaintiff's termination as it was not privy to this information until September 28, 2021 – years after his termination.  Exh. L.

50.   Plaintiff returned home from one of his trips to California on behalf of CCI on December 13, 2018, one day before he was scheduled to return to work at the School.  (Pl. Aff., Exh L, p. 3).

> Response:   Admitted.  Further responding, Plaintiff's work for CCI at this time could not have been a factor for Plaintiff's termination as it was not privy to this information until September 28, 2021 – years after his termination.  Exh. L.

51.   CCI reported $595,518 in gross income for 2018.  (Exh. P).

> Response:   Denied in part.  To the extent Statement of Fact 51 seeks to communicate that Plaintiff, and not CCI, earned a gross income of $595,518 Statement of Fact 51 is denied.  Exh. DD.

**<u>The School's Efforts To Cover Plaintiff's Duties In Fall 2018</u>**

52.   After learning about Plaintiff's need for a leave of absence, Mr. Vincent advised Mr. Tucker that the School should prepare to cover Plaintiff's responsibilities for the Fall 2018 semester, which was scheduled to begin Tuesday, September 4, 2018.  (Exh. B at 50: 3-14).

> Response:   Admitted.

53.   Plaintiff was the only employee at the School who knew how to do complicated maintenance and repairs on the CCO's flagship telescope.  (Pl. Dep., Exh. D at 302: 12-23, Pl.

Dep., Exh. E at 417: 10-24).  In Plaintiff's absence, no employee at the School could do that work on the telescope.  (Pl. Dep., Exh. E at 417: 10-24)

> Response:      Denied.  Plaintiff testified that there was nobody on campus who could "fix" the telescope but that he could clean and maintain the telescope.  Ex. D pgs. 301: 19 – pg. 303: 4.

54.      Ultimately, current School employees taught Plaintiff's Fall 2018 astronomy course until the School temporarily hired a former faculty member, Mr. Kelly Beatty, to teach the course for the semester.  (Pl. Dep., Exh. E at 415: 24, 416: 1-5; Exh. A at 33: 3-24, 34: 1-20, 36: 1-13, 96: 19-22, 111: 3-14).  Mr. Beatty agreed to teach astronomy for the rest of the Fall 2018 semester or until the School could find someone else to cover the class, whichever came sooner.  (Exh. A at 34: 8-20).

> Response:      Denied.  The School advertised and intended to hire a full time employee to teach astronomy and literally wrote into its job posting that the duties of the position was to "Direct the operations and maintain the School's state-of-the-art observatory for in-school and extracurricular programming." Exh EE.

55.      In October 2018, the School publicly posted an ad for an "astronomy teacher," seeking candidates who could provide additional coverage for the operations of the CCO and teach astronomy.  (Exh. A at 98: 6-14).

> Response:      Denied.   The posting again reads that the duties of the position was to "Direct the operations and maintain the School's state-of-the-art observatory for in-school and extracurricular programming." Exh. EE.

56.      In November 2018, Clay Center Director Robert Phinney left the School.  (Pl. Dep., Exh. E at 415: 14-20; Exh. A at 34: 2-7).  Robert Phinney was one of the only other School

employees with some working knowledge of how to operate or do basic maintenance on the flagship telescope, and he was one of the few faculty members who, like Plaintiff, taught astronomy and physics.  (Pl. Dep., Exh. E at 417: 10-24; Exh. B at 26: 6-20.)

>   Response:       Denied.  Mr. Phinney never taught astronomy or physics, he taught Latin and Health and did after-school programs within the Clay Center and the Clay Center Observatory.  Exh II, para. 10.

57.     The astronomy teacher job posting yielded a qualified candidate, Dr. Felipe Santos, who joined the School's faculty in January 2019.  (Exh. A at 98: 6-14).  Dr. Santos replaced Mr. Phinney; the School did not hire Dr. Santos to replace Plaintiff.  (Id. at 97: 1-2; 99: 5-14).

>   Response:       Denied.  In November 2018, while Plaintiff was on medical leave, the School recruited his replacement.  Dr. Santos did not join as "faculty" in January 2019 – he joined as Director of the Clay Center Observatory, replacing Plaintiff.  The School advertises on its website that Dr. Santos joined the School as its Director of the Clay Center Observatory in January 2019.  Exh. FF.  Mr. Phinney never taught astronomy or physics, he taught Latin and Health and did after-school programs within the Clay Center and the Clay Center Observatory.  Exh. II, para. 10.

58.     In September 2018, the School arranged for a third-party telescope manufacturer to repair the flagship telescope while Plaintiff was on leave.  (Exh. B at 80: 11-24).  The repairs were completed in early December 2018.  (Id.)

>   Response:       Denied.  From September 2018 and in the following months, while Plaintiff was on FMLA leave, *Plaintiff* (and other School faculty and employees)

coordinated with the third-party to repair the telescope, with the School's knowledge. Exh. CC.

**Plaintiff Returned To Work For One Day And Then
Expected To Take Off The Remainder Of The Year**

59.     Upon Plaintiff's request for leave, Ms. Aliber stated that the School's focus "shifted to supporting Mr. Dantowitz in his request for a leave," and only later did the School seek to "resume conversations around" performance when Plaintiff returned.  (Exh. A at 135: 13-22).  Thus, Ms. Aliber and Mr. Tucker did not address Plaintiff's failure to have the flagship telescope operational until after he returned from leave.  (Id. at 136: 3-15; Exh. B at 69: 2-12).

Response:     Denied.  Plaintiff was tasked with working to coordinate the telescope's manufacturer to fix the telescope while on leave, and Ms. Aliber and others were aware that Plaintiff was working to fix the telescope while on FMLA leave and did nothing. Tucker Dep. Exh. B at pg. 75: 2-10.   Exh. CC.

60.     On November 20, 2018, Plaintiff confirmed that his first day back at the School would be December 14, 2018.  (Exh. Q).  On December 13, 2018, Plaintiff emailed Ms. Aliber and requested, "in connection with [his] disability," to record his initial meeting with Ms. Aliber and Mr. Tucker the next day on December 14, 2018, or in the alternative, to bring another faculty member to the meeting with him to take notes.  (Id.)

Response:     Admitted.  Exh. Q.

61.     Ms. Aliber responded that she did not understand Plaintiff to have a disability or to have requested an accommodation previously, but that she would be happy to talk about accommodations if Plaintiff wanted to request one.  (Exh. Q).  Ms. Aliber further stated that she and Mr. Tucker would not agree to the meeting being recorded or another faculty member being present, but that Plaintiff could take breaks during the meeting as needed to take notes.  (Id.)

Response:       Denied.  Ms. Aliber could not reasonably "not understand Plaintiff to have

a disability or to have requested an accommodation previously" as the Plaintiff submitted

a doctor's note outlining his disability, which the two then discussed.  Exh. D at 241-242,

Exh. H, I.

62.      In her December 13, 2018 email to Plaintiff, Ms. Aliber summarized Plaintiff's

job expectations upon his return to work, and offered to discuss the expectations at the meeting

planned for the following day.  (Exh. Q).  Plaintiff stated that he had "no problem" completing

the tasks that Ms. Aliber had summarized for him.  (Pl. Dep., Exh. E at 447: 3-4).

Response:       Admitted.

63.      Plaintiff returned to work on Friday, December 14, 2018, and met with Ms. Aliber

and Mr. Tucker that day as planned.  (Pl. Dep., Exh. E at 443: 20-24).  Plaintiff did not request

any breaks or take any notes during the meeting.  (Id. at 453: 2-7).

Response:       Admitted in part.  Due to his disability, as an accommodation Plaintiff

asked to record the meeting or have a third-party notetaker, which Ms. Aliber denied.

Exh. Q.

64.      In the meeting, Plaintiff objected to working during the School's winter break.

(Pl. Dep., Exh. E at 446: 21-24, 447: 1-18).

Response:       Denied.  Plaintiff had never been expected to work during the School's

winter break in his 20 year tenure, but ultimately did work over the break in order to

complete tasks the School had given him to complete in only 2 weeks, by January 2nd.

Exh. E, pg. 444:13 – pg. 447:24.  Plaintiff specifically testified that he was not

complaining about the idea he work over the winter break, he was just surprised it was

being required of him.  Id. at 455:2-5.

65.     Plaintiff, however, specifically admitted that he was a year-round employee:

> I worked through the summers and did astronomy and – yeah.
> I never took vacations.  I was always there.

(Pl. Dep., Exh. D at 286: 2-4).

Response:     Denied.  Plaintiff testified that he, and the entire faculty never work over the School's winter break.  Further responding, Plaintiff's contract specifies that he is not in school when the students are not in school, subject to the employee handbook. The language specifically reads, "As a year-round administrative faculty member of the School, you will receive paid time off when the students are not in Schhol as described in the School's Employee Handbook."  Exh. E, pg. 444:13 – pg. 447:24; Exh. R.  Exh. Z, 2014 Offer Letter.

66.     Ms. Aliber emailed Plaintiff on December 19, 2018 to provide additional information about making vacation requests and requesting disability accommodations, among other topics, and she directed Plaintiff to the relevant policies in the School's employee handbook.  (Exh. R).

Response:     Denied.  Plaintiff testified that he, and the entire faculty never work over the School's winter break.  Further responding, Plaintiff's contract specifies that he is not in school when the students are not in school, subject to the employee handbook. The language reads, "As a year-round administrative faculty member of the School, you will receive paid time off when the students are not in Schhol as described in the School's Employee Handbook."  Exh. E, pg. 444:13 – pg. 447:24; Exh. R.  Exh. Z, 2014 Offer Letter.

67.     Plaintiff admittedly did not look at the policies in the employee handbook, he admittedly did not request to take any vacation in December 2018, and he admittedly did not request any accommodations.  (Pl. Dep., Exh. E at 447: 19-21, 455: 20-24, 460: 2-24, 469: 1-3).

Response:       Denied.  Plaintiff understood that his accommodations were all still in

place based off of his February 2018 conversation with Ms. Aliber about same. Exh. E

pg. 457: 23 – pg. 458: 5.

68.     Plaintiff testified that he "worked some" during the 2018 winter break, and he did

not complete on time the tasks assigned to him in December 2018.  (Pl. Dep., Exh. E at 445: 18-

23; Exh. S).

Response:       Denied.  The tasks assigned to him in December 2018 could not all

specifically be completed by January 2, 2019, such as: "teach one second semester

astronomy course" and, "serve as primary point of contact and host for external group

visits" and, "prepare and manageCCL5 and Observatory for after-school programming",

among others.  Ehxs. Q,  S.

### **Plaintiff's Counseling Meetings**

### January 2, 2019 Meeting

69.     Plaintiff met with Ms. Aliber and Mr. Tucker on January 2, 2019 to discuss his

job expectations and the tasks that needed to be completed promptly.  (Pl. Dep., Exh. E at 473:

10-24, 474: 1-24, 475: 1-3; Exh. S).  Ms. Aliber took notes during the meeting.  (Pl. Dep., Exh. E

at 475: 4-7).

Response:       Admitted.

70.     Plaintiff asked if he was expected to commence Open Telescope Nights that

month, and Mr. Tucker responded that he was, as the School had communicated to Plaintiff in

Ms. Aliber's December 13, 2018 email setting forth Plaintiff's job expectations.  (Exh. Q; Exh.

S).  Mr. Tucker then reminded Plaintiff that he might also receive job-related requests over the

phone and through voicemail messages, ***and Plaintiff responded that he had not checked his voicemail messages since 2017***.  (Exh. S).

> Response:      Denied.  Exhibit S is a self-serving, unauthenticated document that Plaintiff was not asked to testify about at his deposition.  Further responding, Plaintiff's voicemails also came through his email, which is how he listened to all of his voicemails. Plaintiff did not miss any voicemails.  Exh. II, para. 11.

71.      When asked about the requirement that he provide a step-by-step operations manual to guide users on the location and use of specialized equipment in the CCO by January 2, 2019, ***Plaintiff stated that he did not have it and said "I will get to it when I can."***  (Exh. S). After being reminded that it was due that day, January 2nd, Plaintiff asked "why is this critical?" (Id.)  Ms. Aliber asked Plaintiff to suggest a realistic completion date for this task, and he silently stared at her.  (Id.)  Ms. Aliber then offered to extend the due date, to which ***Plaintiff responded by requesting that Ms. Aliber email him all job expectations.***  (Id.)  Plaintiff said, "if you tell me things, I may forget."  (Id.)  Ms. Aliber then reminded Plaintiff that she had already emailed him his job expectations.  (Id.)  ***Plaintiff stated that he does not always read his emails.***  (Id.)

> Response:      Denied. Exhibit S is a self-serving, unauthenticated document that Plaintiff was not asked to testify about at his deposition.  Further responding, Plaintiff did not engage in the behavior as cited in Statement of Fact 71.  Exh. II, para. 12.

72.      Mr. Tucker informed Plaintiff that his ongoing failure to complete his job expectations, including those identified by Plaintiff himself in June 2018, and those identified by the School in December 2018, suggested a refusal to do his job.  (Exh. S).

> Response:      Denied. Exhibit S is a self-serving, unauthenticated document that Plaintiff was not asked to testify about at his deposition.  Further responding, the items

set for in Exhibits Q and S could not all have been completed by a date in January as they were semester long requirements.  Exh. Q, S.

73.     Ms. Aliber and Mr. Tucker did not talk about Plaintiff's son or autism at the January 2nd meeting.  (P. Dep., Exh. E at 477: 22-24, 478: 1-18).

Response:     Admitted.

<u>January 10, 2019 Meeting</u>

74.     Plaintiff next met with Ms. Aliber and Mr. Tucker on January 10, 2019 in Ms. Aliber's office.  (Pl. Dep., Exh. E at 481: 9-24, 482: 1-7).  Ms. Aliber took notes during the meeting.  (<u>Id.</u> at 482: 22-24, 483: 1-5).

Response:     Admitted.

75.     When asked if he was ready to resume teaching astronomy (which was scheduled to begin in four days, on January 14, 2019), ***Plaintiff stated that he had not focused on teaching, and Plaintiff asked if teaching was still one of his job expectations.***  (Exh. T).

Response:     Denied. Exhibit T is a self-serving, unauthenticated document that Plaintiff was not asked to testify about at his deposition.  Further responding, Plaintiff was aware that teaching astronomy was a requirement for his position, as listed in his yearly job descriptions.  Exh. Z.  Further responding, Plaintiff did not engage in the behavior as cited in Statement of Fact 75.  Exh. II, para. 12.

76.     Plaintiff asked for clarification on the dates of his employee self-appraisal through the new Trakstar system, and Ms. Aliber reminded him that the information had already been emailed to him.  (Exh. T).  ***Plaintiff responded that he did not always read his emails, especially when he thought they were "too long."***  (<u>Id.</u>)

-27-

Response:      Denied. Exhibit T is a self-serving, unauthenticated document that

Plaintiff was not asked to testify about at his deposition.  Further responding, Plaintiff did

not engage in the behavior as cited in Statement of Fact 76.  Exh. II, para. 12.

77.      At the conclusion of the meeting, Plaintiff refused to leave Ms. Aliber's office

after Mr. Tucker left.  (Exh. T).  Mr. Tucker, upon observing that Plaintiff was still in Ms.

Aliber's office, returned to the room, at which point Plaintiff finally stood up and left.  (Id.)

Response:      Denied. Exhibit T is a self-serving, unauthenticated document that

Plaintiff was not asked to testify about at his deposition.

78.      Plaintiff has admitted that Ms. Aliber and Mr. Tucker did not talk about Plaintiff's

son or autism at the January 10th meeting.  (Pl. Dep., Exh. E at 489: 12-19).

Response:      Admitted.

<u>January 18, 2019 Meeting</u>

79.      On January 15, 2019, in advance of their next meeting, Plaintiff provided Mr.

Tucker and Ms. Aliber with a written status update.  (Exh. U).  In that update, Plaintiff admitted

that he had not completed several assigned tasks, and that others had been completed after the

assigned due date.  (Pl. Dep., Exh. E at 506: 6-24, 519: 1-18).  Plaintiff did not request additional

time to complete those tasks.  (Id. at 513: 18-22, 515: 11-21, 517: 19-24, 518: 1-8).

Response:      Denied.  Plaintiff admitted that two out of 16 tasks were not complete but

were assignments that were ongoing and required regular updates.  Exh. U.

80.      Plaintiff then met with Ms. Aliber and Mr. Tucker as scheduled on January 18,

2019 to review his assigned tasks and work progress.  (Pl. Dep., Exh. E at 494: 13-24, 495: 1-9).

Ms. Aliber took notes at this meeting.  (Id. at 495: 11-23).

Response:      Admitted.

81.     After Mr. Tucker identified several areas where Plaintiff failed to complete a task by a set due date, *Plaintiff repeatedly asked "how late is late?" and refused to answer questions directly.*  (Pl. Dep., Exh. E at 497: 2-5, 498: 17-24).

> Response:     Denied.  Plaintiff testified: "We went through every point.  I brought my 38-point list, which I had also provided ahead of time.  And I was really looking forward to it because I had been trying forever it seemed to communicate to them all the work that I had done and get threir response on it.  And on every one of those 38 points, most of them it seems like they were giving me failure marks.  And at the same time, I thought they were done with excellence.  Exh. JJ at pg. 496: 6-19.  *See also* pg. 496: 6 – pg. 498 l. 24.

82.     *Plaintiff repeatedly asked for clarification of basic job responsibilities that a director-level employee was expected to understand.*  (Exh. V; Pl. Dep., Exh. E at 499: 13-16). For example, *Plaintiff asked repeatedly if he should open the flagship telescope and/or hold Open Telescope Nights during inclement weather.*  (Exh. V; Pl. Dep., Exh. E at 499: 13-16). *When advised that such a decision would be at the discretion of the CCO Director, i.e., Plaintiff, Plaintiff demanded a "yes or no" answer and asked "or would that be considered poor performance?"*  (Exh. V; Pl. Dep., Exh. E at 501: 2-6).

> Response:     Denied. Statement of Fact 82 mischaracterizes Plaintiff's testimony. Plaintiff testified: So it was really disturbing when Mr. Tucker and Carmen [Aliber] both insisted that I was claiming that I didn't know whether I should open it up if its raining.  I remember Carmen saying, this makes is sound like you're not qualified to run the observatory if you have to ask questions like this.  And I remember saying that I was talking about the fifth floor, not the dome.  And Mr. Tucker said, no, you were talking

about the observatory…I know when to open a dome.  I know when to close a dome.  So

it's bizarre.  Exh. JJ at 502: 9 –503: 2.  *See also* Exh. II. pgs.  499:9 – 503:2.

83.     Following his meeting with Ms. Aliber and Mr. Tucker on January 18, 2019,

which Plaintiff claims he "didn't mean to make unpleasant," but admittedly did, he was

"concerned that [he] would not have access to his [e]mail," and so he watched a "YouTube

video" about how to copy his email account onto a thumb drive.  (Pl. Dep., Exh. D at 52: 9-24,

53: 1-24, 54: 1-6).  Plaintiff thus transferred all of his work-related emails onto a personal thumb

drive, and he placed a password on the file which he later allegedly forgot.  (Id. at 53: 18-21).

Response:     Admitted.

### On The Basis Of Poor Performance And Insubordination, The School Terminated Plaintiff's Employment

84.     In the course of his discussions with Ms. Aliber and Mr. Tucker, Ms. Aliber noted

that Plaintiff "demonstrated extremely unprofessional behavior.  He was insubordinate, and [the

School] made the determination that his employee conduct did not align with the expectations of

the School."  (Exh. A at 153: 3-9; Pl. Dep., Exh. D at 74: 5-7).

Response:     Denied.  Plaintiff was fired due to his disability, his's son's disability and

for taking medical leave.  Exh. GG.  Plaintiff's replacement had already been hired prior

to Plaintiff's return, making it impossible for Plaintiff to have been terminated for any

action upon his return.  Exhs. EE, FF.

85.     In light of Plaintiff's performance failures and his unprofessional and

insubordinate behavior, Ms. Aliber and Mr. Tucker recommended to Head of School, Mr.

Vincent, that Plaintiff's employment be terminated.  (Exh. A at 153: 3-13; Exh. B at 88: 2-22).

Response:     Denied.  Plaintiff was fired due to his disability, his's son's disability and

for taking medical leave.  Exh. GG. Plaintiff's replacement had already been hired prior

to Plaintiff's return, making it impossible for Plaintiff to have been terminated for any

action upon his return.  Exhs. EE, FF.  Finally, Plaintiff did not have "performance

failures". Ex. D pg. 303:5 – pg. 305: 21.

86.     The School terminated Plaintiff's employment on January 22, 2019.  (Pl. Dep.,

Exh. E at 536: 4-20).

Response:     Admitted.

87.     Mr. Tucker explained that the School terminated Plaintiff's employment for

"[n]ot completing work that was both expected of him and to which he committed [to perform]

on time and completely, and not communicating about the status of the projects he was working

on." (Exh. B at 89: 2-9).  According to Mr. Tucker, Plaintiff "objected to [the School] asking

about his performance.  And he was distracting and unprofessional, and obfuscating, and

redirecting the conversation away from his responsibilities and accountability.  He was

condescending and dismissive. … [H]e was combative in his manner of discussing his

performance." (Id. at 96: 22-24, 97: 1-10).

Response:     Denied.  Plaintiff was fired due to his disability, his's son's disability and

for taking medical leave.  Exh. GG. Plaintiff's replacement had already been hired prior

to Plaintiff's return, making it impossible for Plaintiff to have been terminated for any

action upon his return.  Exhs. EE, FF.  Finally, Plaintiff did not have "performance

failures". Ex. D pg. 303:5 – pg. 305: 21.

88.     Ms. Aliber confirmed that the School terminated Plaintiff's employment "due to

poor performance, his failure to complete the essential functions of his job, and … for

insubordination and unprofessional behavior." (Exh. A at 162: 11-16).

Response:      Denied.  Plaintiff was fired due to his disability, his's son's disability and

for taking medical leave.  Exh. GG.  Plaintiff's replacement had already been hired prior

to Plaintiff's return, making it impossible for Plaintiff to have been terminated for any

action upon his return.  Exhs. EE, FF.  Finally, Plaintiff did not have "performance

failures". Ex. D pg. 303:5 – pg. 305: 21.

### CCI Has Reported Gross Income Of Nearly $3,000,000 Since His Termination

89.      Plaintiff has testified that he never applied for a single job following his

termination.  (Pl. Dep., Exh. D at 72: 24, 73: 1-3).

Response:      Admitted.

90.      Plaintiff has stated that he applied for and was deemed eligible for unemployment

benefits, but he declined to collect them.  (Pl. Dep., Exh. D at 73: 20-24, 74: 1-24, 75: 1-14).

Response:      Admitted.

91.      Rather, since January 2019, Plaintiff admittedly has continued "really working

hard" on his own company, CCI.  (Pl. Dep., Exh. D at 93: 19-21).

Response:      Admitted.

92.      Plaintiff has testified that in March 2019, CCI sold a telescope mount for

$1,050,000.  (Pl. Dep., Exh. D at 76: 2-4).

Response:      Denied in part.  To the extent Statement of Fact 92 seeks to communicate

that Plaintiff, and not CCI, profited $1,050,000 for the sale of its equipment, Statement of

Fact 92 is denied.  Exh. DD.

93.      CCI reported $991,707.00 in gross income for 2019.  (Exh. W).  Plaintiff reported

$694,637 in adjusted gross income on his individual 2019 federal tax return, which included

proceeds from the company's sale of the telescope mount.  (Pl. Dep., Exh. D at 98: 20-24, 99: 1-

21).  This amount constitutes more than six times Plaintiff's annual salary at the School at the time of his termination in January 2019 ($106,500).  (Id. at 99: 18-21).

      Response:     Denied.  Exh. DD.

94.      In 2020, among other work, Plaintiff testified that CCI completed and received payment for work on behalf of the National Aeronautics and Space Administration ("NASA"), including a project that required Plaintiff to travel to Australia for two weeks in December 2020. (Pl. Dep., Exh. E at 557: 24, 558: 1-24, 559: 1-6).

      Response:     Admitted.

95.      CCI reported $1,781.966 in gross income on its 2020 federal tax return.  (Exh. X).

      Response:     Denied in part.  To the extent Statement of Fact 94 seeks to communicate that Plaintiff, and not CCI, profited $1,781,966 for the sale of its equipment and services, Statement of Fact 94 is denied.  Exh. DD.

96.      CCI applied for and received a PPP loan in 2020 in the amount of approximately $49,000.  (Pl. Dep., Exh. D at 97: 12-16, 98: 1-19).  Plaintiff stated that he intends to seek forgiveness of the PPP loan.  (Id.)  CCI reported five jobs on its PPP loan application.  (Exh. Y)

      Response:     Admitted.

97.      As of April 2021, Plaintiff testified that he paid two CCI employees collectively approximately $120,000 per year.  (Pl. Dep., Exh. E at 553: 19-24, 554: 1-12).

      Response:     Denied.  CCI paid two employees, not Plaintiff.  Exh. DD.

Dated: January 21, 2022

For Plaintiff,

_/s/ Suzanne L. Herold_____
Suzanne L. Herold (BBO# 675808)
Herold Law Group, P.C.
50 Terminal Street
Building 2, Suite 716
Charlestown, MA 02129
(617) 944-1325 (t)
(617) 398-2730 (f)
suzie@heroldlawgroup.com

<u>CERTIFICATE OF SERVICE</u>

I, Suzanne L. Herold, hereby certify that this document was served upon Defendants' counsel via electronic filing on January 21, 2022.

/s/ Suzanne L. Herold

_____

Suzanne L. Herold