IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
RONALD F. DANTOWITZ,                    )
                                        )
                 Plaintiff,             )
v.                                      )
                                        )        CIVIL ACTION NO. 20-CV-10540-AK
DEXTER SOUTHFIELD, INC.,                )
CARMEN ALIBER, and                      )
STEWART TUCKER,                         )
                                        )
                 Defendants.            )
_____)

## JOINT PRE-TRIAL MEMORANDUM

The parties submit this Joint Pretrial Memorandum in compliance with this Court's Second Amended Order Setting Civil Jury Trial Section III. A. (Doc. 103) and Local Rule 16.5(d).

### i.      Anticipated Length of Trial

9-10 days (half days).

### ii.     Case Summary for Jury

Plaintiff Ronald Dantowitz worked for Defendant Dexter Southfield School as the Director of its Observatory and a member of the faculty from the fall of 2000 until January 22, 2019, when Dexter Southfield terminated his employment.

Mr. Dantowitz claims that Dexter Southfield retaliated against him for taking leave under the Family and Medical Leave Act ("FMLA") in the fall of 2018 to care for his disabled child and interfered with his FMLA rights. Mr. Dantowitz also claims that the School discriminated against him because of his son's disability. Mr. Dantowitz further claims that the School discriminated against him because he has a mild autism spectrum disorder.

The School contends that it terminated Mr. Dantowitz's employment following a pattern of poor performance and insubordination. The School contends that Mr. Dantowitz failed to provide sufficient medical documentation requiring the School to provide accommodations. Regardless, the School further contends that it offered Mr. Dantowitz reasonable accommodations. The School denies that it discriminated against Mr. Dantowitz because of his disabled son. The School also denies that it interfered with Mr. Dantowitz's FMLA leave or that it terminated Mr. Dantowitz's employment because he took FMLA leave.

### iii.    **What The Evidence Will Show**

<u>Plaintiff</u>

*Evidence Related to Liability*

Mr. Dantowitz was hired by the Dexter Southfield School (DS or the School) to be the Director of the Clay Center Observatory and a member of the faculty in the fall of 2000. Mr. Dantowitz partially designed and oversaw the construction of the Clay Center Observatory, a world-class astronomical observatory and a center for STEM education at DS. He personally maintained the observatory, including delicate and unique telescopes that had been custom-made to his specifications. Mr. Dantowitz's meticulous maintenance allowed the School to save tens of thousands of dollars in repair and equipment replacement costs. He also taught astronomy and led after-school and other STEM programs, and at times took on other responsibilities like teaching physics. Over the years, Mr. Dantowitz also used the resources and connections of his company Celestial Computing to involve DS students with multiple NASA missions and projects with cutting-edge space enterprises like Richard Branson's Virgin Galactic. DS highlighted and continues to highlight these achievements and the Observatory on its tour for prospective students.

Mr. Dantowitz's now 12-year-old son Emmett is autistic and requires substantial hands-on care. After witnessing Emmett's experiences, Mr. Dantowitz sought neuropsychological testing and, in 2014, a neuropsychologist at Faulkner Hospital, Dr. Pamela Friedman, documented his diagnosis of Autism Spectrum Disorder. While noting that Mr. Dantowitz had superior intelligence in many areas, and had developed substantial coping mechanisms, Dr. Friedman described Mr. Dantowitz's challenges in areas such as reading comprehension and processing speed. At that time, Mr. Dantowitz did not make DS formally aware of his diagnosis or seek additional accommodations because he was receiving the accommodations he needed – he had for years had a flexible schedule given that he frequently needed to work when the night sky was visible, and he had designed his office so that it could be darkened, have a door that closes, and be free of distracting noise. He did, however, tell his second-level supervisor Ellen Hinman about his diagnosis and needs, and she was supportive. At that time, DS had no human resources department, and Mr. Dantowitz did not want to discuss his diagnosis more widely. Once DS hired a Director of Human Resources, Carmen Aliber, Mr. Dantowitz provided a letter from Dr. Friedman to her in February 2018 and identified himself as having a disability, but did not request any specific accommodations at that time.

In the summer of 2018, with the knowledge and agreement of DS, Mr. Dantowitz took the observatory offline for substantial maintenance. At the beginning of the summer, he informed Assistant Head of School Stewart Tucker of the numerous areas that needed maintenance or potential replacement, including some significant items that he hoped to be able to defer, like a $37,000 replacement of the main telescope's control system that would take months to accomplish. In that communication, he wrote to Mr. Tucker that the main telescope was at that time stuck and that its control system had possibly had an "end of life event" but he hoped he

could get it working as he had done when he encountered the same issue several years earlier. Mr. Dantowitz did manage to get the control system working and moved the telescope to a vertical position before powering it down for cleaning and maintenance. Mr. Dantowitz provided DS with a list of tasks associated with the Observatory that needed to be addressed.  He diligently worked on his list of items and accomplished nearly all of the tasks that needed performing at the time. However, when he tried to power up the control system at the end of August, he learned for the first time that his fix was only temporary, and the nearly 20-year-old computer would not turn on. With the computer offline, the main telescope could not function without a control system replacement, which could not happen until December. Mr. Dantowitz promptly informed DS administration of the telescope failure once he knew about it.

Also that summer, Emmett (who was then 8 years-old) regressed significantly. Mr. Dantowitz describes that as the "summer of screaming," in which Emmett was unable to communicate his needs and was extremely frustrated. Mr. Dantowitz and his wife Faith had to rotate staying up with Emmett at night, and, in light of Mr. Dantowitz's responsibilities at DS, Faith ended up shouldering the larger share of Emmett's care. By the end of the summer, it became clear that this situation was no longer tenable. Because of his serious health condition, Emmett needed both of his parents available to care for him (at least part of the time). Accordingly, Mr. Dantowitz went to the Head of School, Todd Vincent, and explained both the situation with the Observatory and his need to take family leave. Mr. Dantowitz was unfamiliar with FMLA or potential options for leave, and the Head of School referred him to Ms. Aliber. Mr. Dantowitz talked that day with Ms. Aliber, and she told him that the possibilities were FMLA or "medical leave" on the one hand (terms that she used interchangeably) or "personal leave," which would not be job-protected. She also told him that, in order to take FMLA leave, Mr. Dantowitz would need his own doctor to submit medical documentation, which he did not understand because it was his son, not him, who was the reason for the leave request. Mr. Dantowitz came away from the conversation very confused about his options.

DS reassigned Mr. Dantowitz's astronomy course, but Mr. Dantowitz continued to perform other responsibilities as Director of the Observatory, some of which Mr. Tucker assigned him to complete before the end of September, for about the next two weeks. Mr. Dantowitz had a number of email exchanges with Ms. Aliber, which did not illuminate his understanding of his leave options; he felt that Ms. Aliber was misunderstanding or mischaracterizing his statements and requests. He retained counsel and on September 14, 2018, he had a scheduled 9 AM meeting with Ms. Aliber to finalize the logistics of his leave. That morning, Mr. Dantowitz sent an email to Mr. Vincent and Ms. Aliber, raising concerns about how Ms. Aliber was handling his leave request, and included in bold text, "I need to take FMLA leave to care for my son, beginning on or before October 1, preferably from my perspective as soon as possible, and continuing for 12 weeks thereafter." Mr. Dantowitz's intent was to take leave from about October 1 and lasting through the end of the semester, and in the meantime to make sure the Observatory (other than the main telescope) was up and running; that other faculty had everything they needed to take over his astronomy course; and that he could complete the tasks that Mr. Tucker had asked him to finish by September 14 and September 28, respectively.

It was Mr. Dantowitz's intention to communicate with DS about his thinking at that scheduled meeting with Ms. Aliber on the morning of September 14.  Had they met, he would have been able to convey his requests and thoughts about the timing of the leave, which included the thought that if he were able to complete the tasks Mr. Tucker had identified early, then he would want to start his leave slightly earlier. However, Ms. Aliber did not allow him to have that conversation, instead informing Mr. Dantowitz before the scheduled meeting that he was on personal leave for 12 weeks effective immediately, and it could be converted to FMLA leave retroactively after submission of medical documentation.

After Mr. Dantowitz returned from FMLA leave on December 14, 2018, DS for the first time raised concerns about Mr. Dantowitz's performance. Mr. Tucker and Ms. Aliber faulted Mr. Dantowitz for not completing tasks in the summer (some of which were actually completed, some of which were deferred as planned, and others of which could not be completed due to unforeseen circumstances) and for not completing two tasks that Mr. Tucker assigned in September, which were not completed only because Mr. Dantowitz was placed on FMLA leave before the due dates. Mr. Tucker and Ms. Aliber also piled on 11 additional time-sensitive tasks with short deadlines, some of which required reading or compiling substantial documents. DS was aware (and Ms. Aliber at least personally knew) that Mr. Dantowitz had submitted medical documentation that, because he is on the autism spectrum, he has difficulty with both reading comprehension and short deadlines. He repeatedly asked for guidance on how to prioritize the different tasks he had been assigned because he could not possibly complete them all as scheduled. He received none – Mr. Tucker told him that all of the tasks were equally important and had to be done on time, and he and Ms. Aliber also told him that he needed to use his discretion as Director of the Observatory and his failure to do so indicated he could not do the job. Mr. Dantowitz's sincere attempts to seek clarification were seen by DS as disingenuous and insubordinate. DS refused to engage in an interactive process concerning reasonable accommodations; for instance, when Mr. Dantowitz explicitly asked, as a reasonable accommodation, for either permission to record a meeting with Mr. Tucker and Ms. Aliber, or to have a third party present to take notes, Ms. Aliber refused but unhelpfully offered that they could meet with Mr. Dantowitz about reasonable accommodations (ironic given that he was asking for accommodations specifically for their meetings) if he provided medical documentation of his disability (which they already had). Also in December, DS posted an Astronomy Teacher job whose responsibilities included "Direct[ing] the operations and maintain[ing] equipment of the School's state-of-the-art observatory for in-school and extracurricular programming" (i.e., Mr. Dantowitz's job) and offered Dr. Felipe Santos that position on the day that Mr. Dantowitz returned from FMLA leave.

DS set Mr. Dantowitz up to fail after he returned from leave. It weaponized his disability against him by giving him unachievable goals and impossible time frames, which were particularly difficult for him to meet because of his unique limitations. This was consistent with a plan that a top administrator, Director of Operations Ian Moorhouse, had revealed to Michael Williams, who was at the time DS's IT Director, to get rid of older and disabled faculty members in order to reduce medical and other costs. Mr. Moorhouse told Mr. Williams, while Mr. Dantowitz was on FMLA leave, that the School was trying to terminate people who were older

or had medical issues, and specifically that Mr. Dantowitz and Robert Phinney (who had taught at the School for decades) were targeted for termination. Mr. Phinney was terminated in or about November 2018.

DS terminated Mr. Dantowitz for alleged poor performance and insubordination on January 22, 2019. It cut off Mr. Dantowitz's benefits immediately, leaving Emmett without the extensive medical supports that the Dantowitzes had managed to build up over the prior few years. Because Mr. Dantowitz did not have formal astronomical training or advanced degrees, he had few job prospects and none that would not have required him to relocate. He tried to build up his own business, Celestial Computing, but it has not been profitable other than a one-time sale of equipment that he had wanted to keep in order to generate future revenue.

### Evidence Related to Damages

Since Mr. Dantowitz's termination, he has been unable to find even a remotely comparable position for which he would be qualified. Mr. Dantowitz has been unemployed since his termination, and has needed to withdraw money from his retirement accounts and borrow money from family and friends in order to make ends meet.

At the time of his termination, Mr. Dantowitz received a base salary of $105,000. He also received health insurance valued at $28,800; Health Savings Account and retirement contributions of $16,500; and a waiver of tuition for his other son, who attended DS. That son's tuition at the time of Mr. Dantowitz's termination was $49,210, and he was also able to attend summer camp for free, a savings of $7,000 per year. This son would have attended DS until his graduation in 2024 and summer camp until 2020. Mr. Dantowitz had no specific plans to retire and would likely have remained employed at DS at least until Emmett turns 22 years old, in another ten years. At that point, Emmett will age out of the supportive schooling provided through the Town of Brookline.

Mr. Dantowitz has suffered substantial emotional distress from his discriminatory and retaliatory termination. His termination was a profound shock to him and his family, as he was the sole breadwinner for many years. Mr. Dantowitz was crushed as he had lost his "dream job" – one he was uniquely qualified for, and essentially the only type of job he had ever held. (His only previous long-term job was directing the observatory at the Museum of Science.) Mr. Dantowitz felt helpless because his lack of formal credentials prevents him from qualifying for analogous jobs at the few observatories around the country that would have a similar role. Mr. Dantowitz has been treated for anxiety, including taking medication, since his termination. Those medications have had side effects, including tinnitus which has been plaguing Mr. Dantowitz and is particularly difficult given his sensitivity to noise.

<u>Defendants</u>

The evidence will show that Defendant Dexter Southfield School terminated Plaintiff Ron Dantowitz's employment following a pattern of poor performance and unprofessional and insubordinate behavior.

Mr. Dantowitz was a Science Department Faculty Member and Director of the School's Clay Center Observatory (the "CCO"), a state-of- the-art learning center that boasts a large, flagship telescope. The evidence will show that, as the Director of the CCO, Mr. Dantowitz's primary responsibility was to maintain the equipment at the Observatory and to ensure that the flagship telescope was working properly at all times. As a Science Department Faculty Member, Mr. Dantowitz was responsible for providing a comprehensive education to the students at Dexter Southfield.

The evidence will show that Mr. Dantowitz acted autonomously at the CCO for almost 17 years as "an astronomer in residence" but otherwise failed to contribute significantly to the School's mission of providing top-notch instruction to a wide variety of students.

The evidence will show that Mr. Dantowitz underwent a neuropsychological exam in June 2014. The doctor concluded that Mr. Dantowitz had symptoms consistent with a mild autism spectrum disorder.

The evidence will show that Mr. Dantowitz's doctor did not recommend any accommodations necessary to complete his job, or that Mr. Dantowitz required additional time to complete tasks at the School. The evidence also will show that Mr. Dantowitz's doctor recommended that Mr. Dantowitz seek additional treatment, which he admittedly never did.

In May 2017, the School hired Defendant Carmen Aliber as its first Director of Human Resources. The evidence will show that Ms. Aliber was charged with implementing a new performance management system. As part of that charge, Ms. Aliber asked all employees to draft job descriptions to formalize each employee's responsibilities and performance expectations. Mr. Dantowitz wrote that he was responsible for "managing the operations of the [CCO] to maximize its impact and effectiveness on student use" and "teaching astronomy in the Upper School"

The evidence will show that Mr. Dantowitz was not happy with having increased oversight. Mr. Dantowitz much preferred acting autonomously as he had been for the past 17 years. Accordingly, the evidence will show that Mr. Dantowitz went back to his doctor in January 2018 and requested a copy of his letter regarding his 2014 alleged autism diagnosis. Mr. Dantowitz presented the letter to Mr. Aliber in February. The evidence will show that Mr. Dantowitz did not request any accommodations and stated that he had overcome all of the challenges associated with his alleged autism spectrum disorder. The evidence also will show that following his meeting with Ms. Aliber, Mr. Dantowitz never provided the School with additional documentation about his alleged disability.

Although Mr. Dantowitz disclosed that he had a "disability" in February 2018, the evidence will show that the School offered Mr. Dantowitz a position at the School for the 2018-19 academic year.

The evidence will show that Ms. Aliber continued to focus on areas at the School which could be improved to ensure that the School provided outstanding learning experiences. Ms. Aliber and Defendant Assistant Head of School Stewart Tucker believed that the activities of the CCO did not align with the best interests of the School. The School could no longer support an

"astronomer in residence" and steps had to be taken to ensure that the CCO provided a maximum benefit to the School.  In the spring of 2018, Mr. Tucker became Mr. Dantowitz's direct supervisor.

The evidence will show that Mr. Tucker and Ms. Aliber met with Mr. Dantowitz in May 2018.  Mr. Tucker asked Mr. Dantowitz for a list of activities he planned to pursue over the summer of 2018.  The evidence will show that Mr. Dantowitz created a list of 36 tasks that he planned to complete over the summer.  Although Mr. Dantowitz stated that the flagship telescope may have had its "end of life event," he assured Mr. Tucker that he could fix it.  If Mr. Dantowitz believed that the flagship telescope may be inoperable by the end of the summer, Mr. Dantowitz should have reported that to the School and obtained the funding to fix the telescope. He did not.  The evidence will show that Mr. Dantowitz left everything to chance.

The evidence will show that Mr. Dantowitz did nothing to ensure that the "end of life event" had not happened.  Instead, Mr. Dantowitz spent several weeks over the summer traveling for a side business he owns, Celestial Computing, Inc. ("CCI").  The evidence will show that Mr. Dantowitz waited until the last day of summer break, August 30, 2018, to inform the School that the flagship telescope was inoperable and would be inoperable for months – potentially until December.

The evidence will show that Mr. Dantowitz's failure to have the flagship telescope ready compromised the academic and community outreach programming the School was able to provide to its students.

The evidence will show that at the same time Mr. Dantowitz advised the School that the flagship telescope was inoperable, Mr. Dantowitz met with Head of School Todd Vincent and requested an immediate leave of absence.  Mr. Dantowitz claimed that he needed time to care for his son, who has autism.  The evidence will show that School administrators had known that Mr. Dantowitz had an autistic son since at least 2012.

The School immediately reassigned Mr. Dantowitz's teaching assignments and planned for a semester with Mr. Dantowitz absent.  Mr. Tucker spent the majority of the Labor Day weekend attempting to obtain coverage for Mr. Dantowitz's class and other responsibilities.

On the day same Mr. Dantowitz informed Mr. Vincent that he required an immediate leave of absence, Mr. Vincent notified Ms. Aliber and asked her to call Mr. Dantowitz to explain Mr. Dantowitz's leave benefits.  Ms. Aliber called Mr. Dantowitz right away and advised him that he had two options:  a personal leave of absence, or Family Medical Leave Act ("FMLA") leave.  The evidence will show that Mr. Dantowitz advised Mr. Aliber that he would discuss the different leave options with his wife and get back to Ms. Aliber.  At this time, Ms. Aliber believed that Mr. Dantowitz had left campus.

For the next ten days or so, Mr. Dantowitz and Ms. Aliber traded emails.  The evidence will show that Mr. Dantowitz pretended not to understand his leave options and how those options affected his employment or benefits.  Mr. Dantowitz did not provide Ms. Aliber with a specific reason for his leave, when his leave would start, or the duration of his leave until

September 14. Mr. Dantowitz even went so far as to hire a lawyer to "assist' him with his leave options.

The evidence will show that unbeknownst to Ms. Aliber, Mr. Dantowitz continued to report to work, acting autonomously as he had for almost 15 years, and undertaking various tasks at his convenience. Mr. Tucker, realizing that Mr. Dantowitz continued to report to School, gave Mr. Dantowitz a list of tasks to complete. The evidence will show that Mr. Dantowitz did not object to the tasks given by Mr. Tucker, or insist that he needed to leave School to care for his son.

On or about September 13, 2018, Ms. Aliber insisted that Mr. Dantowitz provide the School with the details of his requested leave. It had been two weeks since Mr. Dantowitz requested an "immediate" leave of absence, and Mr. Dantowitz refused to engage in meaningful conversations with Ms. Aliber. The evidence will show that on the morning of September 14, 2018, Mr. Dantowitz notified Ms. Aliber that he needed to take a leave of absence "as soon as possible." Ms. Aliber put Mr. Dantowitz on leave that same day, and provided him with the necessary FMLA forms so he could convert his leave to FMLA leave, which he did. Mr. Dantowitz never communicated to the school that his preferred date to start leave was October 1, 2018.

Despite being on leave and being told he was relieved of all of his responsibilities , Mr. Dantowitz continued to report to work. The evidence will show that nobody at the School requested that Mr. Dantowitz come to the School, and that the School was forced to deactivate Mr. Dantowitz's key fob to prevent him from accessing School property after regular business hours.

Mr. Dantowitz then voluntarily participated in communications with the telescope manufacturer. As soon as Ms. Aliber discovered that Mr. Dantowitz was doing so, she told Mr. Dantowitz to stop. The evidence will show that Ms. Aliber told Mr. Dantowitz 5 or 6 times that he was relieved of all work duties and that he should stop communicating with anyone at the School. The evidence will show that Mr. Dantowitz took 12 weeks of FMLA, just as he had requested.

The evidence will also show that, rather than care for his son, Mr. Dantowitz took multiple trips during his FMLA leave to generate business for CCI.

Mr. Dantowitz's first day back from FMLA leave was December 14, 2018. Mr. Tucker and Ms. Aliber planned to meet with Mr. Dantowitz on his first day back. In advance of the meeting, Mr. Dantowitz requested that he be allowed to record the meeting or have another faculty member present based on his "disability." Mr. Dantowitz had not previously requested any such accommodation, nor did his medical documentation state or even infer that any such assistance should be provided. The School declined Mr. Dantowitz's request but offered to allow Mr. Dantowitz extra time to take breaks and take notes. The evidence will show that Mr. Dantowitz did not request additional time or take breaks to take notes.

The School assigned Mr. Dantowitz several tasks upon his return to School. The evidence will show that Mr. Dantowitz stated that he had "no problem" completing the tasks.

The evidence will show that as of January 2019, Mr. Dantowitz's attitude and work ethic deteriorated significantly.  He asked that all communications be conveyed verbally, but also requested that everything be emailed to him.  Mr. Dantowitz consistently feigned ignorance, claiming that he did not understand and/or could not read the contents of the Employee Handbook.

Mr. Dantowitz refused to take responsibility for his failure to have the flagship telescope ready for incoming students in the fall of 2018.  He claimed that he never intended to have the telescope ready, or, alternatively, that the School should have known the telescope would not be ready.  The evidence will show that it is no coincidence that Mr. Dantowitz decided that he needed to take an "immediate" leave of absence on the same day he reported to the School that the flagship telescope was not operational.

Mr. Dantowitz participated in several meetings with Ms. Aliber and Mr. Tucker in January 2019.  He redirected the conversation away from his responsibilities and accountability.  Mr. Dantowitz knew he had already lined up a lawyer to sue the School.  Mr. Dantowitz also knew that he could rely on side business and that he did not need the job at the School.  Accordingly, Mr. Dantowitz had no motivation whatsoever to show respect for the School or treat Ms. Aliber and Mr. Tucker with professional courtesies.  Mr. Dantowitz's separation from the School has been a boon to his other business interests.

Mr. Dantowitz longed for the "old days" when he could spend his time doing whatever he wanted whenever he wanted, with no oversight whatsoever.  When Mr. Dantowitz was asked to account for the work he was doing, he balked, refusing to put the interests of the student body above his own.  The evidence will show that the School had more than sufficient grounds to terminate Mr. Dantowitz's employment in January 2019.

*Evidence Related to Damages*

Mr. Dantowitz's most current offer letter expired on July 31, 2019.  There was no guarantee that Mr. Dantowitz would be offered employment at the School after that date.  Accordingly, Mr. Dantowitz's damages are capped as of July 31, 2019.

Moreover, tuition remission for Mr. Dantowitz's son is not a guaranteed benefit.  Accordingly, there was no expectation that Mr. Dantowitz's son would receive tuition after the 2018-2019 academic year.  There is certainly no expectation that Mr. Dantowitz's son would receive tuition remission after July 2019.  Likewise, there was no guaranty that Mr. Dantowitz's son would receive free camp tuition.

Mr. Dantowitz's damages are capped as of September 28, 2021, the date on which the School discovered that Mr. Dantowitz had misused his FMLA leave.

### iv.   Statement of Established Facts and/or Stipulations

1.   Dexter Southfield is an independent school located at 20 Newton Street, Brookline, Massachusetts.

2.      In May 2017, the School hired Defendant Carmen Aliber as the Director of Human Resources, a newly-created position.  Ms. Aliber is responsible for all aspects of human resources, including hiring, performance management, compensation, employee relations, benefits and professional development.

3.      Defendant Stewart Tucker is the Assistant Head of School.  Mr. Tucker is responsible for overseeing academic and student life programs and the recruitment, professional development and supervision of faculty.

4.      The School's 2018-2019 Employee Handbook included the following relevant policies: Equal Employment Opportunity, Nature of Employment, Employee Conduct, Insubordination, Reasonable Accommodations for Qualified Individuals With Disabilities, Vacation Time, Family and Medical Leave, and Personal Leave of Absence.

5.      The School hired Plaintiff in 2000 in connection with the School's plan to build and establish the Clay Center Observatory (the "CCO"), an astronomical observatory including a large flagship telescope.

v.      **Contested Issues of Fact**

1.      Whether Defendants discriminated against Plaintiff on the basis of a handicap.

2.      Whether Defendants discriminated against Plaintiff on the basis of his son's handicap.

3.      Whether Defendants interfered with Plaintiff's FMLA rights.

4.      Whether Defendants retaliated against Plaintiff for exercising FMLA rights.

vi.     **Jurisdictional Questions**

None.

vii.    **Statement Regarding Damages**

Plaintiff

As described above, Mr. Dantowitz does not have the qualifications necessary to secure comparable employment with another employer. Mr. Dantowitz seeks to recover lost salary and benefits as back pay to the time of trial, and as front pay for at least the next ten years for which he foreseeably would have stayed employed by the School. Mr. Dantowitz also seeks to recover for emotional distress, as well as liquidated damages and punitive damages.

Because Plaintiff was operating his company, Celestial Computing (CCI), part-time while he was at the School (and, indeed, on numerous occasions he used CCI equipment, resources, and connections to benefit DS's students), any income he might earn from CCI is in addition to, not instead of, income he could have earned from the School. The income earned by CCI is

irrelevant to this matter and would unnecessarily confuse the jury. The bulk of the income Plaintiff received as a shareholder from CCI derived from the one-time sale of telescope equipment that CCI could and would have used to generate revenue in the future.

<u>Defendants</u>

Plaintiff's post-termination earnings far exceed what he could earn at the School in the next ten years.  Plaintiff never applied for a single job following his termination.  But he has worked for his company, CCI, instead; and CCI has reported almost $3,000,000 in gross income since Plaintiff's termination.  In March 2019, CCI sold a telescope mount for $1,050,000.  (CCI reported $991,707 in gross income for 2019.  Plaintiff reported $694,637 in adjusted gross income on his individual 2019 federal tax return.  This amount constitutes more than six times Plaintiff's annual salary at the School at the time of his termination in January 2019 ($106,500).

In 2020, Plaintiff and CCI received payment for work on behalf of the National Aeronautics and Space Administration ("NASA"), including a project that required Plaintiff to travel to Australia for two weeks in December 2020.  CCI reported $1,781,966 in gross income on its 2020 tax return.  As of April 2021, CCI had only two other employees, and Plaintiff paid them collectively approximately $120,000 per year.  Thus, Plaintiff's income since his termination far exceeds what he could have earned at the School, and Plaintiff's claim for economic damages should be dismissed.

**viii.   <u>Amendments To The Pleadings</u>**

None.

**ix.   <u>Additional Matters</u>**

The parties reserve the right to seek a sequestration order in advance of trial.

**x.   <u>Witnesses</u>**

<u>Plaintiff</u>

1.   Ronald Dantowitz (Brookline, MA), fact witness

2.   Faith Dantowitz (Brookline, MA), fact witness

3.   Carmen Aliber (Brookline, MA), fact witness

4.   Stewart Tucker (Brookline, MA), fact witness

5.   Todd Vincent (Brookline, MA), fact witness

6.   Robert Phinney (Natick, MA), fact witness

7.   Dr. Norman Wittels, fact witness

8.      Ellen Hinman, fact witness

9.      Michael Williams (Holliston, MA), fact witness

10.     Emilia Guy (Brookline, MA), fact witness

11.     William Pine (Brookline, MA), fact witness

12.     Dr. Daniel Steinberg (Newton, MA), fact witness

13.     Robyn Steinberg (Newton, MA), fact witness

14.     Dr. Denise Faustman, fact witness

15.     Dr. Pamela Friedman (Boston, MA), fact witness

16.     Jeanne M. Robertson (Woburn, MA), fact witness

Plaintiff reserves the right to change the order of witnesses or to choose not to call any witness listed herein. Plaintiff also reserves the right to call rebuttal witnesses based on the evidence at trial or to call any witnesses listed by Defendant.

<u>Defendants</u>

(a)     Ronald Dantowitz, fact witness.


(b)     Stewart Tucker, fact witness.


(c)     Carmen Aliber, fact witness.


(d)     J. Kelly Beatty, fact witness.

(e)     Dr. Felipe Santos, fact witness.


(f)     Ellen Hinman, fact witness.

(g)     Todd Vincent, fact witness.

Defendants reserve the right to change the order of witnesses or to choose not to call any witness listed herein.  Defendant also reserves the right to call rebuttal witnesses based on the evidence at trial or to call any witnesses listed by Plaintiff.  Defendants also reserve the right to recall witnesses as part of their case in chief.

### xi.     <u>Uncontested Exhibits</u>

1.      E-mail dated May 9, 2014 from R. Dantowitz to S. Tucker (with attachment).
2.      Dr. Pamela Friedman letter dated January 17, 2018 (Dantowitz 295-296).
3.      Dantowitz job description.
4.      E-mail chain dated January 19, 2018 – February 6, 2018 (DXSF 105-109).
5.      Letter dated March 8, 2018 from T. Vincent to R. Dantowitz (DXSF 97-98).
6.      E-mail dated June 14, 2018 from S. Tucker to R. Dantowitz (DXSF 91).
7.      E-mail chain dated June 18, 2019 (DXSF 302-303).
8.      E-mail dated June 19, 2018 from R. Dantowitz to S. Tucker (with attachments) (DXSF 304, 322-325).
9.      E-mail chain dated August 28, 2018 – August 30, 2018 (Dantowitz 189-195) (DXSF 306-309).
10.     E-mail dated September 5, 2018 – September 6, 2018 from C. Aliber to R. Dantowitz (Dantowitz 196-199).
11.     E-mail dated September 7, 2018 from S. Tucker to R. Dantowitz (Dantowitz 200).
12.     E-mail dated September 10, 2018 from C. Aliber to R. Dantowitz (Dantowitz 201-202).
13.     E-mail dated September 10, 2018 from C. Aliber to R. Dantowitz (with attachments) (DXSF 334-344).
14.     E-mail dated September 14, 2018 from R. Dantowitz to C. Aliber (DXSF 379).
15.     E-mail dated September 14, 2018 from C. Aliber to R. Dantowitz (with attachments) (DXSF 387, 396-403).
16.     Completed FMLA forms dated September 26, 2018 (DXSF 289-292).
17.     Email chain dated October 22, 2018 (DXSF 425-427).
18.     E-mail dated November 14, 2018 from C. Aliber to R. Dantowitz (DXSF 432).
19.     Letter dated December 14, 2018 from C. Aliber to Dr. Felipe Santos (DXSF 667).
20.     Email dated December 16, 2018 from S. Tucker to R. Dantowitz (DXSF 448-449).
21.     Email dated December 17, 2018 from C. Aliber to R. Dantowitz (DXSF 671-673).
22.     E-mail dated December 18, 2018 from S. Tucker to R. Dantowitz (DXSF 453).
23.     E-mail chain dated December 19, 2018 (DXSF 457-458).
24.     Email dated December 20, 2018 from C. Aliber to R. Dantowitz (DXSF 459-460).
25.     Email dated January 3, 2019 from C. Aliber to R. Dantowitz (DXSF 462-463).
26.     Email dated January 9, 2019 from C. Aliber to R. Dantowitz (DXSF 470-471).
27.     Email dated January 9, 2019 from R. Dantowitz to C. Aliber (DXSF 467-469).

28.   Email dated January 10, 2019 from C. Aliber to R. Dantowitz (DXSF 472-473).
29.   Email dated January 15, 2019 from C. Aliber to R. Dantowitz (DXSF 487-492).
30.   Email dated January 15, 2019 from S. Tucker to R. Dantowitz (DXSF 480-486).
31.   Personnel Conversation Record dated January 22, 2019 (DXSF 44-46).
32.   January 2018 Employee Handbook (Dantowitz 228-324).
33.   August 2018 Employee Handbook (DXSF 188-288).
34.   Progress Notes by Cecilia F. Sarkissian, MD, dated July 30, 2019 (RD-ZDB 37-41).
35.   Progress Notes by Cecilia F. Sarkissian, MD, dated October 26, 2020 (RD-ZDB 33-36).

**xii.   Exhibits to be Offered At Trial**

Plaintiff

A.  Invoices from Lukehart Trucking LLC dated October 12, 2011 (RD-ZDB 31-32).
B.  INV Form 41 dated July 30, 2012 (Dantowitz 158-159).
C.  Email dated March 28, 2014 from T. Vincent to R. Dantowitz (RD-ZDB 1-4).
D.  Letter dated April 17, 2014 from T. Vincent to R. Dantowitz (DXSF 122-124).
E.  Email dated May 22, 2014 from T. Vincent to R. Dantowitz (RD-ZDB 5-6).
F.  Email dated July 21, 2014 from R. Dantowitz to R. Saul (RD-ZDB 7-12).
G.  Letter dated March 10, 2017 from T. Vincent to R. Dantowitz (DXSF 121).
H.  Photographs of Dexter Southfield Hallway and wall display "Tracking Virgin Galactic's Race to Space," RD-ZDB0029-30.
I.  Photograph of telescope mirror before and after Summer 2018 cleaning, RD-ZDB0020.
J.  Email dated September 14, 2018 from T. Vincent to R. Dantowitz (DXSF 416).
K.  Email dated September 14, 2018 from R. Dantowitz to S. Tucker (DXSF 377).
L.  Dexter Southfield Astronomy Teacher job posting (DXSF 293-294).
M.  Astronomy Teacher job posting on Indeed.
N.  Email dated December 19, 2018 from R. Dantowitz to C. Aliber (DXSF 456).
O.  Email dated January 4, 2019 from B. Bloomfield to R. Dantowitz (RD-ZDB 22-24).
P.  Email dated January 4, 2019 from E. Guy to R. Dantowitz (RD-ZDB 25-28).
Q.  R. Dantowitz handwritten notes from January 18, 2019 meeting (RD-ZDB 13-19).
R.  Email dated January 18, 2019 from S. Tucker to T. Reimann (RD-ZDB 21).
S.  "Community Telescope Nights – Dexter Southfield" printout from Dexter Southfield website.

Defendants

A.    Dantowitz medical notes dated June 5, 2014 (Dantowitz 88-91).

B.    Dantowitz medical notes dated August 5, 2014 (Dantowitz 75-80).

C.    Dr. Pamela Friedman letter dated April 10, 2017 (Dantowitz 143-144).

D.    E-mail dated January 11, 2019 from C. Aliber to R. Dantowitz (DXSF 476-477).

E.    Declaration of Ronald F. Dantowitz dated September 28, 2021.

F.      2018 Celestial Computing, Inc. Federal Tax Return.

G.      2018 Dantowitz Federal Tax Return.

H.      2019 Celestial Computing, Inc. Federal Tax Return.

I.       2019 Dantowitz Federal Tax Return.

J.       2020 Celestial Computing, Inc. Federal Tax Return.

K.      2020 Dantowitz Federal Tax Return.

L.      2021 Celestial Computing, Inc. Federal Tax Return.

M.      2021 Dantowitz Federal Tax Return.

N.      Colorado Secretary of State filing August 31, 2018.

O.      Celestial Computing, Inc. Summary of Tax Return Information.

P.      Celestial Computing, Inc. Coronavirus bailout.

Q.      Conversation with Ron Dantowitz (DXSF 528-529).

**xiii.   <u>Objections</u>**

<u>Plaintiff</u>

Dantowitz medical notes dated June 5, 2014 (Dantowitz 88-91).

**Objections:** Irrelevant, cumulative of other evidence, and otherwise inadmissible pursuant to Fed. R. Evid. 402 and 403.

Dantowitz medical notes dated August 5, 2014 (Dantowitz 75-80).

**Objections:** Irrelevant, cumulative of other evidence, and otherwise inadmissible pursuant to Fed. R. Evid. 402 and 403.

Dr. Pamela Friedman letter dated April 10, 2017 (Dantowitz 143-144).

**Objections:** Irrelevant, cumulative of other evidence, and otherwise inadmissible pursuant to Fed. R. Evid. 402 and 403.

E-mail dated January 11, 2019 from C. Aliber to R. Dantowitz (DXSF 476-477).

**Objection:** Hearsay.

Declaration of Ronald F. Dantowitz dated September 28, 2021.

**Objections:** Irrelevant, confusing to the jury, and otherwise inadmissible pursuant to Fed. R. Evid. 402 and 403.

2018 Celestial Computing, Inc. Federal Tax Return.

**Objections:** Irrelevant, confusing to the jury, cumulative of other evidence, and otherwise inadmissible pursuant to Fed. R. Evid. 402 and 403; hearsay.

2018 Dantowitz Federal Tax Return.

**Objections:** Irrelevant, confusing to the jury, cumulative of other evidence, and otherwise inadmissible pursuant to Fed. R. Evid. 402 and 403; hearsay.

2019 Celestial Computing, Inc. Federal Tax Return.

**Objections:** Irrelevant, confusing to the jury, cumulative of other evidence, and otherwise inadmissible pursuant to Fed. R. Evid. 402 and 403; hearsay.

2019 Dantowitz Federal Tax Return.

**Objections:** Irrelevant, confusing to the jury, cumulative of other evidence, and otherwise inadmissible pursuant to Fed. R. Evid. 402 and 403; hearsay.

2020 Celestial Computing, Inc. Federal Tax Return.

**Objections:** Irrelevant, confusing to the jury, cumulative of other evidence, and otherwise inadmissible pursuant to Fed. R. Evid. 402 and 403; hearsay.

2020 Dantowitz Federal Tax Return.

**Objections:** Irrelevant, confusing to the jury, cumulative of other evidence, and otherwise inadmissible pursuant to Fed. R. Evid. 402 and 403; hearsay.

2021 Celestial Computing, Inc. Federal Tax Return.

**Objections:** Irrelevant, confusing to the jury, cumulative of other evidence, and otherwise inadmissible pursuant to Fed. R. Evid. 402 and 403; hearsay.

2021 Dantowitz Federal Tax Return.

**Objections:** Irrelevant, confusing to the jury, cumulative of other evidence, and otherwise inadmissible pursuant to Fed. R. Evid. 402 and 403; hearsay.

Colorado Secretary of State filing August 31, 2018.

**Objections:** Irrelevant, misleading the jury, and otherwise inadmissible pursuant to Fed. R. Evid. 402 and 403; hearsay; lack of foundation; lack of authentication.

Celestial Computing, Inc. Summary of Tax Return Information.

**Objections:** Confusing to the jury and otherwise inadmissible pursuant to Fed. R. Evid. 402 and 403; hearsay.

Celestial Computing, Inc. Coronavirus bailout.

**Objections:** Irrelevant, unduly prejudicial, and otherwise inadmissible pursuant to Fed. R. Evid. 402 and 403; hearsay; lack of foundation; lack of authentication.

Conversation with Ron Dantowitz (DXSF 528-529).

**Objections:** Hearsay, cumulative of other evidence and otherwise inadmissible pursuant to Fed. R. Evid. 403.

Defendants' Objection to Plaintiff's Proposed Trial Exhibits

R. Dantowitz handwritten notes of January 18, 2019.  RD-ZDB0013-19.

**Objection:**  Inadmissible hearsay.

Email from R. Dantowitz to T. Vincent dated September 14, 2018, DXSF 416.

**Objection:**  Inadmissible hearsay.

Emails from R. Dantowitz, DXSF 456.

**Objection:**  Inadmissible hearsay.

INV Form 41, completed by Carla Gates and dated July 30, 2012.

**Objection:**   Relevance.

2017 salary letter, DXSF 121.

**Objection:**  Relevance.

2014 offer letter, DXSF 122-124.

**Objection:**  Relevance.

Astronomy teacher job description, DXSF 293-294.

**Objection:**  Lack of foundation.

E-mail from R. Dantowitz dated September 14, 2018, DXSF 377.

**Objection:**  Inadmissible hearsay.

Astronomy Teacher job description posted to Indeed.

**Objection:** Lack of foundation.

Dexter Southfield webpage "Community Telescope Nights," retrieved January 20, 2022.

**Objection:** Lack of foundation.

E-mail dated January 18, 2019, from S. Tucker to T. Reimann and F. Santos regarding open telescope night, RD-ZDB0021.

**Objection:** Relevance.

Photograph of telescope mirror before and after Summer 2018 cleaning, RD-ZDB0020.

**Objection:** Not previously produced, authentication.

Email chain between R. Dantowitz and R. Saul, ending July 21, 2014, subject "Various Topics," RD-ZDB0007-12.

**Objection:** Not previously produced, inadmissible hearsay, relevance.

Email chain between R. Dantowitz and T. Vincent, ending March 28, 2014, subject "Update During Break," RD-ZDB0001-4.

**Objection:** Not previously produced, inadmissible hearsay, relevance.

Email chain between R. Dantowitz and T. Vincent, ending May 22, 2014, subject "If you prefer, I will stay," RD-ZDB0005-6.

**Objection:** Not previously produced, inadmissible hearsay, relevance.

E-mail chain between R. Dantowitz, E. Guy, and B. Bloomfield, dated January 4, 2019, subject "Request and thank you," RD-ZDB0022-24.

**Objection:** Not previously produced, inadmissible hearsay, relevance.

E-mail chain between R. Dantowitz and E. Guy, dated January 4, 2019, no subject, with attachment, RD-ZDB0025-28.

**Objection:** Not previously produced, inadmissible hearsay, relevance.

Photographs of Dexter Southfield Hallway and wall display "Tracking Virgin Galactic's Race to Space," RD-ZDB0029-30.

**Objection:**  Not previously produced, relevance.

Invoices to Lukehart Trucking, LLC.  RD-ZDB0031-32.

**Objection:**  Not previously produced, relevance.


<u>Defendants' Objection to Plaintiff's Proposed Trial Witnesses</u>

      2.     Faith Dantowitz

**Objection:**  Not identified on Plaintiff's initial disclosures or in response to Defendants' interrogatory requesting that Plaintiff identify persons having knowledge of the facts of the case. Lacks personal knowledge of Plaintiff's poor performance and insubordination, and the details of Plaintiff's termination of employment.

8.     Michael Williams

**Objection:**  Lacks personal knowledge of Plaintiff's poor performance and insubordination, and the details of Plaintiff's termination of employment.

12.     Dr. Daniel Steinberg

**Objection:**  Lacks personal knowledge of Plaintiff's poor performance and insubordination, and the details surrounding Plaintiff's termination of employment.

13.     Robyn Steinberg

**Objection:**  Lacks personal knowledge of Plaintiff's poor performance and insubordination, and the details surrounding Plaintiff's termination of employment.

14.     Dr. Denise Faustman

**Objection:**  Lacks personal knowledge of Plaintiff's poor performance and insubordination, and the details surrounding Plaintiff's termination of employment.


18.     Pamela Friedman

**Objection:**  Not identified on Plaintiff's initial disclosures or in response to Defendants' interrogatory requesting that Plaintiff identify persons having knowledge of the facts of the case. Nor has the witness previously been disclosed as an expert.  Lacks personal knowledge of Plaintiff's poor performance and insubordination, and the details surrounding Plaintiff's termination of employment.

19.     Dr. Norman Wittels

**Objection:**  Not identified on Plaintiff's initial disclosures or in response to Defendants' interrogatory requesting that Plaintiff identify persons having knowledge of the facts of the case. Lacks personal knowledge of Plaintiff's poor performance and insubordination, and the details surrounding Plaintiff's termination of employment.  No contact information provided.

20.     Jeanne Robertson

**Objection:**  Not identified on Plaintiff's initial disclosures or in response to Defendants' interrogatory requesting that Plaintiff identify persons having knowledge of the facts of the case. Nor has the witness previously been disclosed as an expert.  Lacks personal knowledge of Plaintiff's poor performance and insubordination, and the details surrounding Plaintiff's termination of employment.  No contact information provided.

Respectfully submitted,

RONALD DANTOWITZ,                    DEXTER SOUTHFIELD, INC.,
                                     CARMEN ALIBER, and
                                     STEWART TUCKER,

By his attorneys,                    By their attorneys,

*/s/David A. Russcol*                */s/ Anthony L. DeProspo, Jr.*
Inga S. Bernstein (BBO #627251)      Anthony L. DeProspo, Jr. (BBO No. 644668)
David A. Russcol (BBO #670768)       (adeprospo@shpclaw.com)
Zalkind Duncan & Bernstein LLP       Cara E. Murphy (BBO No. 709521)
65a Atlantic Avenue                  (cmurphy@shpclaw.com)
Boston, MA 02110                     SCHWARTZ HANNUM PC
(617) 742-6020                       11 Chestnut Street
ibernstein@zalkindlaw.com            Andover, MA 01810
drusscol@zalkindlaw.com              Telephone: (978) 623-0900
                                     Facsimile:  (978) 623-0908


Date:  January 10, 2023

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the foregoing document, filed through the ECF system will be served electronically upon all registered participants as identified in the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered parties this 10th day of January 2023.

*/s/ David A. Russcol*
David A. Russcol