# Tab A

2022 WL 4111910
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

Ronald F. DANTOWITZ, Plaintiff,
v.
DEXTER SOUTHFIELD, INC.; Carmen Aliber; and Stewart Tucker, Defendants.

Case No. 20-CV-10540-AK
|
Signed September 8, 2022

**Attorneys and Law Firms**

Suzanne L. Herold, Herold Law Group, P.C., Charlestown, MA, for Plaintiff.

Anthony L. DeProspo, Jr., Laura Deck Stones, William E. Hannum, III, Schwartz Hannum PC, Andover, MA, for Defendants.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE

A. KELLEY, DISTRICT JUDGE

*1 This is an employment discrimination action in which Plaintiff Ronald Dantowitz ("Plaintiff" or "Mr. Dantowitz"), a former teacher, alleges that he was wrongfully terminated on the basis of his disability, his minor son's disability, and his decision to exercise his rights under the Family and Medical Leave Act ("FMLA"). Plaintiff has brought seven claims against Defendants Dexter Southfield, Inc., Carmen Aliber, and Stewart Tucker. On the Defendants' Motion for Summary Judgment [Dkt. 68], the Court **GRANTS IN PART** and enters judgment for Defendants on three of Mr. Dantowitz's seven claims (Claims 3, 4, and 5), and **DENIES IN PART**, finding triable issues of fact on the four remaining claims (Claims 1, 2, 6, and 7). Defendants' Motion to Strike [Dkt. 81] is **DENIED**.

## I. FACTUAL BACKGROUND

In evaluating this Motion for Summary Judgment, the Court relies upon Mr. Dantowitz's response [Dkt. 75] to the Defendants' statement of material facts [Dkt. 70]. Those facts admitted by Mr. Dantowitz will be presumed to be true, and those facts denied by Mr. Dantowitz, or raised only by Mr. Dantowitz in rebuttal to Defendants, are considered contested.[1]

### a. Uncontested Facts

Defendant Dexter Southfield, Inc. (hereinafter, "the School") is an independent school in Brookline, Massachusetts. [Dkt. 75, Plaintiff's Responses to Defendants' Statement of Material Facts (hereinafter, "Pl.'s SMF") at ¶ 1]. In 2000, the School hired Mr. Dantowitz as a faculty member in connection with its plans to build and establish the Clay Center Observatory ("CCO"), an astronomical observatory including a large telescope. [Id. ¶ at 6]. Once the CCO opened, Mr. Dantowitz served as its Director. [Id. at ¶ 9]. In this role, Mr. Dantowitz was responsible for creating and delivering programming for the CCO, including programming for students and members of the community, teaching courses, and maintaining the telescope. [Id. at ¶ 10]. In 2017, Mr. Dantowitz drafted a job description for his position as part of a schoolwide initiative, in which he indicated that the CCO Director's role included managing the operations of the CCO; maintaining, operating, and upgrading scientific equipment; maintaining and operating the School's planetarium; developing an annual budget; hosting weekly open houses; and teaching astronomy. [Id. at ¶ 14]. From 2007 until the end of his tenure at the School, Mr. Dantowitz reported to the chairperson of the School's science department and to the Head of the Upper School, but did not receive any formal or written performance evaluations from any of the persons who held these positions. [Id. at ¶ 12].

*2 On January 19, 2018, Mr. Dantowitz submitted a letter from Dr. Pamela Friedman ("Dr. Friedman"), a neuropsychologist, to Defendant Carmen Aliber ("Ms. Aliber"), the School's Director of Human Resources.[2] [Id. at ¶¶ 2, 17]. The letter indicated that Dr. Friedman had, as a result of a 2014 evaluation of Mr. Dantowitz, found that Mr. Dantowitz presented with "a number of symptoms that are consistent with a mild autism spectrum disorder." [See Dkt. 71-8]. Dr. Friedman described Mr. Dantowitz's symptoms as "restricted pattern of behavior and interests"; "sensitivity to sensory aspects of the environment"; "difficulty interpreting social behavior and reading social cues"; and "difficulties with reading comprehension and reading rate." [Id.] She noted that Mr. Dantowitz "demonstrated remarkable compensatory strategies" that permitted him to "function well in multiple roles," but that "this is not a natural or intuitive process for him." [Id.] Mr. Dantowitz and Ms. Aliber met

on February 14, 2018 to discuss the letter. [Pl.'s SMF at ¶ 24]. After this meeting, on March 8, 2018, the School sent Mr. Dantowitz a letter offering to renew his contract of employment for the 2018–19 school year. [See Dkt. 71-6].

On May 30, 2018, Mr. Dantowitz, Ms. Aliber, and Defendant Stewart Tucker ("Mr. Tucker"), who is the Assistant Head of School, met to discuss Mr. Dantowitz's summer plans to prepare the CCO for the 2018–19 school year. [Pl.'s SMF at ¶¶ 3, 26]. Mr. Dantowitz submitted a list of approximately 36 CCO items that needed attention, including various types of maintenance and repairs to the telescope and planetarium. [Id. at ¶¶ 28–29; Dkts. 71-10, 71-11]. In a June 19, 2018 email to Mr. Tucker, Mr. Dantowitz described these items as "areas in need of maintenance, repair, or replacement before we welcome back students in the fall." [Dkt. 71-10]. This email described the telescope as being "stuck in one position," and its control system as possibly having had an "end of life event." [Id.] Mr. Dantowitz indicated he would take action later that day that he was "pretty certain [would] solve the problem, if only temporarily," and that "exactly the same problem happened about six years ago as well, fixed it and we have successfully deferred replacement for many years." [Id.] With this email, Mr. Dantowitz attached a quote for telescope control system repairs for approximately $36,500, indicating an earliest installation date of September 2018. [Dkt. 71-11]. This attachment also indicated that the telescope was "inoperable." [Id.] During the summer of 2018, Mr. Dantowitz worked for his own astronomical high-resolution imaging company, which he operated during his tenure of employment at the School. [Id. at ¶¶ 37, 39; Dkt. 75-37].

Mr. Dantowitz did not complete each of the approximately 36 tasks he identified in his June 19, 2018 email before the start of the 2018–19 school year. [Pl.'s SMF at ¶ 33]. The telescope was not fully operational at the start of the school year, and the CCO did not operate at its full capacity, meaning that the School was unable to offer several academic experiences to students. [Id. at ¶¶ 34, 36].

On August 30, 2018, Mr. Dantowitz met with Todd Vincent ("Mr. Vincent"), the Head of School, at which time Mr. Dantowitz stated the telescope was non-operational.[3] [Id. at ¶¶ 42–43]. Mr. Dantowitz indicated at this meeting a need to take leave to care for his son.[4] [Id.] Mr. Vincent advised Ms. Aliber that Mr. Dantowitz needed a leave of absence, and Ms. Aliber called Mr. Dantowitz to advise him that, depending on the reasons for his leave, he could take personal leave pursuant either to the Family and Medical Leave Act ("FMLA") or to the School's personal leave of absence policy. [Id. at ¶ 44]. Mr. Dantowitz then took FMLA leave from September 14, 2018, to December 13, 2018. [Id. at ¶ 48].

*3 On November 20, 2018, Mr. Dantowitz informed Ms. Aliber by email that he would return to work on December 14, 2018. [Dkt. 71-17]. Ms. Aliber told Mr. Dantowitz that she and Mr. Tucker would meet with him on December 14 to discuss the School's performance expectations for him. [Id.] Mr. Dantowitz expressed concern that, due to his disability, he would not be able to simultaneously take notes at this meeting, and requested that the meeting either be recorded, or that another faculty member be present to take notes. [Id.] Ms. Aliber responded, denying both of these requests, but offering to take breaks during the meeting at Mr. Dantowitz's request in order to allow him to take notes. [Id.] Ms. Aliber also sent a list of 11 performance expectations for Mr. Dantowitz in his capacity as Director of the CCO. [Id.] Mr. Dantowitz indicated that he had "no problem" completing the listed tasks. [Pl.'s SMF at ¶ 62]. During the December 14, 2018, meeting, Mr. Dantowitz did not request breaks or take notes. [Id. at ¶ 63].

On December 19, 2018, Ms. Aliber sent an email to Mr. Dantowitz purporting to summarize discussions between the parties concerning vacation time, accommodations, technology, and Mr. Dantowitz's performance expectations. [Dkt. 71-18]. In his response to Ms. Aliber, Mr. Dantowitz raised a need to care for his son over the School's winter break. [Id.] Mr. Dantowitz, Ms. Aliber, and Mr. Tucker met again on January 2, 2019 to discuss job expectations and tasks that Mr. Dantowitz needed to complete promptly, with Ms. Aliber taking notes. [Pl.'s SMF at ¶ 69]. The parties did not discuss Mr. Dantowitz's son or autism at this meeting. [Id. ¶ 73]. The three parties then met again on January 10, 2019, with Ms. Aliber again taking notes, and did not discuss Mr. Dantowitz's son or autism at this meeting either. [Id. at ¶¶ 74, 78]. On January 15, 2019, Mr. Dantowitz emailed a status update regarding five tasks assigned to him in September 2018, eleven tasks assigned to him in December 2018, and one task assigned to him in January 2019. [Dkt. 71-21]. The parties then met again on January 18, 2019, to discuss Mr. Dantowitz's progress, with Ms. Aliber taking notes. [Pl.'s SMF at ¶ 80]. Following this meeting, Mr. Dantowitz transferred all emails from his work account to a personal thumb drive. [Id. at ¶ 83].

On January 22, 2019, the School terminated Mr. Dantowitz. [Id. at ¶ 86]. Since this time, Mr. Dantowitz has neither applied for other positions nor collected unemployment benefits, but has instead worked on his own company. [Id. at ¶¶ 89–91].

## II. PROCEDURAL HISTORY

Mr. Dantowitz initiated this action in Norfolk County Superior Court, filing his complaint [Dkt. 1-1] there on December 30, 2019. [See Dkt. 1 at ¶ 1; Dkt. 1-1]. Defendants then timely removed the case to federal court in March 2020. [Dkt. 1]. After the conclusion of discovery, Defendants filed the instant Motion for Summary Judgment [Dkt. 68], which Mr. Dantowitz has opposed [Dkt. 76]. Following the submission of additional briefing as to both Defendants' Motion for Summary Judgment [Dkt. 68] and their Motion to Strike [Dkt. 81], the Court held a motion hearing in March 2022 before taking the matter under advisement.

## III. DISCUSSION

### a. Summary Judgment Standard

The **purpose** of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment may be granted when the record, viewed in the light most favorable to the non-moving party, presents no "genuine issue of material fact," and the moving party is entitled to judgment as a matter of law. Paul v. Murphy, 948 F.3d 42, 49 (1st Cir. 2020). The Court must determine (1) whether a factual dispute exists; (2) whether the factual dispute is "genuine," such that a "reasonable fact-finder could return a verdict for the nonmoving party on the basis of the evidence"; and (3) whether a fact genuinely in dispute is material, such that it "might affect the outcome of the suit under the applicable substantive law." Scott v. Sulzer Carbomedics, Inc., 141 F. Supp. 2d 154, 170 (D. Mass. 2001). Courts must draw all reasonable inferences in the non-moving party's favor, and the non-moving party may "defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Paul, 948 F.3d at 49 (citation omitted). On issues where the non-moving party bears the ultimate burden of proof, the non-moving party "must present definite, competent evidence to rebut the motion." Mesnick, 950 F.2d at 822.

*4 Mr. Dantowitz brings seven claims for discrimination and retaliation, five under Massachusetts law (Claims 1–5) and two under federal law (Claims 6–7). [See Dkt. 1-1]. Although the proffered facts in support of each claim are related and comprise a single timeline, the elements of each claim are sufficiently distinct that the Court will analyze each separately.

### b. Claim 1: Disability Discrimination, Chapter 151B

Mr. Dantowitz alleges that the School, Ms. Aliber, and Mr. Tucker violated Massachusetts anti-discrimination law, Mass. Gen. Laws ch. **151B** (hereinafter, "Chapter **151B**"), by discriminating against him on the basis of his disability. Because the provisions of Chapter **151B** prohibiting disability discrimination "track[ ] the ADA in virtually all respects," Gillen v. Fallon Ambulance Serv. 283 F.3d 11, 20 n.5 (1st Cir. 2002), referring here to the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), federal courts apply the familiar standard for a *prima facie* ADA claim to Massachusetts law claims of disability discrimination: "a plaintiff must prove by a preponderance of the evidence that: (1) he was disabled within the meaning of the [statute]; (2) he was a qualified individual with a disability, i.e. able to perform the essential functions of the position with or without reasonable accommodation; and (3) he was discharged because of his disability," Miller v. Verizon Comms., Inc., 474 F. Supp. 2d 187, 194 (D. Mass. 2007) (quoting Ward v. Massachusetts Health Research Inst., Inc., 209 F.3d 29, 32–33 (1st Cir. 2000)) (alterations omitted).

Where a plaintiff establishes a *prima facie* case of disability discrimination, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for its action." Flaherty v. Entergy Nuclear Ops., Inc., 946 F.3d 41, 53–54 (1st Cir. 2019). If the employer articulates a reason, the burden shifts back to the plaintiff, "who must then show, by a preponderance of the evidence, that the employer's proffered reason for the adverse employment action was pretextual and that the true reason was unlawful discrimination." Id. at 54. Commonly called the "McDonnell-Douglas framework," courts routinely apply this burden-shifting analysis in cases where—as here—a plaintiff presents indirect evidence of discrimination. See id. at 53. Defendants argue that Mr. Dantowitz cannot, as a matter of law, prove any of the

three elements of a *prima facie* case, nor can he rebut Defendants' proffered nonretaliatory reasons for terminating his employment. [See Dkt. 69 at 4–10]. The Court will address each element in turn.

On the first element, a plaintiff has a disability[5] within the meaning of Chapter 151B where he has "a physical or mental impairment which substantially limits one or more major life activities of a person" and a record of either of "having such impairment" or of "being regarded as having such impairment." Mass. Gen. Laws ch. 151B, § 1(17); Miller, 474 F. Supp. 2d at 194.

Here, Mr. Dantowitz proffers evidence that he has autism spectrum disorder in the form of a letter from a mental health professional, Dr. Friedman, indicating that he exhibits symptoms consistent with such a diagnosis. [Dkt. 71-8]. The letter details the ways in which Mr. Dantowitz's symptoms and autism diagnosis may substantially limit various major life activities: specifically, "sensitivity to sensory aspects of the environment," "difficulty interpreting social behavior and reading social cues," and "difficulties with reading comprehension and reading rate" [id. at 2]—all of which certainly may affect a person's ability to work. Further, it is undisputed that Mr. Dantowitz established a record of his symptoms as consistent with autism spectrum disorder by providing Dr. Friedman's letter to Ms. Aliber on January 19, 2018. [See Pl.'s SMF at ¶ 17]. The undisputed facts of this case contain ample evidence that, from this date forward, Defendants were aware of Mr. Dantowitz's diagnosis and took overt steps consistent with recognition of a disability, including discussing accommodations. [See id. at ¶ 24].

*5 This showing satisfies Mr. Dantowitz's burden as to the first element of this claim. To the extent Defendants attempt to draw a distinction between the letter providing a "diagnostic impression" rather than a formal "diagnosis" [see Dkt. 69 at 5], this is a triable issue. The Court cannot conclude, as a matter of law, that a plaintiff fails to satisfy his burden to establish a disability through presentation of a formal doctor's letter describing his condition after medical evaluation. Defendants' citation [id. at 6] to Zades v. Lowe's Home Centers, 446 F. Supp. 2d 29, 42 (D. Mass. 2006), is inapposite, as the plaintiff in that case submitted no "medical evidence" to establish her disability and relied only on her own "conclusory statement" along with portions of her own deposition. Id. Furthermore, Defendants' remaining arguments on this element are misplaced. Defendants allege, without citation to authority, that Mr. Dantowitz's statement that he did not require accommodations would defeat his claim of a disability—an argument the Court need not address because the parties dispute whether Mr. Dantowitz ever made such a statement. [See Pl.'s SMF at ¶¶ 24–25 (citing deposition testimony to dispute Defendants' assertion that Mr. Dantowitz rejected Ms. Aliber's offer of accommodations)]. Similarly, Defendants' citations to Mr. Dantowitz's claims of intelligence and successful use of compensatory strategies [see Dkt. 69 at 5–6] are independent of the question of whether he has presented evidence of a legal disability.

On the second element, Defendants argue [id. at 7–8] that Mr. Dantowitz was not a "qualified" person with a disability because he cannot make the requisite showing that he was capable of performing the essential functions of his job, either with or without accommodation. See Ward, 209 F.3d at 32–33. Here, Mr. Dantowitz points to his years of successful employment at the School between 2014—the year he received his diagnostic letter—and fall 2018, when the chain of events leading to his termination began. [See Dkt. 76 at 6–7]. Defendants do not argue that Mr. Dantowitz failed to perform the essential functions of his job during this period, and they refer only to events from fall 2018 and thereafter when attempting to establish that Mr. Dantowitz "failed to perform his core job responsibilities." [Dkt. 69 at 8]. Yet this question is not relevant at this stage of analysis; Mr. Dantowitz's alleged failure to perform his job in the months prior to his termination does not defeat his unrebutted showing that he had adequately performed in prior years. Accordingly, Mr. Dantowitz has met his burden as to this element.

On the third element, Defendants argue [id. at 8–9] that Mr. Dantowitz cannot show he was terminated "because of" his disability. See Ward, 209 F.3d at 32–33. Rather, Defendants allege that Mr. Dantowitz was terminated "purely on the basis of [his] poor performance and insubordination." [Dkt. 69 at 9]. Because Defendants have produced this legitimate, nondiscriminatory reason for Mr. Dantowitz's termination, the burden shifts to Mr. Dantowitz to prove that this reason is pretextual, and that the true case of his termination was unlawful disability discrimination. Flaherty, 946 F.3d at 53–54. To that end, Mr. Dantowitz argues that three sets of facts support his claim of pretext. First, he argues Defendants denied him an accommodation by not permitting him to record, or bring a third-party notetaker to, the series of meetings concerning his performance that

preceded his termination. [Dkt. 76 at 7–10.] Second, he argues the list of tasks he created during the summer of 2018 was never intended to be an exhaustive list of items that he needed to complete prior to the 2018–19 school year, and that Defendants' alleged reliance on that list in terminating him was unreasonable and thus pretextual. [Id. at 10.] Third, he argues that the School hired his replacement during his period of leave, and thus never intended to permit him to return to work, rendering the series of performance-related meetings between his return from leave and his termination fully pretextual. [Id.]

At this stage in the litigation, it would be improper for this Court to attempt any full assessment of the strengths of these three arguments. Rather, the sole question is whether Mr. Dantowitz has presented sufficient evidence from which a reasonable jury could infer that Defendants' "facially proper reasons given for [the] action against him were not the real reasons for that action." Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 33 (Mass. 2016) (quoting Wheelock Coll. v. MCAD, 355 N.E.2d 309, 315 (Mass. 1976)). The facts Mr. Dantowitz proffers are potentially sufficient to support an inference that the series of meetings and communications between Mr. Dantowitz and Defendants in December 2018 and January 2019 were for show, and that Defendants had already made an informal decision to terminate Mr. Dantowitz during his period of leave. This inference would thus defeat Defendants' arguments regarding Mr. Dantowitz's alleged "insubordination" in these meetings as a principal motivating factor in his termination. Moreover, the parties' dispute over the scope and **purpose** of the list of tasks that Mr. Dantowitz drafted in the summer of 2018 creates a material question of fact surrounding Defendants' assertion of Mr. Dantowitz's "poor performance," as Defendants rely significantly on Mr. Dantowitz's failure to complete these tasks in assessing his performance as sufficiently poor to justify termination.

*6 Where, as in many of the claims presented here, a party's unspoken state of mind is essential to resolution of a question of fact, it is very difficult for a court to conclude that a claim or defense succeeds or fails as a matter of law. Because Mr. Dantowitz has produced sufficient evidence that a reasonable jury may call Defendants' proffered innocence of mind into doubt, the Court cannot award summary judgment on Claim 1.

#### c. Claim 2: Associational Disability Discrimination, Chapter 151B

Mr. Dantowitz alleges that the School, Ms. Aliber, and Mr. Tucker further violated Chapter **151B** by discriminating against him on the basis of his association with another person with a disability. [See Dkt. 1-1 at ¶¶ 93–100]. Specifically, Mr. Dantowitz alleges that Defendants terminated him due to his obligations to care for his son, who has a disability. [Id.] Such associational discrimination is prohibited under the Massachusetts Supreme Judicial Court's interpretation of Chapter **151B**. Flagg v. AliMed, Inc., 992 N.E.2d 354, 365 (Mass. 2013). To establish a claim for associational discrimination, a plaintiff must show that "he was a qualified, adequately performing employee" who was terminated "because of his association" with a person with a disability. See id. (describing allegations that plaintiff was a qualified employee terminated because "his wife's total disability resulted in substantial medical expenses" to the employer as "a plausible set of facts for relief" under Chapter **151B**); see also Lashgari v. Zoll Med., 84 Mass. App. Ct. 1106 at *1 (2013) ("To establish a prima facie case for associational handicap discrimination, the employee must show that he was fired because of his association with his handicapped son.") (alteration and citation omitted).

Summary judgment is inappropriate on this claim, largely for the same reasons discussed above in relation to Claim 1. As there, Mr. Dantowitz has met his burden of production with regard to whether he was a qualified, adequately performing employee. Additionally, Defendants acknowledge in their briefing that they first learned of Mr. Dantowitz's son's disability in approximately 2012 [see Dkt. 79 at 4], thus establishing that they were aware Mr. Dantowitz was associated with a person with a disability throughout the course of events in question. Mr. Dantowitz has also proffered a sufficient potential nexus between his son's disability and his termination; as discussed above, a reasonable jury could conclude that Defendants decided to terminate Mr. Dantowitz during, and because of, the period of leave he took to care for his son. Accordingly, a triable issue of fact exists as to Claim 2.

#### d. Claim 3: Retaliation, Chapter 151B

Mr. Dantowitz further alleges that the School, Ms. Aliber, and Mr. Tucker retaliated against him in violation of Chapter **151B**—specifically, by creating a hostile and humiliating work environment and ultimately terminating him due to his requests for accommodations for both his own and his son's disabilities. [See Dkt. 1-1 at ¶¶ 101–04]. To establish a *prima facie* case for retaliation, a plaintiff must show

he "engaged in protected conduct," was "subjected to an adverse action by the defendant," and that "there was a causal connection between the protected conduct and the adverse action." Lebron v. Puerto Rico, 770 F.3d 25, 32 (1st Cir. 2014) (providing standard for **retaliation claims** under the ADA); see Murray v. Warren Pumps, LLC, 821 F.3d 77, 87 (1st Cir. 2016) (applying ADA retaliation standard to analogous **retaliation claims** brought under Chapter **151B**). In the absence of direct evidence of retaliation, the McDonnell-Douglas burden-shifting framework applies. Williams v. Kennedy, 38 F. Supp. 3d 186, 195–96 (D. Mass. 2014) (quoting Hodgens v. General Dynamics Corp., 144 F.3d 151, 160–61 (1st Cir. 1998)).

**\*7** Defendants dispute that Mr. Dantowitz engaged in **protected activity**. [See Dkt. 69 at 12]. Indeed, Mr. Dantowitz's own briefing on this issue does not identify which **protected activity** he engaged in pursuant to Massachusetts anti-discrimination law. [See Dkt. 76 at 12–13]. Rather, Mr. Dantowitz's arguments in support of Claim 3 rely on his decision to take FMLA leave to care for his son [id.], which, while certainly a legally **protected activity** that may give rise to *a* **retaliation claim**, does not fall within the category of **activities protected** by Chapter **151B**. See Mole v. University of Mass., 814 N.E.2d 329, 338 n.13 (Mass. 2004) (defining "**protected activity**," for **purposes** of a state-law **retaliation claim** brought pursuant to Chapter **151B**, as "oppos[ing] any practices forbidden under this chapter or ... has filed a complaint, testified or assisted in any proceeding under [G.L. c. **151B**, § 5]" or " 'aid[ing] or encourag[ing]' any other person in the exercise or enjoyment of' any right under G.L. c. **151B**."). A **claim** of **retaliation** relating to FMLA leave is more properly brought under the statutory cause of action created by the FMLA itself, see Workman v. Outfront Media, LLC, 474 F. Supp. 3d 373, 377 (D. Mass. 2020) (distinguishing between Massachusetts and FMLA **retaliation claims**), and indeed, Mr. Dantowitz has separately pled a **claim** of FMLA **retaliation** in this action, see infra discussion of Claim 7.

Setting aside Mr. Dantowitz's exercise of his rights under the FMLA, the record does not contain facts sufficient to sustain a reasonable jury's verdict of retaliation under Massachusetts law. Mr. Dantowitz does not allege that he filed a complaint, initiated an investigation, or engaged in any other form of **protected activity** that Massachusetts or federal courts have recognized as protected by Chapter **151B**. Thus, as a matter of law, Plaintiff cannot establish that Defendants retaliated against him in violation of that chapter. Accordingly, summary judgment shall issue for Defendants on Claim 3.

### e. Claim 4: Aiding and Abetting Discrimination, Chapter 151B

Mr. Dantowitz alleges that, in addition to directly discriminating against him, Ms. Aliber and Mr. Tucker aided and abetted the School in discriminating against him. [See Dkt. 1-1 at ¶¶ 105–07]. To prevail on an aiding and abetting claim pursuant to Chapter **151B**, a plaintiff must establish (1) "that the defendant committed a wholly individual and distinct wrong separate and distinct from the claim in main"; (2) "that the aider or abetter shared an intent to discriminate not unlike that of the alleged principal offender"; and (3) that "the aider or abetter knew of his or her supporting role in an enterprise designed to deprive the plaintiff of a right guaranteed him or her under [Chapter **151B**.]" Lopez v. Massachusetts, 978 N.E.2d 67, 82 (Mass. 2012) (citation and alterations omitted); Araujo v. UGL Unicco-Unicco Ops., 53 F. Supp. 3d 371, 384 (D. Mass. 2014). An aiding and abetting claim is "entirely derivative" of a freestanding discrimination claim; that is, a plaintiff must first allege that a "main offender"—here, the School—has committed an "underlying act of discrimination" before proceeding to allege aiding and abetting by other tortfeasors. Lopez, 978 N.E.2d at 82; Araujo, 53 F. Supp. 3d at 384.

As discussed above, Mr. Dantowitz has met his burden for overcoming summary judgment on Claim 1, his freestanding claim of discrimination against the School, as well as Claim 2, his claim of associational discrimination. The question on Claim 4 is thus whether Mr. Dantowitz has produced sufficient evidence to sustain a jury's finding that Ms. Aliber and Mr. Tucker committed a distinct act or acts in aid of that discrimination, that they likewise intended to discriminate against Mr. Dantowitz, and that they knew of their role in the School's broader scheme to unlawfully terminate him. See Lopez, 978 N.E.2d at 82.

Defendants assert that Mr. Dantowitz has not pointed to any acts of either Ms. Aliber or Mr. Tucker, distinct from the actions of the School, that could support a separate claim against either individual. [Dkt. 69 at 13]. In his own briefing, Mr. Dantowitz does not identify any such separate acts. [See Dkt. 76 at 13–14]. Rather, Mr. Dantowitz has alleged in Claims 1 and 2, and in his briefing supporting

those claims, that Ms. Aliber and Mr. Tucker are liable in principal alongside the School for his termination. Mr. Dantowitz's complaint and briefing do not separate the principal allegations of discrimination he levels against Ms. Aliber and Mr. Tucker from any distinct acts of aiding and abetting that must be established to support Claim 4. As such, the litigation against Ms. Aliber and Mr. Tucker should proceed only in principal, and summary judgment shall issue for Defendants on Claim 4.

### f. Claim 5: Threats, Coercion, and Intimidation, Chapter 151B

*8 Mr. Dantowitz alleges that Ms. Aliber and Mr. Tucker unlawfully threatened, coerced, and intimidated him on the basis of both his own disability and his son's disability, as well as his requests for reasonable accommodation based on both of those disabilities. [See Dkt. 1-1 at ¶¶ 108–11]. A plaintiff seeking relief under this provision of Chapter 151B must establish that "(1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or [Massachusetts], (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion." Meuser v. FedEx Corp., 564 F.3d 507, 516 (1st Cir. 2009) (quoting Bally v. Northeastern Univ., 532 N.E.2d 59, 51–52 (Mass. 1989)); see Carvalho v. Town of Westport, 140 F. Supp. 2d 95, 99–100 (D. Mass. 2001) (applying Bally's standard to a disability discrimination claim).

A "threat," within the meaning of this statute, is "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." Planned Parenthood League of Mass., Inc. v. Blake, 631 N.E.2d 985, 990 (Mass. 1994). "Intimidation" involves "putting in fear for the **purpose** of compelling or deterring conduct"; and "coercion" entails "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." Id. (citations omitted). Courts apply "the objective standard of a reasonable person" to determine whether a defendant's conduct constitutes threats, intimidation, or coercion. Meuser, 564 F.3d at 520; Haufler v. Zotos, 845 N.E.2d 322, 335 (Mass. 2006).

Generally, a plaintiff must proffer evidence of "an actual or potential physical confrontation accompanied by a threat of harm" to prevail on a claim brought pursuant to this statute. See Koppel v. Moses, No. 20-11479-LTS, 2022 WL 669734 at *2 (D. Mass. Mar. 7, 2022). Although "purely economic pressures may constitute actionable coercion" under Chapter **151B**, it is rare for a successful claim to "involve no physical threat of harm." Thomas v. Harrington, 909 F.3d 483, 492 (1st Cir. 2018) (citing Nolan v. CN8, 656 F.3d 71, 77–78 (1st Cir. 2011)). Massachusetts courts have, however, recognized a "narrow" exception to this requirement of a physical threat of harm where a "pattern of harassment and intimidation" supports a finding of non-physical coercion. Id. at 493 (quoting Howcroft v. City of Peabody, 747 N.E.2d 729, 746 (Mass. App. Ct. 2001)).

Here, the facts proffered by Mr. Dantowitz are not sufficient to support a reasonable jury's verdict in his favor on Claim 5. Mr. Dantowitz has never alleged that any Defendant made a physical threat of harm upon his person, which would place his claim within the narrow exception for "pattern[s] of harassment and intimidation." Id. Yet neither Massachusetts nor federal courts have broadly granted relief pursuant to this exception, and where they have found actionable claims, the plaintiffs there have proffered far more robust sets of facts suggesting a continuous pattern of harassment than Mr. Dantowitz alleges here. For example, in Howcroft, 747 N.E.2d at 733, a police officer brought a claim related to his advocacy against smoking in a police station. Id. The record at summary judgment included facts suggesting:

> defendants' deliberate disregard of State law regarding prohibited smoking in designated areas of the station house, harassment of Howcroft by ordering him to "shut up," blowing smoke in his face after he complained, reassignment of Howcroft to the station house (an act designed, we infer, to increase Howcroft's exposure to tobacco smoke), the declaration by Champagne that the station house was "my building" and a "smoking building," the failed attempts to suspend Howcroft without pay or to deprive him of benefits to which he was subsequently found entitled, and the arbitrary enforcement of [a rule requiring officers to obtain approval before leaving their residences while

on sick leave], permit the conclusion that Howcroft has presented a triable issue whether the defendants attempted to silence him by concerted harassment and retaliation amounting to prohibited intimidation.

*9 Id. at 746. In other cases, plaintiffs have similarly overcome this cause of action's usual requirement of a threat of physical harm with facts showing sufficiently longstanding and egregious patterns of harassment and intimidation. See, e.g., Broderick v. Roache, 803 F. Supp. 480, 487 (D. Mass. 1992) (finding a reasonable jury could return a verdict for plaintiff where facts included a years-long "scheme of harassment" involving, inter alia, numerous disciplinary proceedings and the alleged deprivation of multiple constitutional and statutory rights).

Here, Defendants' actions as presented in the record do not rise to the "sort of physical, moral, or economic pressure that courts have found sufficient to support a claim under this statute." Meuser, 564 F.3d at 519. The individual Defendants' actions do not fit a long-term pattern of harassment of Mr. Dantowitz, but rather appear to represent the steps normally taken by an employer preceding termination—whether that termination was lawful or otherwise. In other words, Mr. Dantowitz has not established a pattern of intimidation or harassing behavior sufficiently distinct from the ultimate adverse action (his termination) of which he complains. The First Circuit has cautioned that "the exception for claims based on non-physical coercion remains a narrow one," and should not be invoked absent a more robust showing of a pattern of harassment and intimidation. Meuser, 564 F.3d at 519. Accordingly, summary judgment shall issue for Defendants on Count 5.

### g. Claim 6: Interference with Rights Accorded by the FMLA

Mr. Dantowitz alleges that the School, Ms. Aliber, and Mr. Tucker interfered with his right under the FMLA, 29 U.S.C. § 28, to take leave to care for both himself and his son. [See Dkt. 1-1 at ¶¶ 112–18].

"The FMLA was enacted to help working women and men balance the competing demands of work and personal life." Carrero-Ojeda v. Autoridad de Energia Electrica, 755 F.3d 711, 718 (1st Cir. 2014). The law entitles an employee, inter alia, to twelve weeks' leave per year for qualifying family and medical reasons, and makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of" any FMLA-protected right. Id. at 722 (quoting 29 U.S.C. § 2615(a)(1)). To prevail on an FMLA interference claim, a plaintiff must show that his employer did not provide him "the benefits to which [he] was entitled per the FMLA." Id. This is a strict-liability standard, as a plaintiff is not required to make any showing as to the employer's intent. Id.

Here, Mr. Dantowitz alleges at least three theories upon which a jury could plausibly find that Defendants denied him the benefits to which he was entitled under the FMLA. First, Mr. Dantowitz alleges that Defendants required him to perform work while he was on leave. [See Dkt. 76 at 15; Pl.'s SOF at ¶ 48]. Second, Mr. Dantowitz alleges that Ms. Aliber discouraged him from taking FMLA leave and instead encouraged him to take another form of leave that did not carry the protections of the FMLA. [See Dkt. 76 at 15; Pl.'s SOF at ¶¶ 45–47]. And third, Mr. Dantowitz alleges that Defendants placed him on leave earlier than he had anticipated, which interfered with his ability to adequately complete tasks prior to beginning leave. [See Dkt. 76 at 15; Pl.'s SOF at ¶ 47].

The facts surrounding each of Mr. Dantowitz's three theories are very much in dispute. [See Pl.'s SOF at ¶¶ 42–43, 45–48]. Defendants argue that they did not require Mr. Dantowitz to perform work while on leave, that Ms. Aliber's conversations with Mr. Dantowitz should not be construed as discouraging of his taking FMLA leave, and that Defendants were reasonable in interpreting Mr. Dantowitz's communications as requesting an immediate term of leave. [See Dkt. 79 at 5–7]. Moreover, each party cites to record evidence in support of its positions on each of Mr. Dantowitz's three theories. Because a clear and material dispute of fact exists on at least three theories that could sustain a verdict for Mr. Dantowitz on Claim 6, summary judgment is not appropriate on this claim.

### h. Claim 7: Retaliation Under The FMLA

*10 Relatedly, Mr. Dantowitz alleges that the School, Ms. Aliber, and Mr. Tucker retaliated against him for invoking his rights under the FMLA. [See Dkt. 1-1 at ¶¶ 119–25]. The FMLA prohibits an employer from retaliating against an employee for exercising any FMLA rights; for example, an employer may not use an employee's decision to take leave "as a negative factor in deciding to hire, fire, promote, or

provide benefits" to that employee. Carrero-Ojeda, 755 F.3d at 719. To state a *prima facie* case for FMLA retaliation, a plaintiff must show that he (1) availed himself of "a protected FMLA right"; (2) was "adversely affected by an employment decision"; and (3) "there was a causal connection between [his] protected conduct and the adverse employment action." Id. (citation omitted). As with other types of **retaliation claims**, a form of the McDonnell-Douglas burden-shifting framework applies where an FMLA plaintiff does not show direct evidence of employer retaliation. See Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 335–36 (1st Cir. 2005).

As noted above in the Court's discussion of Claim 3, Claim 7 is the proper vehicle for Mr. Dantowitz to allege that Defendants unlawfully terminated him as a result of his decision to take FMLA leave. Defendants argue that this **retaliation claim** fails as a matter of law on two grounds: first, that there is no causal connection between Mr. Dantowitz's FMLA leave and his termination; and second, that Mr. Dantowitz cannot satisfy the McDonnell-Douglas burden-shifting framework in the absence of direct evidence of retaliation. [Dkt. 69 at 16–19]. Again, Defendants' arguments are rooted in facts that remain in dispute. [See, e.g., Pl.'s SOF at ¶¶ 33, 81, 84–85, 87–88]. Defendants allege that they terminated Mr. Dantowitz for performance issues that predated his decision to take FMLA leave, and cite Mr. Dantowitz's failure to complete the list of tasks he submitted in the summer of 2018. [Dkt. 69 at 17]. Mr. Dantowitz, again, disputes Defendants' characterization of the list of tasks, and cites Defendants' behavior during and after his FMLA leave as evidence of pretext. [Dkt. 76 at 16–17]. Because numerous facts remain in dispute regarding Mr. Dantowitz's performance prior to his period of FMLA leave, the nature of the list of tasks he drafted, and many other aspects of the parties' respective conduct at the time in question, the Court cannot adjudicate Claim 7 as a matter of law, and summary judgment would therefore be inappropriate.

### i. Damages

As a final matter, Defendants argue that Mr. Dantowitz cannot prove damages in this action because he has profited from his work for his own company since his termination. [Dkt. 69 at 19–20]. As to Claims 1 and 2, the Court need not address the issue of whether Mr. Dantowitz can prove he has suffered economic damages, because Mr. Dantowitz also seeks emotional distress damages, and Massachusetts courts have long recognized that these damages are available in Chapter **151B** employment discrimination actions. See, e.g., Stonehill Coll. v. MCAD, 808 N.E.2d 205, 220 (Mass. 2004). With regard to Claims 6 and 7, emotional distress damages are not available under the FMLA, and thus Mr. Dantowitz must prove actual monetary losses. Pagan-Colon v. Walgreens of San Patricio, Inc., 697 F.3d 1, 16 (1st Cir. 2012).

Defendants argue that the profitability of Mr. Dantowitz's company in the period following his termination negates his ability to recover economic damages for his loss of income from employment at the School. [Dkt. 69 at 19–20]. However, there are no uncontested facts in the record that suggest Mr. Dantowitz's employment at the School and his management of his company were mutually exclusive; indeed, the parties agree that Mr. Dantowitz had operated his company during the period of time he was employed by the School [see Pl.'s SOF at ¶ 37]. There is simply nothing to suggest any basis for this Court to hold, as a matter of law, that Mr. Dantowitz cannot establish he suffered monetary damages in connection with his allegations.

### IV. CONCLUSION

*11 In summary, Defendants' Motion for Summary Judgment [Dkt. 68] is **GRANTED** as to Claims 3, 4, and 5; and **DENIED** as to Claims 1, 2, 6, and 7. Defendants' Motion to Strike [Dkt. 81] is **DENIED**. A jury trial on the four remaining claims is scheduled for January 9, 2023.

**SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 4111910

### Footnotes

1     Defendants' related Motion to Strike [Dkt. 81] is **DENIED**. Defendants correctly note that "as a general matter, only evidence that would be admissible at trial may be considered by the Court on summary judgment." Inner-Tite Corp. v. DeWalch Tech., Inc., 2007 WL 2507737, at *3 (D. Mass. Aug. 31, 2007) (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 49-51 (1st Cir. 1990)). However, each of the admissibility arguments Defendants raise in support of their motion is more accurately categorized as an argument concerning the *weight* to be accorded to Mr. Dantowitz's contested statements and denials at trial. Defendants may, as the Federal Rules of Evidence permit, seek to introduce evidence of Mr. Dantowitz's prior inconsistent statements for substantive and/or impeachment **purposes** at trial, and it will be the province of the jury to determine what, if any, weight to accord these statements. However, it is axiomatic that the Court may not "make credibility determinations or weigh the evidence" when considering a motion for summary judgment. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

2     Ms. Aliber is identified in some documents as Ms. Carmen Urbonas.

3     The parties dispute whether the School had previously been on notice that the telescope was non-operational.

4     Mr. Dantowitz's son, a minor, has autism spectrum disorder. Defendants acknowledge that they have known of Mr. Dantowitz's son's disability since approximately 2012. [See Dkt. 79 at 4].

5     Chapter **151B**, and many cases interpreting it, use the term "handicap" to describe a legally protected disability. This opinion uses the preferred term "disability" in place of "handicap" where not directly quoting sources, and ascribes equivalent legal significance to the two terms.

End of Document      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.    10