# Exhibit B

Ronald F. Dantowitz vs
Dexter Southfield, Inc., et al.

Michael Williams
April 27, 2021

Page 3

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF MASSACHUSETTS
 3
 4   ----------------------------x
 5   RONALD F  DANTOWITZ
 6              Plaintiff
 7                     Civil Action
 8   v               No  20-CV-10540-FDS
 9
10   DEXTER SOUTHFIELD, INC ,
11   CARMEN ALIBER, and
12   STEWART TUCKER,
13              Defendants
14   ----------------------------x
15
16
17        DEPOSITION OF MICHAEL WILLIAMS
18              Conducted Remotely
19              Holliston, Massachusetts
20        Tuesday, April 27, 2021 at 9:30 a m
21
22
23
24        Taken By:  Nicole E  Lavigne, RPR, CSR
```

```
 1                   I N D E X
 2
 3   WITNESS                    EXAMINATION
 4   MICHAEL WILLIAMS
 5   (By Ms  Stones)                    6
 6
 7
 8               E X H I B I T S
 9   NO                            PAGE
10   Exhibit 1  Stipulations for Remote Depositions      7
11   Exhibit 2  Excerpt of Handbook Policy        46
12   Exhibit 3  Acceptable Use Policy        49
13   Exhibit 4  4/1/19 Annual Appraisal        58
14   Exhibit 5  1/14/19 Email              76
15   Exhibit 6  10/11/19 Email            117
16   Exhibit 7  Text Messages            132
17   Exhibit 8  Declaration of Michael Williams      167
18
19        (Exhibits were given to the court
20        reporter to attach to the transcript )
21
22
23
24
```

Page 2

```
 1               A P P E A R A N C E S
 2
 3   SUZANNE L  HEROLD, ESQUIRE
 4   Herold Law Group, P C
 5   50 Terminal Street
 6   Building 2, Suite 716
 7   Charlestown, Massachusetts  02129
 8   suzie@heroldlawgroup com
 9        Counsel for the Plaintiff
10
11   LAURA D  STONES, ESQUIRE
12   Schwartz Hannum PC
13   11 Chestnut Street
14   Andover, Massachusetts  01810
15   lstones@shpclaw com
16        Counsel for the Defendants
17
18   Also Present:  Carmen Aliber
19              Stewart Tucker
20
21
22
23
24
```

Page 4

```
 1               S T I P U L A T I O N S
 2        It is hereby stipulated and agreed by and
 3   between counsel for the respective parties that the
 4   deponent shall waive the reading and signing of the
 5   deposition transcript and that the filing and sealing
 6   of the deposition transcript are waived
 7        It is further stipulated and agreed that all
 8   objections, except objections as to the form of the
 9   question, and all motions to strike shall be reserved
10   until the time of trial
11
12        THE COURT REPORTER:  I am Nicole
13   Lavigne, the stenographer  I'm a
14   Registered Professional Reporter and notary
15   public in the Commonwealth of
16   Massachusetts   This deposition is being
17   taken remotely, and the witness is
18   appearing remotely from Holliston,
19   Massachusetts
20        The attorneys participating in this
21   proceeding acknowledge their understanding
22   that I'm not physically present in the
23   proceeding room nor am I physically present
24   with the witness and that I will be
```

Ronald F. Dantowitz vs
Dexter Southfield, Inc., et al.

Michael Williams
April 27, 2021

---

Page 85

1  for some of the things I had overheard I thought were a
2  little disconcerting.  I also mentioned them to Carmen.
3    **Q. So let's start with Jeff, so what concerns did**
4  **you raise to Jeff?**
5    A.  There were a couple of times that Ian Moorhouse
6  had made reference that the school was looking to
7  terminate people that were older or with medical
8  issues, and I thought that that was a very awkward
9  thing to be said.  And, you know, I brought that to
10  both Carmen and Jeff's attention, and they both said
11  that, you know, this is -- you know, that I'm just
12  trying to make stuff up.  But it was something that I
13  had heard a couple of times from his mouth, and I
14  thought it was a little bit of an alarming situation,
15  having -- being, you know, older and somebody who the
16  school knew had medical issues.
17    **Q. So what did Ian say to you?**
18    A.  When I addressed that directly, we were up in
19  the fifth floor of the Clay Center setting up for an
20  event.  He made a comment within earshot of a number of
21  people letting them know that two individuals
22  specifically, Ron Dantowitz and Bob Phinney, were on
23  their way out and that the school was working on making
24  sure that happens.  He additionally made a comment

---

Page 86

1  about somebody -- you know, getting rid of people that
2  were older -- you know, with medical problems.  I was standing right
3  next to him.
4      I turned to Ian and I said:  I can't believe I'm
5  hearing you.  Even if that was true, that's not
6  something the school -- you should be even talking
7  about.  And I -- and I said:  How do I know I'm not on
8  that list?
9      He goes:  You're definitely not on that list.
10      I said:  Why?  I said:  I'm older and the school
11  has known reports of me having medical issues.  Being a
12  bus driver, I had to borrow a school vehicle and sign
13  out a school vehicle every time I went to a doctor's
14  office.  At the time I was seeing an eye doctor for the
15  eye issue every other week.
16      In addition, Rick Saul, Stewart Tucker, and
17  Ron -- and Todd, Todd Vincent, received an email prior
18  to all of this saying that my doctor was changing the
19  medicine that I was taking.  That change could cause
20  certain emotional issues, again, because the hormones
21  in my body were getting adjusted.  He said that some
22  businesses might want their employees going through
23  this to sign out on FMLA.
24      At the time I was on test -- very high doses of

---

Page 87

1  testosterone and the cost was $2400 a month.  And I let
2  the school know in that message that the good part of
3  being -- you know, being moved off of something that
4  was $2400 a month to something that was around $60 a
5  month, you know, this is a good thing all around.  You
6  know, I thought it was an appropriate conversation, but
7  I felt that I had alerted the school to something that
8  ordinarily would not have been fully disclosed to that
9  degree.
10      In addition, knowing the frequency of doctors'
11  appointments that it was -- became a very concerning
12  comment to me.  Actually lost sleep a few nights about
13  it and also wondered whether or not, you know,
14  everything that was going on, if that was something
15  that the school was looking to terminate me as well.
16    **Q. And what was the concerning comment?**
17    A.  The fact that Ian had announced to people in the
18  room that the school was looking to get rid of older
19  people and people with medical issues.
20    **Q. And as you were giving that answer, are you**
21  **looking at a document right now?**
22    A.  I'm looking at the document that I signed --
23    **Q. I see.**
24    A.  -- for Suzie.

---

Page 88

1    **Q. For the record, I'll just note you held up**
2  **your --**
3    A.  That's fine.  I was just wondering if I had put
4  dates on there so...
5    **Q. So did I hear you correctly that you were on the**
6  **fifth floor of the Clay Center when Ian made these**
7  **remarks?**
8    A.  That's correct.
9    **Q. And who else was within earshot?**
10    A.  I know there were a couple other faculty members
11  in there.  They would have been people that were
12  related to the science and technology camp because they
13  were, I believe, cleaning up the room or organizing the
14  room for an event.
15    **Q. Do you remember the names of any of the**
16  **individuals who were present?**
17    A.  Right off the top of my head, no.  Kevin McLean
18  might have been there and then I believe there were two
19  or three faculty members that are full-time employees
20  and there were a couple of people that were there for
21  the summer.
22    **Q. Do you recall any of the other names?**
23    A.  No.
24    **Q. And what words did Ian use when he made the**

---

Ronald F. Dantowitz vs
Dexter Southfield, Inc., et al.

Michael Williams
April 27, 2021

---

Page 89

1  comment about Ron Dantowitz and Bob Phinney?
2     A.  They were -- he was referencing the fact that
3  they had a lot of extra equipment up on that -- up on
4  the fifth floor that was always in the way, and I think
5  he was just trying to alleviate people from, you know,
6  the stress that they were going through trying to clean
7  up a room around all the equipment that was up there.
8  Both of them came with a sizable amount of -- I will
9  call them toys, toys and tools, and usually cluttered
10  that space.
11     Q.  And do you recall what words Ian used?
12     A.  He had ind -- he just said that, you know, it is
13  something that the school is looking to get rid of both
14  of them and then followed up the conversation with, you
15  know, the school is looking to get rid of, you know,
16  old -- you know, "older people" and "people with
17  medical problems" were his exact words.  Those repeated
18  in my head multiple times.  That's when I actually
19  mentioned something to both Carmen and Jeff was a few
20  days later after not being able to sleep.
21     Q.  And did Ian use the phrase "get rid of"?
22     A.  Yes.
23     Q.  Did Ian make any reference to the school
24  removing the equipment that you just referenced?

---

Page 90

1     A.  Yes.  He had indicated that the school was
2  working to get all that equipment cleaned up.
3     Q.  Did he use the phrase "get rid of" when he was
4  referring to the equipment?
5     A.  Yes.  And later, at one point, he told me just
6  between the two -- you know, when it was a conversation
7  with just between the two of us that both Bob and Ron
8  would be losing their jobs somewhere along the line.
9     Q.  So the comment about Ron and Bob, was that
10  within earshot of others or this was a comment made
11  just to you?
12     A.  Just to me, but it was very common.  People
13  would -- he made that comment in passing to other
14  faculty members because it was something that was
15  routinely brought up when he was not around with other
16  faculty members; people would mention that they were,
17  you know, going to be leaving the school soon.
18     Q.  And who else did Ian mention this to?
19     A.  I think pretty much everybody in the science and
20  technology camp.  I believe -- I believe I had a
21  conversation with Kevin McLean about it.  I believe
22  Bradley Cooke mentioned it to me and a few other
23  employees.
24     Q.  Do you remember any of the others' names?

---

Page 91

1     A.  No.
2     Q.  So tell me about your conversation with Kevin.
3  What did he say to you?
4     A.  He just had indicated that, you know, it was
5  something he had heard and that was about the extent of
6  it.
7     Q.  Did he say where he had heard it?
8     A.  From Ian.
9     Q.  And what did he say that Ian said?
10     A.  You know, that basically the -- all of the, as I
11  called it, the toys and -- toys and tools would be gone
12  when they are no longer at the school.
13     Q.  So that was Kevin's -- Kevin also referenced the
14  equipment on the fifth floor of the Clay Center?
15     A.  Yeah.  It was -- that equipment was always an
16  issue for the school because it added a lot of clutter
17  to that area, and it was probably not well-kept.
18     Q.  Do you remember anything else about your
19  conversation with Kevin?
20     A.  No.  I mean, we always talked in passing and
21  tried to figure out what we needed to do to get things
22  done, and that came up in conversation at one point.
23     Q.  Do you remember when you had this conversation
24  with Kevin?

---

Page 92

1     A.  Not at all.
2     Q.  Remember what year it was?
3     A.  I would say off and on in 2018 and 2019.
4     Q.  And do you remember when Ian made these comments
5  on the fifth floor of the Clay Center?
6     A.  I do not.  I can say that within my calendar, it
7  would have been around the time that I no longer
8  received invites to operations meetings, and I was
9  asked by the head of school Todd Vincent why I'm not
10  attending the meetings and I told him I was not
11  invited.  I told Ian that he needed to invite me and no
12  longer was my name on the invitation so...
13     Q.  So roughly --
14     A.  You would have to check my calendar in the
15  school's email system to see when that stopped.
16     Q.  Well, do you remember roughly, you know, what
17  year or what --
18     A.  I think it was around 20 -- in the -- I think it
19  was around August 2018.
20     Q.  All right.  And tell me about your conversation
21  with Bradley.  What did he tell you?
22     A.  Bradley is a female.  And when she found out I
23  was leaving, she asked me why I was leaving.  I told
24  her that it was a career change.  We had a -- start of

---

Ronald F. Dantowitz vs
Dexter Southfield, Inc., et al.

Michael Williams
April 27, 2021

---

Page 101

1 Bob had expressed concerns to me that, you know, he
2 felt targeted by Ian, and he felt that there was
3 something going on. And I was just making sure, you
4 know, if I could help, you know, ease whatever the
5 situation was without knowing it, you know, whether it
6 was moving equipment around on campus, I kind of, you
7 know, helped with some of that communications.
8     And, you know, because of that, I had a lot of
9 opportunity to, you know, walk the Clay Center and walk
10 various areas of space and storage as to, you know, who
11 owns what and where -- you know, whether it's an IT
12 issue, whether it's an observatory issue. And, you
13 know, during those conversations, Ian had indicated to
14 me that -- you know, a couple of times that they --
15 they were working on solving the problem, as they
16 say -- as he would say.
17     **Q. So Ian -- did Ian use the phrase "solving the**
18 **problem"?**
19     A. He would use those phrases. He -- a couple
20 times he said that they would be -- they would part
21 ways, whether they -- you know, one -- at one point he
22 actually said to me that he was doing everything he
23 could to make their lives difficult and hoped they
24 would leave.

---

Page 102

1     **Q. When did he say that to you?**
2     A. A couple of times in conversation. And, you
3 know, again, it was just kind of an awkward situation,
4 but, you know, he would make those comments that
5 hopefully they would leave on their own. I would kind
6 of laugh and say: Well, Bob is not going to leave on
7 his own. He grew up in this school. And that's when
8 he, you know, had indicated that, you know, something
9 would occur, probably a termination of some sort.
10     And I have no -- and I have no idea how --
11 actually have no idea how Bob and the school parted
12 ways other than, you know, some things that Bob said.
13 And other than this, I would have had no idea why Ron
14 and the school parted ways.
15     **Q. When did -- the conversation you just described**
16 **with Ian, when did it take place?**
17     A. It would have been throughout 2017, 2018, and
18 2019. It was multiple conversations.
19     **Q. When did Ian specifically reference Ron**
20 **Dantowitz in conversations with you?**
21     A. His primary focus in 2017 and '16 was on Bob.
22 In 2019 it was with Ron on a number of occasions. I
23 know that Ron was not on campus. I didn't know a
24 hundred percent why Ron wasn't on campus. I thought it

---

Page 103

1 was -- I thought he was on some sort of medical leave.
2     Ron and I had spoken on a number of occasions
3 prior to his departure about various medical issues he
4 had. He told me that he was having cataract issues,
5 which is difficult thing for somebody who's got to look
6 through a telescope. I actually had cataract surgery.
7 The eye issues that I had, I ended up having a cataract
8 due to steroid drops that were put into the eye. So I
9 explained to him that it was a painless, you know,
10 process, and we had a long conversation about that.
11     He had also told me that he was -- he had some
12 other issues that he was dealing with with his family
13 as well as with himself personally. To be honest with
14 you, I don't remember exactly what they were, you know,
15 some sort of medical or emotional issue. So --
16     **Q. I'm --**
17     A. -- I just assumed he was out helping his kids.
18     **Q. I'm asking about conversations you had with Ian**
19 **where Ian referenced Ron. So when did those**
20 **conversations occur?**
21     A. During Ron's leave.
22     **Q. Do you remember anything more specific about**
23 **when those conversations --**
24     A. Datewise, no, not at all.

---

Page 104

1     **Q. Okay. Let's start with the first time Ian**
2 **mentioned Ron to you. Where were you guys when you had**
3 **this conversation?**
4     A. We would have been in the Clay Center looking at
5 equipment that he was asking me if I knew if Ron owned
6 it or if it was owned by the school.
7     **Q. Okay. And what else -- what do you remember**
8 **from that conversation? What did Ian say and what did**
9 **you say?**
10     A. Ian told me that he was trying to get Ron to get
11 all his equipment off campus, and they wanted to make
12 sure if it was not owned by the school, that he would
13 take it -- all the equipment off -- off campus. I know
14 that both -- well, I don't know for a fact. Based on
15 what Ron and Bob told me, that they provided a lot of
16 stuff that they owned for their different programs to
17 the school, but I would have no idea as to who owned
18 what.
19     I don't -- I wasn't responsible for the books.
20     **Q. Okay. And do you remember anything else about**
21 **that conversation with Ian?**
22     A. We had several. I mean, we went through -- we
23 went through four different floors in the Clay Center,
24 the basement, the third floor, the fourth floor, and

---

Ronald F. Dantowitz vs
Dexter Southfield, Inc., et al.

Michael Williams
April 27, 2021

---

Page 105

1 the fifth floor on a number of occasions into various

2 closets and looking at different equipment. And we had

3 that same conversation, you know, easily 10 or 15

4 different times so...

5 **Q. Okay. Did Ian mention Ron Dantowitz in any**

6 **other one-on-one conversations that you had with him?**

7 A. No. That was -- that was the extent.

8 **Q. Going back to when you were on the fifth floor**

9 **of the Clay Center and others were present, you said**

10 **Ian made a remark about people who were older and with**

11 **medical problems; is that right?**

12 A. That's correct.

13 **Q. And I'm just going to ask one more time, what**

14 **words did Ian use when he made this remark?**

15 A. At first it was he was telling everybody not to

16 worry about the equipment that was in the way of the

17 cleaning because that was something they were taking

18 care of. And then after he made that statement, he

19 made a very casual comment that the school was looking

20 to get rid of anybody that was older or with medical

21 issues, and that's when I turned to him and said: You

22 can't say that. Even if that was true, you should

23 never say that.

24   His reply to me says: It's fine because it's

---

Page 106

1 all hearsay and would not be something that he could be

2 held accountable for.

3   And then I said to him, I said: Well, I'm

4 concerned I'm on that list.

5   He asked me why I would be concerned. I told

6 him that I'm an older person. I told him -- I think at

7 the time I was 52, and I said: I'm looking at -- you

8 know, I don't know where you judge age. So am I on

9 that list from an age perspective, and he said no. I

10 then said: Well, I also have medical issues that the

11 school is aware of and became more aware of than

12 ordinarily because of the changes that the doctor was

13 putting me through.

14 **Q. And when you use that phrase "on that list" when**

15 **you were speaking to Ian, what list were you referring**

16 **to?**

17 A. Well, he was saying that they were trying to get

18 rid of people that were older and with medical

19 problems, so I would imagine if that's a true

20 statement, then they have a magical list of people that

21 they're trying to identify. I mean, it's a logical

22 assumption from that point of view.

23 **Q. Did anyone else in the room react to Ian's**

24 **remarks?**

---

Page 107

1 A. I think a lot of people just -- that overheard

2 it just went back to ignoring what was being said. I

3 think part of the conversation that I've had with other

4 people on campus was it was a very uncomfortable thing.

5 And I don't know whether or not I spoke to Kevin

6 directly about it, but I know that I had that same

7 conversation with a few people. And I just said I -- I

8 can't -- I don't know what's going on. I said to me

9 it's a weird -- it's a weird comment. I don't know why

10 anybody would ever say that.

11 **Q. And did you speak with anyone else who was**

12 **present in the room when Ian made these remarks?**

13 A. I think after that, I left. My job was done. I

14 left and, you know, I didn't speak to Ian or anybody

15 else in that area for days. I was busy doing other

16 things I needed to take care of.

17   THE COURT REPORTER: I've been trying

18   to wait for a quick break, but when you get

19   a moment, I do need two minutes.

20   MS. STONES: Sure, absolutely. I

21   thought we would take a break sooner.

22   Unfortunately this line was just kind of a

23   lot longer. Yeah, I'm also looking for a

24   breaking point. Just a moment.

---

Page 108

1   All right. We can just go ahead and

2   break now. It's fine. We'll have to come

3   back to this topic a bit when we come back.

4   We have been going for a long time. Thank

5   you to everyone for your patience on that.

6   It's 11:45 now. So I'm going to suggest

7   actually let's take a break for, you know,

8   at least 30 minutes, let people get a

9   snack, get a drink of water.

10   So I'll suggest we come back at 12:15

11   unless anyone -- Suzie, would you suggest a

12   different time?

13   MS. HEROLD: No. That's good.

14   MS. STONES: All right. Well, let's

15   go off the record. We'll come back at

16   12:15.

17   (A brief recess was taken.)

18   MS. STONES: It's 12:14 and we're

19   back on the record.

20 **Q. (By Ms. Stones) Mr. Williams, you testified**

21 **that you spoke with Jeff Dubois and Carmen about**

22 **concerns about discrimination and harassment while you**

23 **were at the school; is that right?**

24 A. I did not put it to those terms to them, but I

---

Ronald F. Dantowitz vs
Dexter Southfield, Inc., et al.

Michael Williams
April 27, 2021

---

Page 189

1    A. Upon my notice, which would have been four weeks
2 prior to my departure.
3    Q. Do you remember where you were when you talked
4 to him?
5    A. I was in his office.
6    Q. Was anyone else present?
7    A. No.
8    Q. And what words did Jeff use during this
9 conversation?
10    A. As I indicated, he said that, you know, it would
11 give the school an opportunity to bring in younger
12 employees which is something they're trying to do.
13    Q. And what did you say in response?
14    A. I didn't respond at all.
15    Q. Did you tell anyone about your conversation with
16 Jeff?
17    A. I don't recall.  I'm assuming you mean at the
18 school.  I obviously told Suzie and Ron.
19    Q. Yeah.  While you were still employed at Dexter
20 Southfield, did you ever tell anyone about this
21 conversation with Jeff?
22    A. No.
23    Q. Looking at paragraph 17, you referenced your
24 exit interview.  Is that the meeting with Carmen and

---

Page 190

1 Carla that you described a moment ago or is that
2 something different?
3    A. That's correct.
4    Q. It's the meeting with Carmen and Carla?
5    A. Mm-hmm.
6    Q. Okay.  And when did that meeting take place?
7    A. A few days before my last day.
8    Q. Do you remember where the meeting was held?
9    A. In Carmen's office.
10    Q. Was anyone present other than you, Carmen, and
11 Carla?
12    A. No.
13    Q. What do you remember about what was said in that
14 meeting?
15    A. Other than the normal process, when I mentioned
16 the MRI, she did tell me that the school was
17 self-funded you know, insurance and that they were
18 working to reduce medical expenses by -- the company
19 that they're working with will be reducing the number
20 of claims that would be allowed and considered
21 frivolous.
22    Q. Do you remember anything else about what was
23 said during that meeting?
24    A. Other than the stuff I've already said, no.

---

Page 191

1    Q. Did Carla say anything?
2    A. No.
3    Q. Were you asked about what the school could do
4 better or differently?
5    A. It's very possible that was in there.
6    Q. Do you remember responding to a question like
7 that?
8    A. I honestly don't remember.
9    Q. Do you remember if you raised any concerns or
10 complaints about your experience at the school?
11    A. I don't -- I don't recall if I did.
12    Q. Have you used the school as a professional
13 reference?
14    A. Have I used the school as a -- no.
15    Q. So I want to turn to the last page of your
16 declaration, paragraph 18.  You reference "at least one
17 of the senior managers."  Who are you referring to?
18    A. I believe that in the way Ian was working with
19 various people in some of the conversations that I had,
20 he was looking to do everything he could to get a
21 younger staff in there.  As I had indicated, he had
22 suggested that I build out the IT staff with junior
23 people because they were less expensive, and oftentimes
24 you can add more people into the group and make your

---

Page 192

1 teams bigger.  And you would also be in a position
2 where they would look up to you, and you'd be able to,
3 you know, sort of manage people better.
4        I come from a mentality of you hire smart
5 people, and you let them do what they need to do to
6 make things happen.  So I think that every aspect of
7 conversations I ever had with Ian was around making
8 sure that we are looking at things as an organization
9 to eliminate people that are tenured and bring in
10 people -- junior people into the organization.
11    Q. So does your statement in paragraph 18 refer to
12 Ian Moorhouse?
13    A. Yes.
14    Q. Does it refer to anyone else?
15    A. I would wonder if that's something that was on
16 Carmen's agenda as well, but I have no real bias to
17 that opinion from that point of view.  I have no
18 real -- really anything to stand on to say this is
19 clearly what's going on.
20        MS. STONES:  All right.  I think I'm
21     about done.  If we could just take another
22     quick break and then we'll come back and we
23     should be able to wrap up pretty quick.
24        So it's 2:31 right now.  So if we

---