IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RONALD F. DANTOWITZ, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> DEXTER SOUTHFIELD, INC., ) <br> CARMEN ALIBER, and ) <br> STEWART TUCKER, ) <br> ) <br> Defendants. ) | CIVIL ACTION NO. 20-CV-10540-AK |

## DEFENDANTS' TRIAL BRIEF

Pursuant to Local Rule 16.5(f), Defendants hereby submit their trial brief. Defendants respectfully direct the Court's attention to the following issues.

## OVERVIEW

### Defendants Are Not Liable To Plaintiff

The evidence will show that Defendant Dexter Southfield School terminated Plaintiff Ron Dantowitz's employment following a pattern of poor performance and unprofessional and insubordinate behavior.

Mr. Dantowitz was the Director of the School's Clay Center Observatory (the "CCO"), a state-of- the-art learning center that boasts a large, flagship telescope. The evidence will show that, as the Director of the CCO, Mr. Dantowitz's primary responsibility was to maintain the equipment at the Observatory and to ensure that the flagship telescope was working properly at all times. Mr. Dantowitz also was responsible for providing a comprehensive education to the students at Dexter Southfield.

The evidence will show that Mr. Dantowitz acted autonomously at the CCO for almost 17 years as "an astronomer in residence" but otherwise failed to contribute significantly to the School's mission of providing top-notch instruction to a wide variety of students. While a select few students participated in astronomy-related experiences, thousands of children were left behind. Mr. Dantowitz undertook the majority of these projects to the benefit of outside business concerns.

The evidence will show that the School requested that as a member of the science department, Mr. Dantowitz teach physics in the fall of 2014. The evidence will show that Mr. Dantowitz did not want to teach the physics class. Accordingly, in May 2014, Mr. Dantowitz self-reported to a psychologist that he believed he had symptoms consistent with an autism spectrum disorder, and that he should not have to teach physics.

The evidence will show that Mr. Dantowitz underwent a neuropsychological exam in June 2014. The doctor concluded that Mr. Dantowitz had symptoms consistent with a mild autism spectrum disorder. The evidence will show that the School decided against Mr. Dantowitz teaching physics and, accordingly, Mr. Dantowitz did not share the results of his neuropsychological exam with the School in 2014.

The evidence will show that Mr. Dantowitz's doctor did not recommend any accommodations necessary to complete his job, or that Mr. Dantowitz required additional time to complete tasks at the School. The evidence also will show that Mr. Dantowitz's doctor recommended that Mr. Dantowitz seek additional treatment, which he admittedly never did.

In May 2017, the School hired Defendant Carmen Aliber as its first Director of Human Resources. The evidence will show that Ms. Aliber was charged with implementing a new performance management system. As part of that charge, Ms. Aliber asked all employees to

draft job descriptions to formalize each employee's responsibilities and performance expectations. Mr. Dantowitz wrote that he was responsible for "managing the operations of the [CCO] to maximize its impact and effectiveness on student use" and "teaching astronomy in the Upper School"

The evidence will show that Mr. Dantowitz was not happy with having increased oversight. Mr. Dantowitz much preferred acting autonomously as he had been for the past 17 years. Accordingly, the evidence will show that Mr. Dantowitz went back to his doctor in January 2018 and requested a copy of a letter regarding his 2014 alleged autism diagnosis. Mr. Dantowitz presented the letter to Mr. Aliber in February. The evidence will show that Mr. Dantowitz did not request any accommodations and stated that he had overcome all of the challenges associated with his alleged autism spectrum disorder. The evidence also will show that following his meeting with Ms. Aliber, Mr. Dantowitz never provided the School with additional documentation about his alleged disability.

Although Mr. Dantowitz disclosed that he had a "disability" in February 2018, the evidence will show that the School offered Mr. Dantowitz a position at the School for the 2018-19 academic year.

The evidence will show that Ms. Aliber continued to focus on areas at the School which could be improved to ensure that the School provided outstanding learning experiences. Ms. Aliber and Defendant Assistant Head of School Stewart Tucker believed that the activities of the CCO did not align with the best interests of the School. The School could no longer support an "astronomer in residence" and steps had to be taken to ensure that the CCO provided a maximum benefit to the School. In the spring of 2018, Mr. Tucker became Mr. Dantowitz's direct supervisor.

The evidence will show that Mr. Tucker and Ms. Aliber met with Mr. Dantowitz in May 2018. Mr. Tucker asked Mr. Dantowitz for a list of activities he planned to pursue over the summer of 2018. The evidence will show that Mr. Dantowitz created a list of 36 tasks that he planned to complete over the summer. Although Mr. Dantowitz stated that the flagship telescope may have had its "end of life event," he assured Mr. Tucker that he could fix it. If Mr. Dantowitz believed that the flagship telescope may be inoperable by the end of the summer, Mr. Dantowitz should have reported that to the School and obtained the funding to fix the telescope. He did not.

The evidence will show that Mr. Dantowitz did nothing to ensure that the "end of life event" had not happened. Instead, Mr. Dantowitz spent several weeks over the summer traveling for a side business he owns, Celestial Computing, Inc. ("CCI"). The evidence will show that Mr. Dantowitz waited until the last day of summer break, August 30, 2018, to inform the School that the flagship telescope was inoperable and would be inoperable for months – potentially until December.

The evidence will show that Mr. Dantowitz's failure to have the flagship telescope ready compromised the academic and community outreach programming the School was able to provide to its students.

The evidence will show that at the same time Mr. Dantowitz advised the School that the flagship telescope was inoperable, Mr. Dantowitz met with Head of School Todd Vincent and requested an immediate leave of absence.

The School immediately reassigned Mr. Dantowitz's teaching assignments and planned for a semester with Mr. Dantowitz absent. Mr. Tucker spent the majority of the Labor Day weekend attempting to obtain coverage for Mr. Dantowitz's class and other responsibilities.

On the day same Mr. Dantowitz informed Mr. Vincent that he required an immediate leave of absence, Mr. Vincent notified Ms. Aliber and asked her to call Mr. Dantowitz to explain Mr. Dantowitz's leave benefits. Ms. Aliber called Mr. Dantowitz right away and advised him that he had two options: a personal leave of absence, or Family Medical Leave Act ("FMLA") leave. The evidence will show that Mr. Dantowitz advised Mr. Aliber that he would discuss the different leave options with his wife and get back to Ms. Aliber. At this time, Ms. Aliber believed that Mr. Dantowitz had left campus.

For the next ten days or so, Mr. Dantowitz and Ms. Aliber traded emails. Mr. Dantowitz did not provide Ms. Aliber with a specific reason for his leave, when his leave would start, or the duration of his leave until September 14. Mr. Dantowitz even went so far as to hire a lawyer to "assist' him with his leave options.

The evidence will show that unbeknownst to Ms. Aliber, Mr. Dantowitz continued to report to work, acting autonomously as he had for almost 15 years, and undertaking various tasks at his convenience. Mr. Tucker, realizing that Mr. Dantowitz continued to report to School, gave Mr. Dantowitz a list of tasks to complete. The evidence will show that Mr. Dantowitz did not object to the tasks given by Mr. Tucker, or insist that he needed to leave School to care for his son.

On or about September 13, 2018, Ms. Aliber insisted that Mr. Dantowitz provide the School with the details of his requested leave. It had been two weeks since Mr. Dantowitz requested an "immediate" leave of absence, and Mr. Dantowitz refused to engage in meaningful conversations with Ms. Aliber. The evidence will show that on the morning of September 14, 2018, Mr. Dantowitz notified Ms. Aliber that he needed to take a leave of absence "as soon as possible." Ms. Aliber put Mr. Dantowitz on leave that same day, and provided him with the

necessary FMLA forms so he could convert his leave to FMLA leave, which he did. Mr. Dantowitz never communicated to the school that his preferred date to start leave was October 1, 2018.

Despite being on leave and being told he was relieved of all of his responsibilities, Mr. Dantowitz continued to report to work. The evidence will show that nobody at the School requested that Mr. Dantowitz come to the School, and that the School was forced to deactivate Mr. Dantowitz's key fob to prevent him from accessing School property after regular business hours.

Mr. Dantowitz then voluntarily participated in communications with the telescope manufacturer. As soon as Ms. Aliber discovered that Mr. Dantowitz was doing so, she told Mr. Dantowitz to stop. The evidence will show that Ms. Aliber told Mr. Dantowitz 5 or 6 times that he was relieved of all work duties and that he should stop communicating with anyone at the School. The evidence will show that Mr. Dantowitz took 12 weeks of FMLA, just as he had requested.

The evidence will also show that, rather than care for his son, Mr. Dantowitz took multiple trips during his FMLA leave to generate business for CCI.

Mr. Dantowitz's first day back from FMLA leave was December 14, 2018. Mr. Tucker and Ms. Aliber planned to meet with Mr. Dantowitz on his first day back. In advance of the meeting, Mr. Dantowitz requested that he be allowed to record the meeting or have another faculty member present based on his "disability." Mr. Dantowitz had not previously requested any such accommodation, nor did his medical documentation state or even infer that any such assistance should be provided. The School declined Mr. Dantowitz's request but offered to

allow Mr. Dantowitz extra time to take breaks and take notes. The evidence will show that Mr. Dantowitz did not request additional time or take breaks to take notes.

The School assigned Mr. Dantowitz several tasks upon his return to School. The evidence will show that Mr. Dantowitz stated that he had "no problem" completing the tasks.

The evidence will show that as of January 2019, Mr. Dantowitz's attitude and work ethic deteriorated significantly. He asked that all communications be conveyed verbally, but also requested that everything be emailed to him. Mr. Dantowitz consistently feigned ignorance, claiming that he did not understand and/or could not read the contents of the Employee Handbook.

Mr. Dantowitz refused to take responsibility for his failure to have the flagship telescope ready for incoming students in the fall of 2018. He claimed that he never intended to have the telescope ready, or, alternatively, that the School should have known the telescope would not be ready. The evidence will show that it is no coincidence that Mr. Dantowitz decided that he needed to take an "immediate" leave of absence on the same day he reported to the School that the flagship telescope was not operational.

Mr. Dantowitz participated in several meetings with Ms. Aliber and Mr. Tucker in January 2019. He redirected the conversation away from his responsibilities and accountability. Mr. Dantowitz knew he had already lined up a lawyer to sue the School. Mr. Dantowitz also knew that he could rely on side business and that he did not need the job at the School. Accordingly, Mr. Dantowitz had no motivation whatsoever to show respect for the School or treat Ms. Aliber and Mr. Tucker with professional courtesies. The evidence will show that the School had more than sufficient grounds to terminate Mr. Dantowitz's employment in January

2019.  Mr. Dantowitz's separation from the School has been a boon to his other business interests.

## Damages

Mr. Dantowitz's most current offer letter expired on July 31, 2019.  There was no guarantee that Mr. Dantowitz would be offered employment at the School after that date.  Accordingly, Mr. Dantowitz's damages are capped as of July 31, 2019.

Moreover, tuition remission for Mr. Dantowitz's son is not a guaranteed benefit.  Accordingly, there was no expectation that Mr. Dantowitz's son would receive tuition after the 2018-2019 academic year.  There is certainly no expectation that Mr. Dantowitz's son would receive tuition remission after July 2019.  Likewise, there was no guaranty that Mr. Dantowitz's son would receive free camp tuition.

In addition, Mr. Dantowitz has earned hundreds of thousands of dollars since leaving the School, which will serve as an offset to potential awards of front pay and back pay.

## Dr. Pamela Friedman

Defendants renew their objection to Plaintiff calling Dr. Pamela Friedman as a "fact" witness.  Dr. Friedman performed Plaintiff's neuropsychological examination in August 2014.  Dr. Friedman's evaluation notes specifically set forth the tests that were administered and how those tests were interpreted.  (Tab A).  While this is the best of evidence of Dr. Friedman's evaluation, Plaintiff has <u>objected</u> to its admission into evidence.  Plaintiff seeks to call Dr. Friedman to testify that Plaintiff is disabled – an expert opinion.  Plaintiff's treatment notes do not indicate that Plaintiff is disabled, nor does the January 17, 2018 letter Plaintiff provided to the School indicate that he is disabled.  (Tab B).

"[A] treating physician not identified as an expert should not be allowed to testify about plaintiff's current condition, prognosis, causation or permanency, and any other forward-looking speculation, or other conclusion reached with the benefit of hindsight and after the underlying events that gave rise to the lawsuit." Castro-Medina v. Proctor & Gamble Commercial Co., 565 F. Supp. 343, 361-362 (D.P.R. 2008). Viewed through this lens, Dr. Friedman adds nothing to this case. Dr. Friedman's notes speak for themselves. Plaintiff's attempt to slip through an expert opinion should be rejected.[1]

### Plaintiff's Income Information

Plaintiff's tax returns are essential to proving that Plaintiff has sustained no damages. In discovery, Defendants requested the following:

> All documents concerning any and all wages, unemployment benefits, or other benefits or monies you received in connection with employment or other income since January 22, 2019, including but not limited to paychecks, pay stubs, W2 forms, 1099 forms, and tax returns.

(Tab C, No. 16). Plaintiff initially refused to produce any documents. Defendants were forced to file **two** motions to compel to obtain responsive documents. Eventually, Plaintiff produced tax returns for calendar years 2018-2021. Plaintiff's tax returns clearly show that Plaintiff's taxable income has totaled over $1,000,000 since he left the School. The Court should not allow Plaintiff to manipulate Plaintiff's income information.[2]

### CCI

At his deposition, Plaintiff feigned ignorance regarding his work for CCI. In lieu of a third day of deposition, Plaintiff produced an affidavit (Tab E) which describes Plaintiff's

---

[1] It bears repeating that Plaintiff did not identify Dr. Friedman as a witness in his initial disclosures or in response to interrogatories requesting the identity of all witnesses with knowledge of the facts of the case. Had Defendants known that Plaintiff intended to call Dr. Friedman at trial, Defendants would have deposed her.
[2] Plaintiff produced a Form W-2 showing that he earned $160,000 from CCI in 2022. (Tab D). Plaintiff will no doubt object to the admissibility of that document.

activities with CCI.  Plaintiff has testified under oath that he took four trips in July and August 2018 (totaling thirteen days of travel) for CCI at the same time Plaintiff was supposed to be working on the flagship telescope.  Defendants intend to introduce this evidence in support of their claim that Plaintiff failed to have the telescope ready in time for incoming students in September 2018.  Indeed, had Plaintiff not been traveling, he would have known two weeks sooner that the telescope would not be ready for incoming students.

Similarly, Plaintiff took four trips for CCI in October through December 2018, during his FMLA leave, totaling fifteen days of travel.  Whether the School allowed employees to hold second jobs is irrelevant.  Defendants should be able to introduce evidence that Plaintiff traveled extensively for CCI rather than spend time with his family.  It goes to Plaintiff's credibility.  Plaintiff's trips also align with his attempted trips to visit the School during his FMLA leave.  It is clear that Plaintiff sought access to the School to retrieve equipment he needed for trips.

Plaintiff did not move *in limine* to exclude evidence of CCI's business dealings.  The Court should allow Defendants to present this relevant evidence to the jury.

### Examination Notes

Plaintiff has objected to the admissibility of his medical notes from doctor's visits on June 5, 2014 and August 5, 2014. (Tab F) ; (Tab A).  Plaintiff claims the documents are not relevant.  On the contrary, the notes are very relevant and Defendants should be allowed to rely on them at trial.  The notes are admissible pursuant to Fed. R. Evid. 803(4).

The notes are relevant because they describe Plaintiff's state of mind in seeking medical treatment.  Plaintiff's "main complaint" was that he was asked to teach physics.  That is entirely consistent with Defendants' theory that Plaintiff sought to avoid tasks that he found objectionable.  Indeed, at his deposition, Plaintiff testified that he believed his diagnosis provided

him with an "easy out" to avoid certain tasks.  It is important that Defendants be allowed to show that Plaintiff underwent a neuropsychological examination in 2014 but did not disclose it to the School did not require Plaintiff to teach physics.

The medical notes also are relevant because Plaintiff now claims he suffers tinnitus.  However, Plaintiff made similar complaints back in 2014, long before his employment was terminated.  Defendants should be allowed to show that this is not a "new" condition (caused by the School) but something he has been dealing with for years.

Respectfully submitted,

DEXTER SOUTHFIELD, INC.,
CARMEN ALIBER, and
STEWART TUCKER,

By their attorneys,

*/s/ Anthony L. DeProspo, Jr.*
Anthony L. DeProspo, Jr. (BBO No. 644668)
(adeprospo@shpclaw.com)
Cara E. Murphy (BBO No. 709521)
(cmurphy@shpclaw.com)
SCHWARTZ HANNUM PC
11 Chestnut Street
Andover, MA 01810
Telephone: (978) 623-0900
Facsimile:  (978) 623-0908

Date:  January 27, 2023

## **CERTIFICATE OF SERVICE**

      I hereby certify that the foregoing document, filed through the ECF system will be served electronically upon all registered participants as identified in the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered parties this 27th day of January 2023.

                                              */s/ Anthony L. DeProspo, Jr.*
                                              Anthony L. DeProspo, Jr.