UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RONALD F. DANTOWITZ,<br><br>   Plaintiff,<br><br>v.<br><br>DEXTER SOUTHFIELD INC.,<br><br>   Defendant. | Civil Action No. 20-CV-10540-AK |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO ALTER OR AMEND JUDGMENT**

  Plaintiff Ronald F. Dantowitz ("Plaintiff" or "Mr. Dantowitz") has moved pursuant to Fed. R. Civ. P. 59(e) that the judgment against Defendant Dexter Southfield Inc. ("Defendant" or "Dexter") be altered or amended to include prejudgment interest, liquidated damages, and equitable relief.

  Because judgment entered in Mr. Dantowitz's favor on his claims under the Family and Medical Leave Act ("FMLA"), the addition of interest is required by statute. *See* 29 U.S.C. § 2617(a)(1) ("Any employer who violates section 2615 of this title shall be liable to any eligible employee affected [for]… interest… at the prevailing rate"). The statute also authorizes relief in the form of liquidated damages and equitable relief, *see* 29 U.S.C. § 2617(a)(1)(A)(iii), (B), and such relief is warranted in this case.

  I. <u>The Court Should Award Prejudgment Interest at the State Statutory Rate</u>

  The FMLA statute requires that prejudgment interest be added to the jury's award of back pay at the "prevailing rate." *See* 29 U.S.C. § 2617(a)(1)(A)(ii). Because Congress has not

identified a specific interest rate for prejudgment interest,[1] the Court has discretion to determine the appropriate prejudgment interest rate to apply. *See Cottrill v. Sparrow, Johnson & Ursillo, Inc.*, 100 F.3d 220, 224-25 (1st Cir. 1996). In the absence of a designated federal rate for FMLA claims, the Court "may look to state law in setting the pre-judgment interest rate." *Colon Velez v. Puerto Rico Marine Management, Inc.*, 957 F.2d 933, 941 (1st Cir. 1992). In this case, it is appropriate to use the state statutory rate of 12% per annum, starting on the date of commencement of the action in state court on December 30, 2019. *See* Mass. Gen. Laws ch. 231, § 6B. Plaintiff filed this case in state court and should not be penalized for Defendants' decision to remove the case to this Court. This is the rate that "litigants in Massachusetts invariably expect to pay." *Hall v. Meadwestvaco Corp.*, No. 03-30310-KPN, 2005 WL 1205554, *5 (D. Mass. May 18, 2005) (ordering interest at state rate in FMLA case). As a single, fixed rate, it is certain and more administrable than a rate like the prime rate or federal postjudgment interest rate, which vary weekly or sporadically. Prejudgment interest is designed to compensate a plaintiff for the deprivation of funds he should have received and prevent unjust enrichment to the defendant. *See TMTV Corp. v. Mass Productions, Inc.*, 645 F.3d 464, 474-75 (1st Cir. 2011). In light of the length of time Plaintiff has had to wait since his unlawful termination in order to vindicate his rights, application of the state rate is appropriate. *Cf. Lavery v. Restoration Hardware Long Term Disab. Benefits Plan*, 937 F.3d 71, 85 (1st Cir. 2019) (affirming district court calculation relying on the "passage of time" between denial of benefits and order granting same).

---

[1] Congress has established a post-judgment interest rate pursuant to 28 U.S.C. § 1961(a) but has been silent as to the rate for pre-judgment interest. *See Colon Velez*, 957 F.2d at 941.

## II. The Court Should Award Liquidated Damages Because Defendant Failed to Prove That They Are Unwarranted

In passing the FMLA, Congress required that in addition to lost wages and benefits and interest thereon, a prevailing plaintiff "shall" recover liquidated damages in an amount equal to the back pay damages and prejudgment interest, effectively doubling the back pay award and interest. *See* 29 U.S.C. § 2617(a)(1)(A)(iii). An employer can only avoid imposition of liquidated damages by proving "to the satisfaction of the court that the act or omission which violated [FMLA] was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of [FMLA]." *Id.* "Because the employer bears the burden of proof, the statute creates a 'strong presumption in favor of awarding liquidated damages.'" *Pagán-Colón v. Walgreens of San Patricio*, 697 F.3d 1, 12-13 (1st Cir. 2012), quoting *Thom v. Am. Standard, Inc.*, 666 F.3d 968, 976 (6th Cir. 2012). Defendant must prove *both* "good faith" *and* "reasonable grounds" to establish this affirmative defense. *Id.* at 12.

In this case, Defendant has proven neither. As the jury found, Dexter used Mr. Dantowitz's FMLA leave as a negative motivating factor in his termination and unlawfully retaliated against him for taking FMLA leave. Both Mr. Tucker and Ms. Aliber testified that they knew it was illegal to retaliate against someone for taking FMLA leave. The prohibition on retaliation was included in Dexter's Employee Handbook. (*See* Trial Exhibit 33 at 84.[2]) But that is exactly what Dexter did. In order to have reasonable grounds to believe its conduct was lawful, an employer has to have honestly and actively attempted to determine its obligations under FMLA and comply with them. *See Pagán-Colón*, 697 F.3d at 14. There was no evidence that Defendant sought legal advice concerning Plaintiff's termination and followed it. *Compare id.* at

---

[2] The relevant policy has also previously been filed as Dkt. 110-3.

15 (legal advice can be evidence of reasonable grounds). Dexter could not have had, and has not established, any reasonable grounds to believe that retaliation against Mr. Dantowitz was permissible. *See Antekeier v. Laboratory Corp. of America*, No. 17-CV-786, 2018 WL 3647109, *2-*3 (E.D. Va. July 31, 2018) (liquidated damages required because finding of good faith would inherently contradict jury's finding of retaliation).

Nor has it proven that it acted in good faith. Defendant claimed at and prior to trial that its termination decision was based solely on Plaintiff's allegedly poor performance in 2018 and 2019, and alleged insubordination in meetings with Mr. Tucker and Ms. Aliber after his return from leave in December 2018. The evidence did not support that Dexter acted in good faith on either front. *Cf. Chao v. Hotel Oasis, Inc.*, 493 F. 3d 26, 35 (1st Cir. 2007) (upholding liquidated damages under Fair Labor Standards Act, on which FMLA was modeled, where employer provided false information and manipulated records). With regard to insubordination, the evidence showed that Mr. Tucker and Ms. Aliber willfully misunderstood Mr. Dantowitz during their meetings, particularly with regard to whether Mr. Dantowitz was asking whether he should open the observatory dome in inclement weather and expose the main telescope to rain or snow (something that he, having designed the observatory, was well aware of) or whether he was asking about Dexter's expectations for indoor programming if the weather did not cooperate with an Open Telescope Night. Ms. Aliber's repeated descriptions of Mr. Dantowitz as "disingenuous" and statements that he needed things to be "black and white" employed damaging stereotypes of him as an employee on the autism spectrum and did not show the good faith or empathy that one would expect from a human resources professional.

The evidence at trial showed that the alleged performance issues were false, pretextual, and in bad faith. For instance, the evidence showed that Dexter blamed Mr. Dantowitz for failing

to communicate a malfunction in the main telescope for several months, when in fact Mr. Dantowitz did warn Mr. Tucker about it before the summer; had temporarily fixed it in June; took extraordinary measures to attempt to get it repaired by the manufacturer and secure backup hardware from Harvard; and learned that the telescope could not function only a few days before he notified Dexter. Dexter never even asked Mr. Dantowitz about what he had done to repair the telescope over the summer or whether it had started working after his attempted fix in June, instead assuming the worst. Dexter blamed Mr. Dantowitz for "significant failures" like not replacing a GAM module in 2018 when Mr. Dantowitz had written in June that he planned to defer that maintenance to the following year. Some tasks were identified as failures specifically because Mr. Dantowitz's FMLA leave prevented him from completing them in September. (*E.g.*, Trial Ex. 30 at 3.) And another alleged performance issue was Mr. Dantowitz's decision to clean the carpets in the observatory by hand to avoid the humidity from power washing them, leading to Mr. Tucker's stern notation, "did not shampoo." (Trial Ex. 30 at 6.) Plaintiff's allegedly poor performance ranged from the picayune to the absurd.

In addition, for the first time in the Defendant's case at trial, Mr. Vincent testified incredibly that Mr. Dantowitz had been performing poorly for many years before he took FMLA leave, that Mr. Vincent had met with Mr. Dantowitz several times to discuss these issues, and that these issues were part of the reason for Mr. Dantowitz's termination. Since Ms. Aliber testified that she first learned of any possibility of performance issues with Mr. Dantowitz in mid-2018, Mr. Vincent apparently wanted the jury to believe that, even as Ms. Aliber was doing a top-to-bottom review of the school to set and formalize performance standards, he did not see fit to inform her of Mr. Dantowitz's purportedly longstanding performance shortfalls. And although Mr. Vincent often took notes of meetings (as confirmed by Mr. Williams's testimony),

and the jury could observe Mr. Vincent assiduously taking notes during the trial, Mr. Vincent testified that he had no notes of meetings with Mr. Dantowitz because he wanted to be "careful" about what he put in writing. The jury rightfully rejected Mr. Vincent's testimony. His false assertions of performance issues also demonstrate a lack of good faith. Because Dexter did not prove either reasonable grounds to believe it had complied with FMLA or good faith in terminating Mr. Dantowitz, let alone both, the Court must add liquidated damages of $15,000, plus the amount of prejudgment interest ordered by the Court, to the judgment.

### III.    The Court Should Order Equitable Relief, Specifically, Front Pay

In addition to back pay and interest, FMLA also provides that the Court should award "such equitable relief as may be appropriate." 29 U.S.C. § 2617(a)(1)(B). The goal of such equitable relief is to make the plaintiff whole for future losses due to the employer's illegal act of retaliatory termination. *See Selgas v. Am. Airlines, Inc.*, 104 F.3d 9, 12 (1st Cir. 1997) (discussing equitable relief under Title VII). Although reinstatement is an available remedy under FMLA, 29 U.S.C. § 2617(a)(1)(B), and it "accomplishes the dual goals of providing full coverage for the plaintiff and of deterring such conduct by employers in the future," *Selgas* at 12, it is not feasible in circumstances like this case, where there is no open position to which Plaintiff can be reinstated. *See Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 18 (1st Cir. 1999) (under ADA, reinstatement not appropriate when "claimant's former position no longer exists" (emphasis deleted)). Mr. Tucker testified that Dexter no longer has a Director of the Clay Center Observatory. In addition, the Supreme Court has observed that reinstatement is inappropriate where there is "continuing hostility between the plaintiff and the employer or its workers, or because of psychological injuries that the [retaliation] has caused the plaintiff." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 853 (2001). Although emotional distress damages are not

available under FMLA, Mr. Dantowitz testified to the emotional toll that his termination took on him, to the point that he could not bear to see the School or even the Dexter school buses that went past his house for an extended period of time. It would not be reasonable or equitable to expect Mr. Dantowitz to return to Dexter under these circumstances. Nor is Dexter likely to be willing to take him back; in light of the incredible and unsupported accusations at trial that Mr. Dantowitz had performed poorly for years, was uninterested in and incapable of doing his job, and refused to take direction from administrators, it would not be feasible for Mr. Dantowitz to have to report to those same administrators. And since the Head of School, Mr. Vincent, was among those testifying that Mr. Dantowitz had not been performing adequately, this is not an issue that could be solved by an alternative reporting structure. Because reinstatement is not a viable option, the equitable remedy of front pay is appropriate. *See Pollard*, 532 U.S. at 850 (endorsing holding of Eighth Circuit in *Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1066 (8th Cir. 1988) that "front pay was appropriate given substantial animosity between parties where 'the parties' relationship was not likely to improve, and the nature of the business required a high degree of mutual trust and confidence'"); *Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 615-16 (1st Cir. 1985) (front pay appropriate under ADEA where reinstatement is impracticable); *Johnson v. Spencer Press of Maine, Inc.*, 364 F.3d 368, 380 (1st Cir. 2004) (front pay awards are within discretion of district judge).

      Because reinstatement is not feasible, Plaintiff requests that the Court order equitable relief in the form of front pay for ten years of lost wages and benefits. The evidence showed that it is not reasonably possible for Mr. Dantowitz to find a comparable job to the Observatory Director position from which he was unlawfully terminated, because he lacks the formal degrees for such a role and because there are few observatories in the Greater Boston area. Despite

having the burden of proof on failure to mitigate damages, Defendant produced no evidence at trial of any other comparable job openings. Mr. Dantowitz cannot reasonably relocate to find work, even if there were a comparable job open to him without a formal astronomy degree (let alone a Ph.D which most institutions require), because it would uproot his son Emmett from the school and supports he receives by dint of residing in the Town of Brookline. Mr. Dantowitz testified that it will be another ten years before his son ages out of the school he is in, and so Mr. Dantowitz intends to remain in Brookline for at least ten years (and would have planned to continue working for Dexter at least that long if not longer). It would therefore be equitable and justified for the Court to order Dexter to compensate Mr. Dantowitz for ten years of salary and benefits that he would have received had he been permitted to remain employed by Dexter, as follows:

| Salary/Benefit[3] | 2023[4] | 2024 | 2025 | Each Year After 2025 |
|---|---|---|---|---|
| Salary (Trial Ex. 5) | $92,202.74 | $106,500 | $106,500 | $106,500 |
| 401(k) Match (R. Dantowitz testimony) | $9,220.27 | $10,650 | $10,650 | $10,650 |
| Health Insurance (C. Aliber testimony) | $15,583.56 (at $1,500 per month) | $18,000 | $18,000 | $18,000 |
| Health Savings Account (R. Dantowitz testimony) | $5,194.52 | $6,000 | $6,000 | $6,000 |
| Tuition Waiver for M. Dantowitz (R. Dantowitz testimiony) | $40,690.41 | $47,000 | 0 | 0 |
| Total: | $162,891.50 | $188,150 | $141,150 | $141,150 |

If the Court orders front pay through the end of 2032, the grand total would be $1,480,241.50. That likely undervalues the benefits at least in part, because medical costs and health insurance premiums rise much faster than inflation.

---

[3] For each item, the value is held constant on the assumption that cost-of-living adjustments would roughly match interest rates or inflation, and so the present value of each is the same for each year. That is, future increases due to cost-of-living adjustments are cancelled out by the need to reduce future earnings to present value. The evidence showed that Mr. Dantowitz had received a 1% raise from 2017-2018 to 2018-2019 (*compare* Trial Ex. 39 *with* Trial Ex. 5) and had received similar raises between 2014-2015 and 2017-2018 (*compare* Trial Ex. 38 *with* Trial Ex. 39). Because these numbers are based largely on Mr. Dantowitz's last contract in 2018-2019, they surely understate the value of the salary and benefits that he would have earned if he had remained employed.

[4] Numbers for 2023 are prorated for the portion of the year after the date of the verdict, i.e., multiplied by 316/365 or approximately 86.58%.

Mr. Dantowitz's ability to pay household expenses through salary from his business, Celestial Computing, should not offset the future lost salary and benefits caused by Dexter. When Mr. Dantowitz was employed by Dexter, he was able to run Celestial Computing as a side job, while working for Dexter full-time. With his termination, Mr. Dantowitz went from receiving *both* his Dexter salary and benefits *and* whatever income he might derive from Celestial Computing to receiving only the CCI income. That loss continues unless and until Mr. Dantowitz is able to replace his Dexter income with full-time employment (which it is reasonable to expect will never happen). As the Court instructed the jury for its consideration of Plaintiff's Chapter 151B claim, earnings should not be deducted from front pay if Plaintiff likely would have received them even if he had remained employed, and that is the case here. Although Mr. Dantowitz has been able to secure a salary for a limited time through CCI, he has done so by selling part of his stake and risking the rest on a loan. As Mr. Dantowitz testified, the money that he is receiving as a salary was loaned to CCI (or its new parent company Skyshow), and Mr. Dantowitz has to pay it back. If the company does not succeed and enable repayment of the loan in the next 18 months or so, Mr. Dantowitz will have to liquidate CCI and will be left with nothing. Although his current CCI income is salary in form, in substance it comes from selling an asset rather than earning income from an employer. For this reason also, the Court should award front pay without an offset for salary from CCI.

A substantial award of front pay is consistent with an analysis of the factors courts have used to evaluate the appropriateness and nature of equitable relief. Among the fact-specific issues courts have considered are "(1) the plaintiff's age; (2) the length of plaintiff's employment by the defendant; (3) the likelihood the employment would have continued absent the discrimination; (4) the length of time for plaintiff, using reasonable effort, to secure comparable

employment; (5) the plaintiff's work and life expectancy; (6) the plaintiff's status as an at-will-employee; (7) the length of time other employees typically held the plaintiff's position; (8) the plaintiff's ability to work; (9) the plaintiff's ability to work for the defendant-employer; (10) the plaintiff's efforts to mitigate damages; and (11) the amount of any liquidated or punitive damage award made to the plaintiff." *Burke v. LPM Holding Co., Inc.*, No. 10-CV-11940-JCB, 2012 WL 13055463, at *3 (D. Mass. Apr. 17, 2012) (citing *Dollar v. Smithway Motor Xpress, Inc.*, 787 F. Supp. 2d 896 (N.D. Iowa 2011)).

Mr. Dantowitz is 57 now; his age, education and employment background make it highly unlikely that he would be able to reinvent himself in a new career. *See Padilla v. Metro-North Commuter R.R.*, 92 F.3d 117, 126 (2d Cir. 1996) (affirming front pay award until age 67 because plaintiff "in his forties" had "unique and narrowly focused skills" and it was very unlikely that he would be able to find comparable employment); *Kelley v. Airborne Freight Corp.*, 140 F.3d 335, 355-56 (1st Cir. 1998) (under Massachusetts law, affirming $1,000,000 front pay award where plaintiff intended to work for employer until retirement and, due to his level of education, it would have been very difficult for him to "obtain a comparable salary" elsewhere); *Carl v. Fulton Cnty., Georgia*, No. 1:07-CV-1812-AJB, 2013 WL 12357465, at *10 (N.D. Ga. Mar. 31, 2013), and cases cited (reasonable to award front pay to retirement age if plaintiff is close to retirement or testifies to reasons why they would have remained at the same employer); *Osorio v. Source Enterprises, Inc.*, No. 05 CIV. 10029 (JSR), 2007 WL 683985, at *6 (S.D.N.Y. Mar. 2, 2007) (awarding five years front pay on retaliation claim where plaintiff's job, as editor-in-chief of hip-hop magazine, was so specialized that no comparable position was likely to become available).

As to duration of employment, Mr. Dantowitz worked for Dexter for close to twenty years, and it was one of only two full-time jobs he had had during his working life. Mr. Dantowitz had received annual salary letters every year without any indication that his employment would be discontinued prior to his retaliatory termination, and he had been working under a contract with no set end date. (*See* Trial Ex. 38.)

The jury disbelieved Defendant's explanation for Plaintiff's termination, and that weighs in favor of a finding that Plaintiff would have been allowed to continue teaching and operating the Clay Center Observatory indefinitely absent unlawful retaliation. Mr. Dantowitz is able to work for the foreseeable future, but has no prospect of obtaining comparable employment. *See Padilla*, 92 F.3d at 125; *Hukkanen v. Int'l Union of Operating Engineers, Hoisting & Portable Loc. No. 101*, 3 F.3d 281, 286 (8th Cir. 1993) (upholding award of ten years of front pay where that was reasonable and necessary to allow plaintiff to get back to the level of pay and responsibilities at her former position); *Broadnax v. City of New Haven*, 141 F. App'x 18, 22 (2d Cir. 2005) (affirming front pay award of $937,237.67, from age 42 to retirement age, where "no evidence in the record suggests that Broadnax would be able to find work at a salary level commensurate with her pre-termination salary"); *Luca v. Cnty. of Nassau*, 344 F. App'x 637, 641 (2d Cir. 2009) (upholding front pay award for 36 years of pay disparity). And as discussed above, it would not be reasonable for him to return to Dexter.

Although Mr. Dantowitz was an at-will employee, he had been employed continuously as the Clay Center Observatory Director for over 18 years and was the only one to hold that position at the time.

Mr. Dantowitz has done what he can to mitigate his damages through selling telescope equipment and part of his stake in Celestial Computing,[5] but he has few assets left to sell, and the long-term viability of CCI as a business able to generate sufficient income to support Mr. Dantowitz and his family is uncertain.

And although liquidated damages should be awarded, the amount of those damages is not large compared to the anticipated future losses. *Compare Boadi v. Ctr. for Hum. Dev., Inc.*, No. 14-CV-30162-KAR, 2017 WL 4181347, at *6 (D. Mass. Sept. 21, 2017) (declining to award front pay where jury award of back pay for over 4 years, which was doubled by liquidated damages, adequately compensated plaintiff for her losses); *McPadden v. Wal-Mart Stores E., L.P.*, No. 14-CV-475-SM, 2016 WL 4991488, at *2, *4 (D.N.H. Sept. 16, 2016) (awarding three years of front pay, despite large compensatory damage award on "probably the weakest case that [the judge could] remember ever sending to a jury," where plaintiff had already secured new employment and was relatively young and skilled, making it reasonable to infer that she would likely secure comparable employment in the future). Mr. Dantowitz's testimony on these points provides an adequate foundation for the award of front pay requested. *Cf. Hyldahl v. AT&T*, 642 F. Supp. 2d 707, 722 (E.D. Mich. 2009) (basing front pay award on plaintiff's testimony concerning "mitigation attempts, the anticipated date of retirement, and her inability to find employment that was similarly compensated"). Courts have awarded long periods of front pay where they are justified by the facts, and that is the case here. *See Newton v. Pennsylvania State Police*, No. CV 18-1639, 2022 WL 874306, at *10-11 (W.D. Pa. Mar. 24, 2022) (citing cases in

---

[5] Because mitigating his damages by selling assets places Plaintiff in a worse position, it should not be offset against his damages in light of the purpose of front pay to make him whole for his reasonably anticipated losses. *See Selgas*, 104 F.3d at 12 (equitable relief is designed to make plaintiff whole and "bring the plaintiff to the position which s/he would have occupied but for the illegal act(s)").

which ten years or more of front pay have been awarded or upheld, and awarding front pay to mandatory retirement age).

WHEREFORE, Plaintiff requests that the Court alter or amend the judgment as sought herein, and such other and further relief as the Court deems just and proper.

Respectfully submitted,  
RONALD F. DANTOWITZ,  
The Plaintiff,  
By His Attorneys,  

/s/ David A. Russcol  
Inga S. Bernstein (BBO #627251)  
David A. Russcol (BBO #670768)  
Zalkind Duncan & Bernstein LLP  
65a Atlantic Avenue  
Boston, MA 02110  
(617) 742-6020  
ibernstein@zalkindlaw.com  
drusscol@zalkindlaw.com  

Dated: April 4, 2023

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by electronic filing on April 4, 2023.

/s/ David A. Russcol  
David A. Russcol