**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **RONALD F. DANTOWITZ,**<br><br>    **Plaintiff,**<br><br>v.<br><br>**DEXTER SOUTHFIELD, INC.,**<br><br>    **Defendant.** | **Civil Action No. 20-CV-10540-AK** |

**ORDER ON MOTION FOR ATTORNEYS' FEES AND COSTS**

LEVENSON, U.S.M.J.

INTRODUCTION

Plaintiff Ronald F. Dantowitz has filed a petition for attorneys' fees and costs, seeking $382,478.50 in fees and $21,855.36 in costs. Docket No. 181. The petition is supported by affidavits from attorneys David Russcol, Inga Bernstein, Suzanne Herold, and David Brody. Docket Nos. 182–186.

As detailed below, a jury awarded Mr. Dantowitz $15,000 in damages arising from violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. 2601, *et seq*. In the months since the fee petition was filed, Judge Kelley has awarded Mr. Dantowitz an additional $15,000 in liquidated damages, as prescribed by the FMLA.[1]

---

[1] Judge Kelley also awarded prejudgment interest, which is still accruing. Mr. Dantowitz estimates the interest to be, at present, approximately $13,000. For the purposes of this petition, the Court presumes that Mr. Dantowitz will receive total compensation in the amount of approximately $43,000.

Defendant Dexter Southfield, Inc. ("Defendant" or "the school") filed an opposition to the petition. Docket No. 189. Mr. Dantowitz filed a reply brief in further support of his petition. Docket No. 195. Judge Kelley referred the petition to me. Docket No. 201.

I held a hearing on the petition and invited Mr. Dantowitz's counsel to submit supplemental briefing to address my concerns about the magnitude of the fee request relative to the size of the jury's award of damages and relative to the overall scope of the trial presentation, in which Mr. Dantowitz was largely unsuccessful. Mr. Dantowitz took me up on the invitation and filed a supplemental brief. Docket No. 216. Defendant has filed a response to Mr. Dantowitz's supplemental brief. Docket No. 217.

I have reviewed all the above-referenced materials, as well as rough transcripts of the trial testimony. For the reasons addressed below, I will grant Mr. Dantowitz's petition for attorneys' fees and costs in part, awarding attorneys' fees and expenses in the aggregate sum of $162,450.91.

I.      **Background**

In 2000, Mr. Dantowitz was hired as an astronomy teacher and director of an observatory, the Clay Center, at Dexter Southfield Academy, a private college-preparatory school in Brookline, Massachusetts, which is operated by Defendant. Complaint, Docket No. 1-1, ¶ 8. As observatory director, Mr. Dantowitz was responsible for keeping the school's telescope in working order.[2] *Id.* ¶ 16.

It was common knowledge at the school that Mr. Dantowitz's son, who was born in 2010, had been severely autistic since birth. *Id.* ¶ 10. In 2014, Mr. Dantowitz himself was diagnosed

---

[2] This is no ordinary school telescope. Dexter Southfield's website describes the Clay Center as "home to our research-grade observatory." *About Dexter Southfield*, https://www.dextersouthfield.org/about/mission-values (accessed Sep. 28, 2023).

with autism spectrum disorder, although this condition has been described as "mild." *Id.* ¶ 12; Docket No. 71-8. He disclosed that diagnosis to his supervisor and other administrators at the school. *Id.* ¶¶ 12–15.

In August 2018, Mr. Dantowitz requested a leave of absence to care for his son. *Id.* ¶¶ 18–19. Defendant's administrators steered Mr. Dantowitz toward the school's leave policy, rather than leave under the FMLA. *Id.* ¶¶ 19–20. Defendant's obfuscation led Mr. Dantowitz to confer with attorneys David Brody and Jacyln McNeely, who helped arrange for Mr. Dantowitz's leave under the FMLA. *Id.* ¶¶ 20–36.

Mr. Dantowitz returned to work in December 2018. During the following two months, he was closely evaluated and received poor performance reviews. *Id.* ¶¶ 61–81. One criticism was that Mr. Dantowitz had only notified the school in June 2018, shortly before requesting leave, that the telescope required serious repairs. *Id.* ¶ 17.

On January 22, 2019, Mr. Dantowitz was terminated. *Id.* ¶ 83. Mr. Dantowitz, represented by Mr. Brody, timely filed a Charge of Discrimination against the school with the Massachusetts Commission Against Discrimination ("MCAD").[3]

In December 2019, now represented by attorney Suzanne Herold, Mr. Dantowitz sued the school in Norfolk County Superior Court, alleging five claims of disability discrimination under Mass. G.L. c. 151B ("Chapter 151B") and two claims under the FMLA. Defendant removed the case to this Court. Docket No. 1.

---

[3] Filing a charge of discrimination with MCAD is a procedural threshold to filing a discrimination claim under Chapter 151B. *See Cuddyer v. Stop & Shop Supermarket Co*., 434 Mass. 521, 531 n.11 (2001) ("A claim cannot be brought alleging discrimination under G.L. c. 151B, unless it is preceded by the filing of a complaint of unlawful discrimination with the MCAD within six months of the alleged act or acts of discrimination.").

In the course of the litigation, the school moved for summary judgment. Mr. Dantowitz's opposition brief devoted four pages to argument concerning his FMLA claims and eleven pages to argument concerning his disability claims. *Compare* Docket No. 76, at 14–17 (FMLA claims), *with id.* at 4–14 (Chapter 151B claims).

Before the Court entered a ruling on the motion for summary judgment, Defendant presented Mr. Dantowitz with a settlement offer in the amount of $300,000. The offer was contingent on mutual release of all claims, without admission of liability, and was not subject to Fed. R. Civ. P. 68. At the time, Mr. Dantowitz had already incurred attorneys' fees in the amount of roughly $150,000. Mr. Dantowitz rejected the offer.

In its order on summary judgment, the Court dismissed three of Mr. Dantowitz's Chapter 151B claims relating to his disability. Docket No. 89 (dismissing Claims 3, 4, and 5). The summary judgment order devoted three pages to the FMLA claims and twelve pages to the disability claims. *Compare* Docket No. 89, at 20–22 (FMLA claims), *with id.* at 8–19 (Chapter 151B claims).

As the case teed up for trial, attorneys Inga Bernstein and David Russcol filed notices of appearance and replaced Ms. Herold as counsel for Mr. Dantowitz. On the eve of trial, Mr. Dantowitz filed a stipulation that dismissed his claims against the two individual defendants, school administrators Carmen Aliber and Stewart Tucker. Docket No. 149. The stipulation covered both disability and FMLA related claims.

At trial, Mr. Dantowitz's attorneys devoted the bulk of their time to evidence concerning Mr. Dantowitz's disability, including voluminous testimony aimed at showing that the school had discriminated against other disabled employees. In particular, Mr. Dantowitz's attorneys attempted to demonstrate that the tasks that the school had assigned to Mr. Dantowitz after he

returned from his leave of absence were selected because they would particularly frustrate a person with Mr. Dantowitz's disability.

Following nine days of trial, the jury returned a verdict finding Defendant not liable for any of Mr. Dantowitz's surviving disability claims under Chapter 151B. The jury did, however, find the school liable on both FMLA claims and completed a special verdict slip awarding Mr. Dantowitz $15,000 in damages, specifically for back pay. Docket No. 175. The jury awarded Mr. Dantowitz zero dollars for the other forms of damages identified on the special verdict slip, namely front pay, emotional distress, and compensatory losses between September 14, 2018, and October 1, 2018. *Id.*

Mr. Dantowitz subsequently filed a motion to alter the judgment, asking the Court to award liquidated damages, prejudgment interest, and front pay. Docket No. 190. Among other things, Mr. Dantowitz asked the Court to override the jury's verdict on damages, as a matter of equity, by awarding him ten years of front pay (in the amount of $1,480,241.50). Mr. Dantowitz was unsuccessful in this major request for post-trial relief. The Court did, however, award liquidated damages in the amount of $15,000, as required under 29 U.S.C. § 2617(a)(1)(A)(iii), based upon its finding that Defendant had failed to prove that the school "acted in good faith and had reasonable grounds for believing its actions were not a violation of the FMLA." Docket No. 207. The Court also awarded prejudgment interest on the jury's award of back pay, as required under 29 U.S.C. § 2617(a)(1)(A)(ii). *Id.*

In rejecting Mr. Dantowitz's request for a seven-figure front pay award, the Court noted:

> The jury's decision followed extensive trial testimony about Plaintiff's job performance, his at-will employment status, his income and earnings, his CCI business, his efforts to mitigate damages, and his continued employment prospects. Plaintiff testified about all of these subjects for three days on direct examination and for two days on cross-examination.

*Id.*

5

II.     **The Petition for Attorneys' Fees**

There is no dispute that Mr. Dantowitz is entitled to reasonable attorneys' fees for his successful FMLA action. The FMLA provides that "[t]he court in such an action shall, in addition to any judgment awarded to the plaintiff, allow a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action to be paid by the defendant." 29 U.S.C. § 2617(a)(3). There is, moreover, nothing unusual in the circumstance that the requested attorneys' fees substantially exceed the dollar amount of the judgment in Mr. Dantowitz's favor. Congress has enacted a statutory regime whereby fee awards are available to ensure that discrimination and retaliation claims will be prosecuted, without regard to the absolute dollar value of those claims.[4]

As discussed below, the present motion requires the Court to consider what constitutes a reasonable attorney's fee for the portion of the case on which Mr. Dantowitz was successful, while taking into account that most of Mr. Dantowitz's attorneys' efforts on his behalf were unavailing.

a.  *The Legal Framework*

To determine a reasonable fee award, courts typically use the "lodestar method," whereby the court calculates "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley* v. *Eckerhart*, 461 U.S. 424, 433 (1983). More specifically, the court takes "the time counsel spent on the case, subtracts duplicative, unproductive, or excessive hours, and then applies prevailing rates in the community (taking into account the qualifications,

---

[4] By contrast, the contingent fee arrangement common to much civil litigation presupposes that the total dollar amount of a claim will be a major determinant of whether attorneys will devote time and resources to particular claims.

experience, and specialized competence of the attorneys involved)." *Gay Officers Action League*
v. *Puerto Rico*, 247 F.3d 288, 295 (1st Cir. 2001).

After this initial computation, the court may exercise discretion to "adjust the lodestar
itself, upwards or downwards" based on a variety of factors, "including the results obtained and
the time and labor actually required for the efficacious handling of the matter." *Torres-Rivera* v.
*O'Neill-Cancel*, 524 F.3d 331, 336 (1st Cir. 2008) (citing *Hensley*, 461 U.S. at 430 n.3).

### b.   Calculating the Lodestar

Mr. Dantowitz's attorneys have submitted a welter of billing records to support their fee
petition:

- Mr. Russcol has submitted three months of billing records: November 14, 2022,
  through February 17, 2023, totaling 270.4 hours. Docket No. 184-1.

- Ms. Bernstein has submitted three months of billing records: November 14, 2022,
  through February 17, 2023, totaling 238.6 hours. Docket No. 183-1.

- Ms. Herold has submitted three years of billing records: June 18, 2019, through
  November 8, 2022, totaling 156 hours. Docket No. 185-1.

- Mr. Brody has submitted five months of billing records: September 12, 2018, through
  February 8, 2019. Docket No. 186-1. These records identify 56.7 hours of time billed
  by Mr. Brody, and 34.9 hours of time billed by Ms. McNeely.[5]

Defendant requests that the hours for Mr. Brody and Ms. McNeely be reduced for their
time spent filing a complaint with MCAD, arguing that MCAD does not have jurisdiction over

---

[5] The records submitted by Mr. Brody also include 6.7 hours billed by two partners at Sherin &
Lodgen LLP, Brian Macdonough and Nancy Shilepsky, for which Mr. Brody does not seek
compensation. Docket No. 186, ¶ 16.

FMLA claims.[6] *See* Docket No. 189, at 5–6. However, I credit Mr. Brody's affidavit, which states that he "likely would have done this work even if [he] had only intended to pursue the FMLA claims in court." Docket No 186, ¶ 20. Accordingly, I will not reduce the reported hours for Mr. Brody or Ms. McNeely.

Defendant also requests that the hours for Mr. Brody and Ms. Herold be reduced by 20% for block billing. *See* Docket No. 189, at 6. My review of their records persuades me to treat these two lawyers differently on this point.

Review of Mr. Brody's hours showed some use of block billing, but I did not find the kind of problematic practice that courts most commonly associate with block billing. *See, e.g.*, *Equal Emp. Opportunity Comm'n v. AutoZone, Inc.*, 934 F. Supp. 2d 342, 353 (D. Mass. 2013) (noting the problems associated with block billing "[g]iven the imprecise construction of many of the time entries and their frequent lack of task differentiation"). Mr. Brody's billing invoices were concise yet specific, and I will not reduce his hours merely because some entries can be characterized as "block billing."

I will reduce the hours of Ms. Herold by 20% to discount hours that were recorded using block billing. The problem is not only the use of block billing, *per se*, although the use of block billing compounds the difficulty. The core problem is that Ms. Herold's billing records are unacceptably vague and do not clearly indicate what legal work was performed by the attorney. I will describe a few representative failures.

The records extensively use shorthand and abbreviations but do not provide any translation key. For example, for November 1, 2020, Ms. Herold writes "Begin dra discovery

---

[6] Defendant does not object to the hours spent by Mr. Brody and Ms. McNeely to facilitate Mr. Dantowitz's FMLA leave.

resp. Dra sig page. EMX client. EM opc." I interpret this entry to mean that Ms. Herold began to draft responses to discovery requests, drafted the signature page, sent multiple emails to the client, and emailed opposing counsel. But no client (or court that ultimately determines the fee award) should be expected to decode the bill they receive from their attorney. Moreover, the records fail to specify the subject of the activity in question. There is nothing to indicate what the emails to the client or opposing counsel were about. Without any inkling of the subject of the activity, the Court cannot determine whether the task concerned substantive legal questions, clerical logistics, or some other purpose. Nor can the Court discern whether, or to what extent, these activities pertained to the FMLA claims on which Mr. Dantowitz ultimately prevailed.

Another example drives home how the vagueness of Ms. Herold's entries, coupled with her routine use of block billing, makes it all but impossible to discern how many hours were spent on particular activities. For March 22, 2021, Ms. Herold writes "Prepare for meeting. Meeting client re: depo prep. EMX client. RR edited depo agreement. Scan/EM docs opc. EMX opc." I interpret this entry to mean that Ms. Herold prepared for a meeting, met with the client in preparation for a deposition, sent emails to the client, reviewed and revised an edited deposition agreement, scanned and emailed documents to opposing counsel, and sent additional emails to opposing counsel. Thus, Ms. Herold (vaguely) identifies six discrete activities, making it impossible for the Court to determine how much time was spent on *legal* work, such as meeting with a client to prepare for a deposition, as opposed to *administrative* tasks, such as scanning documents. *See Torres-Rivera*, 524 F.3d at 339–40 (affirming district judge's reduction of fee by 15% due to block billing).

In sum, a 20% reduction to Ms. Herold's hours is appropriate here because Ms. Herold frequently used block billing that was clouded by vague abbreviations and non-particularized descriptions.

Defendant also requests that the hours for Ms. Bernstein and Mr. Russcol be reduced by 10% for duplicative work after being brought on as new counsel. *See* Docket No. 189, at 6–7. Mr. Dantowitz objects, arguing that Ms. Bernstein and Mr. Russcol have already discounted their hours by 11.5 hours and 17.4 hours, respectively, which accounts for approximately 5% of their total hours. *See* Docket No. 195, at 10–11. I note that many of the hours that Ms. Bernstein and Mr. Russcol voluntarily knocked off their bill were spent before Ms. Bernstein and Mr. Russcol had even been retained by Mr. Dantowitz. Plaintiff fails to explain why these attorneys would expect to be compensated for time spent before they were retained. I am persuaded that Mr. Dantowitz's decision to hire Ms. Bernstein and Mr. Russcol on the eve of trial resulted in duplicative work. To account for the fact that some reduction has already been taken, I will deduct an additional 5% (approximately) of the hours identified by Ms. Bernstein and Mr. Russcol, for a total of roughly 10%. Accordingly, I reduce Ms. Bernstein's hours by an additional 11.5 hours and Mr. Russcol's hours by an additional 17.4 hours.

   *c.  Results Obtained*

Defendant seeks a reduction of the lodestar based on Mr. Dantowitz's unsuccessful claims (*i.e.*, claims raised in the complaint that were ultimately dismissed), the limited damages awarded by the jury, and the size of the settlement offer that Mr. Dantowitz passed up.

As the First Circuit has directed in *Coutin v. Young & Rubicam Puerto Rico, Inc.*, 124 F.3d 331, 338 (1st Cir. 1997), the trial court has discretion to reduce the lodestar figure in consideration of the "results obtained" in a suit. As *Coutin* instructs:

[T]he term "results obtained" has a variety of meanings. It can refer to a plaintiff's success claim by claim, or to the relief actually achieved, or to the societal importance of the right which has been vindicated, or to all of these measures in combination. We think that the last meaning is the best choice, and that, as a consequence, all three types of "results" potentially bear upon the amount of an ensuing fee award.

124 F.3d at 338.

### i.  *Societal Importance*

Although it appears last in *Coutin*'s list of factors, I begin with the question of societal importance, since it is the simplest to address. There is no dispute here about the societal importance of the right vindicated by Mr. Dantowitz. As noted above, statutory fee-shifting provisions, such as those contained in the FMLA, "reflect a legislative judgment that 'the public as a whole has an interest in the vindication of the rights conferred by the statutes . . . over and above the value of a . . . remedy to a particular plaintiff.'" *Joyce v. Town of Dennis*, 720 F.3d 12, 31 (1st Cir. 2013) (alteration in original) (quoting *City of Riverside v. Rivera*, 477 U.S. 561, 574 (1986)).

### ii.  *Claim-by-Claim Analysis*

Mr. Dantowitz cannot claim compensation for attorneys' fees that were expended on a wholly unsuccessful legal theory. "[W]ork on an unsuccessful claim cannot be deemed to have been 'expended in pursuit of the ultimate result achieved' . . . and therefore no fee may be awarded for services on the unsuccessful claim." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983) (quoting *Davis v. Cnty. of Los Angeles*, No. 73-63-WPG, 1974 WL 180, at *3 (C.D. Cal. June 5, 1974)). In practice, the issue may be nuanced; it is not always a simple matter to segregate fruitful from unfruitful efforts. *See Bogan v. City of Boston*, 489 F.3d 417, 428–29 (1st Cir. 2007) ("[F]ees are appropriately excluded from the lodestar only 'when different claims for relief are not interconnected, that is, when the claims rest on different facts and legal theories.'"

(quoting *Figueroa–Torres v. Toledo–Davila*, 232 F.3d 270, 278 (1st Cir.2000))). Even when there is some overlap, moreover, the court is not compelled to treat a partial (or pyrrhic) victory as an unmitigated success. As the Court of Appeals has noted, "where multiple claims are interrelated and a plaintiff has achieved only limited success . . . a court 'may . . . simply reduce the award to account for the limited success.'" *Andrade v. Jamestown Hous. Auth.*, 82 F.3d 1179, 1191 (1st Cir. 1996) (quoting *Hensley*, 461 U.S. at 436–37).

Mr. Dantowitz brought seven claims: two FMLA claims and five Chapter 151B disability claims. Of those, Mr. Dantowitz lost all five of his disability claims; the court dismissed three of the disability claims on summary judgment and the jury rejected the remainder. Mr. Dantowitz's contention that he was mistreated, and ultimately fired, because of his autism spectrum disorder diagnosis was the primary battleground in this case. On that legal theory, Mr. Dantowitz suffered a total defeat.

At summary judgment, the disability claims took up the great majority of the parties' argument. Similarly, at trial Mr. Dantowitz devoted several days to testimony from witnesses that concerned his disability and his allegations that, after he returned from his leave of absence, he was treated in a manner that was particularly challenging to him because of his disability.

The jury did find that Defendant violated the FMLA, including by interfering with Mr. Dantowitz's right to take FMLA leave and retaliating against him for doing so. Even here, however, Mr. Dantowitz's success was limited. The jury awarded damages only in connection with one of his two FMLA claims, and then only for backpay during a narrow window of time. The jury specified a notably modest damage award: $15,000 in back pay.

In many cases, including this one, simply counting the number of claims does little clarify the extent or degree of success in litigation. A mechanical tallying of the numbers of

successful and unsuccessful claims says little about the course and conduct of this litigation. The number of separately enumerated claims in a lawsuit can simply reflect the tactical, or even stylistic, preferences of the lawyers who draft a complaint. In short, it says little about Mr. Dantowitz's degree of success that he prevailed on two-sevenths of his claims.

Rather than simply counting claims, it makes more sense to consider the *kinds* of claims, and the underlying factual contentions, at issue. Regardless of how many separately numbered claims were in the complaint, there were essentially two sets of allegations here: FMLA claims and personal disability claims.

The disability claims here turned on one axis: did the school discriminate against Mr. Dantowitz based upon Mr. Dantowitz's own disability? Evidence in support of Mr. Dantowitz's claims necessarily focused on Mr. Dantowitz's own abilities, on the kinds of accommodations Mr. Dantowitz might have required, on Mr. Dantowitz's efforts to demonstrate that school officials harbored a discriminatory animus toward him in particular, and on Mr. Dantowitz's efforts to demonstrate that school officials harbored a general animosity toward people with disabilities.

The FMLA claims turned on a separate axis: did the school properly accommodate Mr. Dantowitz's need as a *parent* (without regard to any characteristics personal to Mr. Dantowitz himself) to take leave in order to care for his child, and did the school retaliate against him for doing so?[7] Furthermore, the pertinent time frames differ: while the claimed discrimination allegedly played out over many months and years before Mr. Dantowitz's discharge, the FMLA claims concerned only the period from August 2018 through January 2019.

---

[7] It is largely beside the point that Mr. Dantowitz's child suffers from a disability that bears the same diagnostic label as Mr. Dantowitz's own disability.

Review of the record shows that Mr. Dantowitz's lawyers spent much more time at trial adducing evidence aimed at supporting his disability claims than they did on evidence pertinent to the FMLA claims. The summary judgment order shows that most of the dispute was devoted to the disability claims. And the rough trial transcripts, along with representations from the parties in their papers concerning this fee petition, reflect that the bulk of the trial testimony concerned Mr. Dantowitz's disability claims. For example, Mr. Dantowitz presented testimony from two former Dexter Southfield employees to the effect that Defendant "had a policy of terminating older employees and employees with medical conditions." Docket No. 189, at 5.

In an effort to salvage a win on attorneys' fees from the wreckage of a disappointing jury verdict, Mr. Dantowitz seeks to emphasize all conceivable points of connection between the two main legal theories he pursued. Mr. Dantowitz strains to argue that his disability claims and the FMLA claims – particularly the FMLA retaliation claim – are so closely interrelated that the litigation would not have notably changed, even if Mr. Dantowitz had pursued only the FMLA claims. *Cf. Photosomphone v. Allison Reed Grp., Inc.*, 984 F.2d 4, 7 (1st Cir. 1993) ("[A] district court may find that the federal and state claims are so interrelated, and the time spent in preparation of those claims so overlapping, that an attempt to separate the time attributable to one or the other would be futile.").

Mr. Dantowitz summarizes his argument as follows:

The majority of the evidence in the case focused on what Mr. Dantowitz's job was, what performance expectations had or had not been set over time, the extent to which he was performing his job adequately or was unfairly blamed for circumstances beyond his control from the summer of 2018 through his termination, the conduct of Plaintiff and Dexter administrators during three meetings preceding his termination, and the state of mind of Dexter and its administrators. All of this evidence was equally applicable to all claims as it addressed whether Dexter's stated reasons for terminating Plaintiff (poor

performance and insubordination) were true or were pretextual, from which the jury could infer liability.

Docket No. 216, at 2.[8]

Mr. Dantowitz's efforts to conflate his disability evidence and his FMLA evidence do not withstand scrutiny. At a sufficiently generalized level, all of Mr. Dantowitz's claims could be said to be interconnected, in the sense that they all arose from his employment at the school and his ultimate discharge. But the critical elements of the core claims were discrete, both factually and legally. There is a palpable difference between: (a) successfully proving that the school mishandled Mr. Dantowitz's entitlement to FMLA leave to care for his son and retaliated when he asserted his rights; and (b) failing to prove that the school harbored a discriminatory animus toward persons with disabilities generally and that the school discriminated against Mr. Dantowitz in particular, based on Mr. Dantowitz's mild autism.

Mr. Dantowitz concedes that the trial time he spent with witnesses who testified that they had been subjected to discrimination at the school was "partly focused on disability discrimination that they experienced or learned about." Docket No. 216, at 3. But he attempts to shoehorn even this testimony into his claim of interconnectedness, arguing that the testimony "permit[ed] the jury to infer an atmosphere of retaliation for exercising protected rights." *Id.*; *see*

---

[8] Mr. Dantowitz also argues that the jury reached its findings, in part, because the Court instructed that disability retaliation claims must meet a but-for "determinative cause" standard that is higher than the "motivating factor" standard governing FMLA retaliation claims. Docket No. 216, at 3–4. This does not help his position. Whatever the burden of proof, his disability claim failed.

There are, of course, cases in which essentially the same evidence may be offered in support of claims that are subject to differing burdens of proof. In those cases, differing burdens may well explain otherwise inconsistent jury verdicts. But this is not such a case. Merely because there were differing burdens of proof, it does not follow that evidence about discriminatory animus toward Mr. Dantowitz himself was probative, or even relevant, to the jury's consideration of whether Mr. Dantowitz was properly afforded the FMLA leave he needed to care for his son.

Docket No. 195, at 9 ("Although this did not concern the same protected activity as Mr. Mr. Dantowitz's FMLA retaliation claim, it was relevant to show these decisionmakers' hostility and retaliatory animus toward employees exercising their legally protected rights.").

Having spent the time and effort to call witnesses to testify about the school's purported pattern or history of discrimination against persons with disabilities, Mr. Dantowitz now seeks to recast the testimony as showing a general propensity for retaliation. This effort is unpersuasive. Attempting to link his two sets of claims, Mr. Dantowitz argues that evidence of discrimination was also aimed at showing that the school administrators had a broadly retaliatory mindset. This proves too much; by Mr. Dantowitz's logic, all manner of disparate evidence could be called "equally applicable" in the sense that it all tends to show bad character.[9] With the broad brush that Mr. Dantowitz asks the Court to employ, any amount of testimony and evidence concerning an employer's administrative actions against other employees might be said to bear on any retaliation claim.

The probative evidence on the successful claims concerned the facts surrounding Mr. Dantowitz's leave, how he was treated before he took leave, how he was treated after he returned from leave, and his termination. Mr. Dantowitz did not need to prove anything concerning his disability in order to prevail on the FMLA leave claim, for the simple reason that Mr. Dantowitz's disability was not the basis for his leave of absence. Mr. Dantowitz is likely correct that some quantum of evidence about his disability may have helped explain why particular tasks that he was assigned after his return from leave were particularly onerous for him. But this is a

---

[9] Mr. Dantowitz's argument is further undermined by the fact that the jury only found liability for one of his two retaliation claims. The jury does not seem to have credited the notion that there was a generalized "atmosphere of retaliation" at the school.

far cry from showing that his campaign to prove the school discriminated against him based on his disability was somehow an integral part of his FMLA claim.

Mr. Dantowitz's argument misses the point that adjusting the lodestar for results obtained does not amount to any suggestion by the Court as to whether counsel made a mistake in their trial strategy by focusing on evidence about Mr. Dantowitz's disability. Mr. Dantowitz was plainly aiming for a big damages verdict and reasonably figured that his best shot lay in the direction chosen. Had the jury been convinced that the school discriminated against Mr. Dantowitz based on his disability, it might well have entered a large damages award for front pay and punitive damages.

Far from second-guessing Mr. Dantowitz's tactical and strategic choices, the Court engages in a *hindsight* inquiry to determine which of counsel's efforts reasonably contributed to the modest victory that Mr. Dantowitz ultimately obtained. Viewed through this lens, large swaths of Mr. Dantowitz's evidence were superfluous to his FMLA claim testimony and otherwise unavailing. This includes the testimony from former school employees who described their experiences of alleged discrimination (based on their age or medical condition). Such evidence was largely irrelevant to the FMLA claims and may not even have been admissible if the FMLA claims had been tried alone. The same is true about nearly all of Mr. Dantowitz's testimony about his own condition, about his perceptions of others' views about his condition, and about the kinds of accommodations that might have been appropriate to his condition. As for Mr. Dantowitz's evidence about lost income and financial harms, a similar analysis applies. Although these may have been relevant to a front-pay damages award under the FMLA, the jury's verdict effectively disposed of any such claim.

In sum, although some aspects of the successful FMLA claims and the unsuccessful disability claims were interrelated, the two sets of claims differed in kind and differed as to the nature and scope of relevant evidence. The evidence presented during the trial primarily concerned Mr. Dantowitz's disability claims. Mr. Dantowitz did not prevail on those claims, and it cannot be said that Mr. Dantowitz reasonably needed to submit copious evidence concerning his disability, let alone that he needed to muster testimony aimed at showing general discriminatory animus at the school, to prevail on his FMLA claims.

Simply put, Mr. Dantowitz's FMLA claims arise from his request for leave to care for a disabled child, rather than for his own disability. The lower causation standard associated with the FMLA claim further suggests that significantly less argument and evidence was needed to achieve the result in this case.

### iii.   Relief Obtained

As noted above, the jury found Defendant liable for the two FMLA violations and awarded $15,000 in back pay. Mr. Dantowitz subsequently requested liquidated damages, in the statutory amount of twice the awarded damages. He also sought equitable relief in the form of over $1.4 million dollars in front pay.

Judge Kelley ruled for Mr. Dantowitz on the issue of liquidated damages, finding that Defendant had not proven that it acted in good faith, and therefore owed Mr. Dantowitz an additional $15,000 – pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii). Judge Kelley, however, rejected Mr. Dantowitz's request for equitable relief and declined to disturb the jury's verdict. Thus, Mr. Dantowitz has been awarded a total of $30,000 of damages – augmented by prejudgment interest. Mr. Dantowitz also obtained a public jury verdict in his favor (as to the FMLA) and a public finding that Defendant did not prove a good faith defense to statutory liquidated damages.

In absolute terms, Mr. Dantowitz's recovery of $30,000 plus prejudgment interest is not trivial. I am, however, required to gauge the *degree* of Mr. Dantowitz's success when weighing a reasonable award of fees. As discussed below, it is unmistakable that the stakes in this litigation were an order of magnitude larger than the damages award Mr. Dantowitz ultimately secured. His total failure to persuade the jury or the judge to award any front pay transformed this from a potentially huge case to a very small one.

In gauging the relief obtained, there are several potential points of reference to consider, and I will discuss them in turn:

- In presenting his case the jury, Mr. Dantowitz asked for an award of $4 million in damages.[10]

- After the jury's verdict, Mr. Dantowitz asked the Court to award $1.4 million in equitable relief post-trial.

- At the hearing on Mr. Dantowitz's fee motion, Mr. Dantowitz's counsel acknowledged that there was in place a contingent fee arrangement whereby Mr. Dantowitz paid counsel at a rate of approximately one-half their ordinary billing rate, in consideration for counsel taking a share of any ultimate recovery above a baseline threshold. Counsel did not specify the amount of that threshold but acknowledged that the jury award in this case did not surmount it.

- During the pendency of the litigation, Defendant made a settlement offer of $300,000 in September 2022, before the Court entered its order on summary judgment. Mr.

---

[10] In theory, one might also consider the demand figure in a Complaint. Such figures, however, are commonly untethered to any concrete anchor and, as such, have little value as a measuring stick of success. In any event, the Complaint in this case does not recite a demand for any specified amount of damages. Docket No. 1-1.

Dantowitz passed up that offer and ended up winning a fraction of that amount in damages.

### 1. The Amount Sought at Trial

It is risky to assess success based on the damages demand propounded by counsel in a summation before the jury. The obvious incentives are for plaintiff's counsel to aim high – limited only by counsel's confidence in their own credibility with the jury. Accordingly, the request for a $4 million judgment tells us little more than that – from Mr. Dantowitz's perspective – a meaningful "win" would have been well above one million dollars.

### 2. The Amount Sought After Trial

Mr. Dantowitz's post-trial motion for equitable relief sheds a little more light on what a substantial win for Mr. Dantowitz would have looked like. The request for front pay, stripped of any demand for punitive damages or liquidated damages, was still well into seven figures, at $1.4 million. By this yardstick, Mr. Dantowitz's ultimate recovery looks altogether scanty. Even with prejudgment interest added, the damages award here is little more than 3% of the amount Mr. Dantowitz sought as equitable relief.

Like Mr. Dantowitz's $4 million demand before the jury, his $1.4 million motion for post-verdict equitable relief is likely inflated, at least to some degree, by high-hopes or simple chutzpah. Thus, it may be unduly harsh to gauge Mr. Dantowitz's degree of success by comparison to such measures. Other points of reference, therefore, may be of use.

### 3. The Contingent Fee Threshold

There is considerable delicacy in the question of how and whether to consider evidence of contingent fee arrangements when assessing the reasonableness of a request for statutorily mandated attorneys' fees. These are apples and oranges. By definition, a contingent arrangement

governs the amount that a plaintiff is required to pay his lawyers, while the lodestar analysis is aimed at calculating the amount that a defendant is required to pay a plaintiff for reasonable attorneys' fees. *See Venegas v. Mitchell*, 495 U.S. 82, 90 (1990) ("What a plaintiff may be bound to pay and what an attorney is free to collect under a fee agreement are not necessarily measured by the 'reasonable attorney's fee' that a defendant must pay pursuant to a court order.").

The considerations that shape private contingent fee arrangements necessarily involve the various plaintiffs', and their attorneys', assessments of litigation risk and potential monetary rewards. The typical assumption in such cases is that attorneys will receive some fraction (popular convention suggests 1/3) of the total recovery as their contingent fee. By definition, this kind of contingency yields attorneys' fees that are directly proportional to the dollar amounts recovered.

By contrast, Congress has mandated that reasonable attorneys' fees must be awarded for successful FMLA retaliation claims, even though such fees may often exceed the amount of the plaintiff's recovery. Reasonableness under this model is emphatically *not* to be based on any proportion of the dollar recovery. *See generally Gay Officers Action League*, 247 F.3d at 296 (noting, in the context of a different fee-shifting statute, that "proportionality [of the fee to the recovery] is no longer an issue once the prevailing party has separated the wheat from the chaff (*i.e.*, isolated the time spent on her successful claim or claims)").

The First Circuit's decision in *Diaz v. Jiten Hotel Mgmt., Inc.*, 704 F.3d 150, 154 (1st Cir. 2012), underscores the point that courts must not import principles associated with contingent fee arrangements into the analysis of a "reasonable fee" under a fee-shifting statute. In *Diaz*, the Court of Appeals remanded for reconsideration a fee award of $25,000, which the trial judge had

based, in part, on applying plaintiff's contingent fee arrangement to a $75,000 informal settlement offer that the plaintiff had rejected.

Accordingly, the relevance of a contingent fee arrangement is marginal, at best. The amounts to be paid under such an arrangement simply do not correspond to any lodestar-based computation of a reasonable attorneys' fee.

There are, in this case, provisions of Mr. Dantowitz's particular contingent fee arrangement that supply a useful data point. Mr. Dantowitz's counsel candidly acknowledged that his contingent fee arrangement included a 50% discount on the attorneys' regular hourly rates, coupled with a minimum threshold for the attorneys to share in any recovery.

Mr. Dantowitz has not divulged the agreed-upon minimum amount that would have entitled his attorneys to receive a share of his recovery, in addition to their steeply discounted hourly fees. Accordingly, there is little information here to inform the Court's assessment of the "relief obtained." It is, however, reasonable to assume that the threshold was a number that Mr. Dantowitz and his attorneys viewed – before the fact – as a successful outcome. And plainly the outcome fell short. The jury's award of damages did not surmount even the minimum degree of success that would have permitted the attorneys to recoup any part of the hourly fee discount they extended to Mr. Dantowitz. The failure to meet the contingent-fee threshold provides another indicator that the outcome did not meet Mr. Dantowitz's and his attorneys' self-identified level of success.

#### 4. The Settlement Offer

As I will discuss below, the Court must be cautious in considering the significance of a rejected settlement offer.[11] There are a variety of potential pitfalls, but the core principle is that, while negotiated settlements may be encouraged, parties should not be penalized for exercising their right to go to trial.

With this caution in mind, it bears noting that the $300,000 settlement offer that Mr. Dantowitz rejected provides the most concrete available benchmark for measuring Mr. Dantowitz's, and his attorneys', assessment of what they considered a minimally successful outcome. For purposes of rough approximation, I accept Mr. Dantowitz's estimate that – at the time of the settlement offer – Mr. Dantowitz's fee agreements with Ms. Herold, Mr. Brody, and Ms. McNeely would have left him with a personal recovery of approximately half of the offered amount, *i.e.*, $150,000.[12] *See* Docket No. 216, at 5.

In other words, if Mr. Dantowitz had accepted the settlement offer, he would have recovered more than three times the amount he ultimately obtained after a nine-day trial and voluminous post-trial briefings (five times if we don't count prejudgment interest). To state the obvious, such a settlement would have carried the advantages of certainty (*i.e.*, no trial risk), cost savings (*i.e.*, no expenditure of attorneys' fees for preparing and presenting a trial), and immediacy (*i.e.*, no delays pending resolution of the case and any appeals).

---

[11] Fed. R. Evid. 408 prohibits consideration of compromise offers "either to prove or disprove the validity or amount of a disputed claim," but it does not place any such restriction on considering compromise offers for the specialized purpose of gauging the performance of attorneys or assessing the results obtained at trial.

[12] Defendant suggests that Mr. Dantowitz would have walked away with over $200,000 had he accepted the settlement offer. *See* Docket No. 217, at 3 n.3.

Although Mr. Dantowitz urges the Court to disregard entirely the settlement offer, it is appropriate, within narrow bounds, to consider settlement offers in evaluating "results obtained." While other circuits plainly permit the consideration of informal settlement offers, the First Circuit has been more circumspect. *See Coutin*, 124 F.3d at 341 n.8 (reserving the question of whether a fee award may be reduced because "the prevailing plaintiff received a damage award which was less than the defendant offered in settlement"). Several opinions from the First Circuit set important boundaries for considering settlement offers in the context of a fee petition.

First, the First Circuit has ruled in *Coutin* that "it is a mistake of law to reduce an award of attorneys' fees in a civil rights case in response to a plaintiff's rejection of a defendant's settlement offer when the subsequent judgment exceeds that offer." 124 F.3d at 341. This boundary is illustrated in the case of *Joyce v. Town of Dennis*. *See* 720 F.3d 12. In *Joyce*, a sex discrimination case, a jury was assembled to determine damages after liability had been conceded, and it awarded the plaintiff $15,000. In light of that verdict, the trial judge observed that a pre-trial settlement offer of $35,001 had been entirely reasonable, and "deleted from [plaintiff's] requested costs the expenses incurred after [the date of the offer]." 720 F.3d at 32. After additional reductions, the trial judge awarded only $30,000 in attorneys' fees, rejecting the plaintiff's request for over $170,000.

The First Circuit noted that the final judgment awarded by the district court had amounted to roughly $45,000, after adding in attorneys' fees, which exceeded the settlement offer of $35,001. Citing *Coutin*, the First Circuit overturned the district court's cutoff of all fees incurred after rejection of the settlement offer. *Id.*[13] The boundary articulated in *Coutin* and

---

[13] On remand, the trial judge awarded approximately $87,000 in attorneys' fees. The plaintiff did not appeal that reduction, which knocked off roughly 50% of the requested fees. *See Joyce v. Town of Dennis*, No. CIV.A. 08-10277-NMG, 2014 WL 585455, at *6 (D. Mass. Feb. 12, 2014).

illustrated in *Joyce* supports the principle that a plaintiff should not be penalized (through the reduction of attorneys' fees) for rejecting a settlement offer when the plaintiff ends up receiving a greater total judgment after further litigation. The total judgment, after all, may properly include an award for attorneys' fees. While the mechanics are somewhat paradoxical – most obviously, a judge will not know whether the total judgment exceeds the settlement offer until *after* determining the amount of reasonable attorneys' fees – the boundary line is clear: if the total judgment will exceed the settlement offer, a judge may not reduce attorneys' fees simply because a settlement offer was rejected.

Mr. Dantowitz argues that "it would be circular and problematic if Defendant were able to avoid the impact [of the boundary identified in *Coutin* and *Joyce*] by reducing the award of attorney's fees below the amount of the settlement offer." Docket No. 195, at 5 n.3. Although this point may be valid in some settings, it has no real bearing in this case. *Coutin* and *Joyce* do not restrict a court from reducing attorneys' fees based on an assessment of "relief obtained" when, as here, the rejected settlement vastly *exceeds* the total judgment. I would need to award attorneys' fees in excess of $250,000 (more than 16 times the jury verdict) to approach a total judgment that exceeded the settlement offer.

Mr. Dantowitz also points to the boundary identified in *Diaz v. Jiten Hotel Management, Inc.*, 704 F.3d 150, 154 (1st Cir. 2012). The district court's error in that case was not simply that – as discussed above – the district court had imported inapt contingent fee principles into a "reasonable fee" computation. The error in *Diaz* was compounded by pegging the attorneys' fee award to a set fraction (1/3) of a settlement offer that had been rejected. While *Coutin* teaches that "degree of success" is a fundamental part of the lodestar inquiry, the "degree of success" inquiry does not entail – or even suggest – any proportionality principle that would link the

amount of a fee award to the absolute dollar value of a settlement offer (or a verdict, for that matter). Congress has already determined, as a matter of policy, that reasonable attorney fees must be awarded to prevailing litigants in FMLA retaliation cases without regard to the absolute dollar amount of the damages. Any other rule would essentially provide differing standards for reasonable attorneys' fees depending on the income levels the wrongfully discharged employees they happen to represent. Accordingly, in considering the "degree of success," I do not reduce or limit the fee award by applying the proportions of any contingent fee arrangement to the settlement offer (or the ultimate damages award, for that matter).

Mr. Dantowitz also urges the Court to adopt the position of the Second Circuit, which Mr. Dantowitz contends, has "refused to permit consideration of settlement offers" in the context of fee award determinations. *See* Docket No. 216, at 1 n.2 (citing *Ortiz v. Regan*, 980 F.2d 138, 140-41 (2d Cir. 1992). I note that Mr. Dantowitz overstates the state of play in that circuit. *Cf. Marisol A. ex rel. Forbes v. Giuliani*, 111 F. Supp. 2d 381, 398 (S.D.N.Y. 2000) (noting that, even after *Ortiz*, multiple trial courts in the Second Circuit "have reduced fee awards where plaintiffs unreasonably rejected settlement offers and eventually obtained relief which they could have gotten by settling earlier"). And in other circuits, I note, the picture is quite different. As Defendant points out, a substantial majority of the Courts of Appeals have found that a rejected settlement offer can be a relevant consideration when determining a fee award. *See* Docket No. 189, at 2–3; *see also Lohman v. Duryea Borough*, 574 F.3d 163, 168 (3d Cir. 2009) ("While evidence of settlement negotiations is only one indicator of the measure of success, it is a permissible indicator that is not precluded by Rule 408.") *Sheppard v. Riverview Nursing Ctr., Inc.*, 88 F.3d 1332, 1337 (4th Cir. 1996) (finding that "courts may consider a plaintiff's refusal of a settlement offer as one of several proportionality factors guiding their exercise of discretion" in

determining attorneys' fees awards); *McKelvey v. Secretary of Army*, 768 F.3d 491, 495 (6th Cir. 2014) ("[T]he prior settlement offer was one factor among many considered by the court in exercising its discretion to set a reasonable attorney's fee."); *Moriarty v. Svec*, 233 F.3d 955, 967 (7th Cir. 2000) ("Substantial settlement offers should be considered by the district court as a factor in determining an award of reasonable attorney's fees, even where Rule 68 does not apply."); *Dalal v. Alliant Techsystems, Inc.*, 182 F.3d 757, 761–62 (10th Cir. 1999); *Walker v. Iron Sushi LLC*, 752 Fed. Appx. 910, 915 (11th Cir. 2018) ("[A] rejected settlement offer is an appropriate factor to consider in assessing the reasonableness of a request for attorney fees, even in contexts beyond statutes that define attorney fees as 'costs.'").

Apart from any exercise in counting decisions by the Courts of Appeals, what makes sense here is *not* to disregard a significant data point, but rather to exercise care to when considering it, to avoid misusing or overstating its significance.

To that end, I'll start with Mr. Dantowitz's observation that, because Defendant's informal settlement offer was not made subject to the strictures of Fed. R. Civ. P. 68, the rejection of that offer "should not be a basis to reduce the amount of fees that are reasonable."[14] Docket No. 195, at 7. Mr. Dantowitz is correct that Rule 68 is not in play here. I will not import the logic of that rule into the present dispute. The task for the Court is to calculate a reasonable fee, not to reward or punish Mr. Dantowitz for his decision to accept or reject a particular settlement offer.

---

[14] Rule 68 provides that "a party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms, with the costs then accrued." Fed. R. Civ. P. 68(a). An offer extended under Rule 68 carries the benefit of limiting liability for costs that accrue after the offer is made, if the rejected offer is greater than the ultimate judgment. *See* Fed. R. Civ. P. 68(d) ("If the judgment that the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made.").

The appropriate purpose of considering a rejected settlement offer is not to set a presumptive cap on fees, nor is it to impose any "proportionality" principle. Nor, indeed, is the Court called upon to judge the reasonableness of Mr. Dantowitz's decision to go to trial. I read *Joyce* as supporting the proposition that a litigant is *not* obliged to accept a "reasonable" settlement offer. On the contrary, Congress has chosen to create incentives for plaintiffs to pursue discrimination and retaliation claims by requiring the courts to award reasonable attorneys' fees for successful representations. To treat a settlement offer as a presumptive limitation (direct or proportional) on the computation of reasonable attorneys' fees would risk penalizing parties who exercise their right to proceed to trial.

While Mr. Dantowitz is correct in pointing to these cautionary principles, it does not follow that Mr. Dantowitz's rejection of the school's settlement offer is irrelevant in gauging the degree to which the results he obtained at trial can be considered a success. There is an important distinction between: (1) mechanically reducing a fee award based on a rejected settlement offer and (2) comparing the "results obtained" by a party after trial with the quantum of relief that was immediately available by way of settlement.

The analytical value of the rejected settlement offer here is that it provides a concrete benchmark by which to gauge the results obtained at trial. In this regard, the significance of the rejected settlement offer is on a par with other monetary data points, such as the dollar amount that Plaintiff asked the jury to return, or the dollar amount of the front-pay award that Plaintiff sought post-trial. As I discussed above, the sums Mr. Dantowitz demanded before the jury and the judge (post-trial) tell us only about upper limits of what Mr. Dantowitz and his attorneys thought reasonable to request. By contrast, his rejection of a $300,000 offer tells us about the *lower* limits of what Mr. Dantowitz would have counted as a meaningful victory. However loud

may be the words of Mr. Dantowitz's attorneys as they tout the jury's damages award as a significant win, his actions speak much louder. He walked away from an amount twenty times larger.

The rejected offer in this case is useful in gauging the "results obtained" precisely because it was so much higher than the damage award ultimately obtained. Mr. Dantowitz's rejection of a $300,000 settlement offer powerfully reflects that he proceeded to trial in the expectation that he stood to win significantly more than that amount. As a tactical matter, this may have been an eminently reasonable decision,[15] and I am not called upon to decide whether Mr. Dantowitz and his attorneys were reasonable in deciding to proceed to trial. Instead, I am called upon to gauge, with the benefit of hindsight, the degree to which Mr. Dantowitz ultimately succeeded at trial.

That Mr. Dantowitz rejected a $300,000 settlement offer unmistakably demonstrates that Mr. Dantowitz did not see $300,000 as a "win." He obviously hoped and expected to win more at trial, presumably much more. Instead, he won a damages award that, when doubled with liquidated damages, represents one-tenth of the sum he rejected. It is one thing to turn down a $35,000 offer (as in *Joyce*) and proceed to win $15,000 (plus attorneys' fees) at trial. It is quite another to turn down $300,000 and then win $15,000 at trial (doubled to $30,000 post-trial). While Mr. Dantowitz's attorneys are entitled to a reasonable fee for their efforts, on the "results obtained" scale, the results look meager indeed.

---

[15] Mr. Dantowitz was represented by highly skilled and experienced counsel. It seems clear that he passed up a six-figure settlement in hopes of winning a seven-figure judgment. There was nothing irrational about such a wager. But there is no escaping that, in this instance, the wager did not pay off.

Mr. Dantowitz also argues that, apart from the jury's damages award, the verdict afforded him a measure of satisfaction in the explicit finding of liability, something that an informal settlement would not have delivered. This, he contends, had significant value to him "as a matter of principle," and he argues that the Court should include that subjective value in the evaluation of relief.

It is true that success in litigation is not always measured in dollars. As noted in *Coutin*, evaluations of relief obtained can and should encompass both "damages awarded and nonmonetary relief," such as a declaratory judgment or injunction. *See* 124 F.3d at 338, 339 n.6 (identifying injunctive relief as a form of "meaningful relief"). A mere finding of liability, however, is not a form of relief. *See id.* at 339 ("If a prevailing party succeeds on all (or substantially all) of her claims, but receives no significant relief (e.g., the jury awards only nominal damages), the trial judge sometimes may deny fees altogether because this scenario often 'highlights the plaintiff's failure to prove actual, compensable injury.'" (quoting *Farrar v. Hobby*, 506 U.S. 103, 115 (1992))).

Mr. Dantowitz's contention that he scored a moral victory with the jury's bare finding of FMLA liability rings hollow. Indeed, the claimed moral victory is wholly evanescent when I consider that the jury rejected entirely Mr. Dantowitz's claim that he suffered from discrimination or retaliation on the basis of his disability and assessed only a minimal backpay award. It strains credulity to suggest that anyone in Mr. Dantowitz's camp greeted the jury's verdict with anything short of abject disappointment.

From an attorney's perspective, the verdict was enough of a "win" to entitle them to reasonable attorneys' fees. But from the client's perspective, the result was disastrous.

Presumably, the verdict makes only a dent in the (discounted) fees Mr. Dantowitz has paid his lawyers.

### iv.   Evaluating the Results Obtained

Returning to the *Coutin* factors, this case closely resembles the second hypothetical fee-reduction "configuration" described in *Coutin*, which is worth quoting in full:

> If a plaintiff prevails on an insubstantial subset of her interrelated claims and obtains only limited relief, the trial court has discretion to shrink fees to reflect that inferior result. Withal, a plaintiff who has limited success from a claim-by-claim standpoint, but who nevertheless obtains substantial compensation or other important relief, usually will fare much better in the fee wars, even though some of her claims failed.

124 F.3d at 339 (internal citations omitted).

Here, even assuming that the FMLA claims and the disability claims are interrelated – which is a bit of a stretch – Mr. Dantowitz only prevailed on two of his seven total claims and only obtained limited relief in the form of money damages of $30,000 plus $13,000 in prejudgment interest. While Mr. Dantowitz vindicated a significant right, which the parties do not contest, it seems clear that *Coutin* anticipated that a trial court could and should hesitate to award full fees for such a result.

It is also helpful to compare the facts in this case with the facts at issue in the settlement-related cases cited by Mr. Dantowitz:

- In *Walsh v. Boston University*, 661 F. Supp. 2d 91 (D. Mass. 2009), the plaintiff accepted a Rule 68 offer of $15,000 on FMLA, Chapter 151B, and ADA claims against a former employer. The plaintiff had survived a summary judgment motion, but only after losing his 93A claim. The court applied a 30% fee reduction and awarded approximately $70,000 in attorneys' fees. The court noted that the $15,000 amount "is far less than the recovery requested of

back wages" and that "plaintiff did not procure the requested relief of reinstatement or punitive damages." *Walsh*, 661 F. Supp. 2d at 116.

- Ultimately in *Diaz v. Jiten Hotel Management, Inc.*, 741 F.3d 170 (1st Cir. 2013), the First Circuit affirmed the trial judge's reduction of the lodestar due to billing record hours associated with unsuccessful claims.[16] Where the plaintiff secured a jury verdict of $7,650 in damages on a Chapter 151B age discrimination claim, the trial court had reduced the total attorney hours from approximately 430 hours to 310 hours and awarded approximately $90,000 in attorneys' fees. *See Diaz v. Jiten Hotel Mgmt., Inc.*, 930 F. Supp. 2d 319, 322 (D. Mass.), *aff'd*, 741 F.3d 170 (1st Cir. 2013).

- In *Coutin*, the plaintiff requested over $50,000 in attorneys' fees after obtaining a jury verdict of over $45,000 in money damages on a single-count Title VII complaint. *See* 124 F.3d at 338. The trial judge rejected the lodestar method and awarded $5,000 in fees. On appeal, the First Circuit found that it was "error to forgo the lodestar" and noted that the relief obtained equated to "roughly three times the appellant's annual salary" and therefore could not be deemed "'limited' in any relevant sense." *Coutin*, 124 F.3d at 340.

Considering these three comparator cases, several points stand out:

- All three cases involved individual employment actions alleging discrimination and all resulted in damages of $50,000 or less, without further substantive relief.

---

[16] Mr. Dantowitz cites the earlier decision in *Diaz v. Jiten Hotel Management, Inc.*, 704 F.3d 150, 154 (1st Cir. 2012), which is discussed above. The First Circuit's 2012 *Diaz* decision remanded the determination of attorneys' fees to the trial judge.

- The first two cases were each treated as "limited successes" in terms of results obtained, whether by proportion of unsuccessful claims, amount of money damages, or a combination of both.

- By contrast, the award in *Coutin* showed "a 100% success rate" (124 F.3d at 340), and was not considered a "limited success," given that the sum obtained represented approximately three times the plaintiff's annual salary.[17]

- None of the underlying petitions involved more than $150,000 in attorneys' fees and none of the fee awards totaled more than $100,000.

Mr. Dantowitz's petition is similar to the comparator cases in several respects. His was an employment case in which the relief obtained was an award of less than $50,000, without further substantive relief. Like *Walsh* and *Diaz*, but unlike *Coutin*, Mr. Dantowitz obtained only limited success – he secured a damages award far smaller than expected and a finding of liability on only two of seven claims. He sought, but *failed* to obtain, an award of damages many times greater than his annual compensation, instead he got a modest period of backpay.

For all these similarities, Mr. Dantowitz's petition differs from any of the comparator cases in one salient respect. Mr. Dantowitz has requested nearly $400,000 in attorneys' fees and costs, while none of the comparator cases sought more than $150,000. Mr. Dantowitz frames his arguments against a substantial fee reduction in terms of the proportions discernible in the comparator cases (*e.g.*, the court in *Walsh* only applied a 30% reduction, the court in *Diaz* affirmed a fee award that was 12 times the amount of money damages, etc.). But this approach

---

[17] The ruling in *Coutin* reinforces the critical point that, in the context of the fee-shifting provisions of a civil rights statute, *absolute* dollar values should not be given undue weight. Congress has provided incentives to ensure that capable lawyers will vindicate the rights of all citizens, including the poorest and most vulnerable. That the award was for three years' worth of salary was critical; that the salary at issue was modest is largely irrelevant.

fails to acknowledge that none of the comparator cases involved remotely comparable amounts of attorneys' fees.

For all the reasons discussed above, I will not gauge the reasonableness of Mr. Dantowitz's fee request based on some fixed ratio to the dollar amount of the verdict. But this cuts both ways. The mere fact that the attorneys' fees in *Diaz* turned out to be 12 times the amount of the damages award does nothing to persuade me that a 12x multiplier is sensible here; the more relevant point is that the attorneys' fees found reasonable in *Diaz* amounted to less than $100,000. By the same token, the 30% reduction in *Walsh*, for a $100,000 bill for services, does nothing to persuade me that 30% is the right discount for a whopping $400,000 bill.

Taken together, the *Coutin* factors indicate that a substantial fee reduction is appropriate in light of the decidedly limited results obtained in this case. While Mr. Dantowitz vindicated important rights under the FMLA, there was no further substantive relief in this case, *i.e.*, there was no impact beyond the confines of this lawsuit. Moreover, Mr. Dantowitz spent the bulk of his time and effort attempting to prove his disability claims, and failed entirely. A lawsuit addressing only the FMLA claims would have required far less evidence and testimony about Mr. Dantowitz's disability. Simply put, Mr. Dantowitz achieved limited success, whether compared to what he sought in the course of the lawsuit or compared to the settlement he passed up.

### v.  *Conclusion Regarding the Results Obtained*

I find that an adjustment to the lodestar amount is appropriate in this case based on the fact that the results obtained were very much limited. Mr. Dantowitz's success is entitled to reasonable attorneys' fees constituting 40% of the amounts he has requested. This is broadly

consistent with the various methods, discussed above (and recapped below), which help quantify Mr. Dantowitz's degree of success in this case:

- <u>Claim Counting</u>: Mr. Dantowitz only prevailed on two of the seven claims that he raised. As discussed above, in this case the "claim counting" exercise sheds little light on a fair outcome. Accordingly, I do not discount the fee request based on the 2:7 proportion proposed by Defendant, which would suggest a success rate of 28%.

- <u>Types of Claims</u>: It is more relevant to consider that there were two main kinds of claims here, Disability Discrimination and FMLA. Although Mr. Dantowitz prevailed on one of those two sets of claims, the FMLA claims did not amount to anything like "half" of the case. In terms of time and effort, the FMLA matters appear to cover less than one-third of the effort expended in briefing or in trial testimony. The wholly unsuccessful disability discrimination claims were the main focus in time and effort. The FMLA claims were the tail, not the dog.

- <u>Amount of Compensation</u>: As discussed above, Mr. Dantowitz was awarded approximately $43,000 in total compensation, a tiny fraction of the sums he sought from the jury, and later from the Court as "equitable relief." In numerical terms, the total recovery was roughly 1% of the $4 million that Mr. Dantowitz asked the jury to award. It was roughly 3% of the $1.4 million that Mr. Dantowitz asked the Court to award. And – perhaps most tellingly – it was roughly 14% of the risk-free settlement amount that Mr. Dantowitz rejected.

- <u>Basis for Damages</u>: Leaving aside the somewhat artificial exercise of comparing numerical ratios, the simplest description of the outcome in this case is that Mr. Dantowitz sought both back pay and front pay in connection with both his (successful)

FMLA claims and his (unsuccessful) disability discrimination claims. He failed entirely in his bid for front pay, which represented the lion's share of the damages he might reasonably have hoped to win. Moreover, the $15,000 that the jury awarded for back pay reflects that, even where he prevailed, the award Mr. Dantowitz secured was modest indeed.

Simply put, to say that Mr. Dantowitz was 40% successful in this case is generous, whichever yardstick one applies. This is *not* a case in which a plaintiff achieved a substantial success that happens to have a low dollar value. This is a case of very limited success.

It is difficult to escape the irony of the situation. The paltry success that Mr. Dantowitz achieved provides the springboard for a fee award based on a 40% success ratio, when the actual damages Mr. Dantowitz obtained do not come close to 40% of any available benchmark.[18]

### d. Reasonableness of Hourly Rates

Defendant does not contest the hourly rates submitted by Mr. Dantowitz's counsel. Defendant is to be commended for acknowledging that the hourly rates are reasonable. I came to the same conclusion after reviewing the underlying attorney affidavits. These are indeed highly esteemed lawyers in the areas of employment and civil rights law.

Accordingly, I find that the hourly rates for Mr. Dantowitz's counsel, identified below, are reasonable.

The hourly rate for Ms. Bernstein is $650.

The hourly rate for Mr. Russcol is $500.

---

[18] To compound the irony, it might also be noted that the final attorneys' fee award will be nearly four times the amount Mr. Dantowitz himself will receive in damages and interest. For the reasons I have noted, this is the not the relevant measure – although Mr. Dantowitz's briefing does raise such comparisons. From the perspective of the lay public, however, I fear that the award I make here may appear excessive.

The hourly rate for Ms. Herold is $450.

The hourly rate for Mr. Brody is $325.

The hourly rate for Ms. McNeely is $310.

     *e.  Costs*

Mr. Dantowitz has requested costs in the amount of $21,855.36. These costs include the filing fee, costs of depositions and transcripts for five witnesses who testified at trial, chalks used at trial, charges for research on Westlaw, parking for two counsel at trial, expenses for private mediations in July 2022 and January 2023, and costs associated with consulting Mr. Dantowitz's tax preparer (including a summary document submitted to Defendant that "resolves discovery disputes concerning [Mr. Dantowitz's] income"). *See* Docket No. 185, at 10–12.

Defendant objects to "inappropriate" costs associated with the summary document prepared by Mr. Dantowitz's tax preparer as well as "duplicative" costs associated with the depositions of two witnesses, Mr. Tucker and Ms. Aliber. Docket No. 189, at 7.

As to the costs associated with Mr. Dantowitz's tax preparer, Mr. Dantowitz argues that general consulting services were necessary to understand Mr. Dantowitz's tax returns (which were submitted as evidence at trial) and that the cost of such services should be counted as compensable consulting fees under 29 U.S.C. § 2617(a)(3). Mr. Dantowitz also argues that he sought to introduce the summary document at trial to help the jury understand certain sale proceeds from his business – proceeds which Mr. Dantowitz construes as mitigation of losses resulting from his termination. Mr. Dantowitz acknowledges, however, that the Court only admitted Mr. Dantowitz's tax returns. Because the tax preparer's invoice does not itemize the costs of the consulting fees and the summary document, Mr. Dantowitz proposes a 35%

reduction of awarded costs invoiced by the tax preparer. The Court finds Mr. Dantowitz's proposal reasonable and will reduce $1,925.70 of the costs submitted by the tax preparer.

As to the deposition charges, Mr. Dantowitz contends that, while there were deposition charges associated with both Ms. Herold (initial trial counsel) and Ms. Bernstein and Mr. Russcol (subsequent trial counsel), those charges were not duplicative. *See* Docket No. 195, at 11–12. Ms. Herold's affidavit includes invoices for three depositions: Carmen Caliber (May 5, 2021); Tucker Steward (May 5, 2021); and Ronald Dantowitz (March 24, 2021). *See* Docket No. 185-2. Ms. Bernstein's affidavit includes a list of costs for four deposition transcripts and identifies the dates of those depositions as April 21, 2021, April 27, 2021, March 24, 2021, and January 27, 2023, but does not include the actual invoices. *See* Docket No. 183-2.

 I requested that Mr. Dantowitz provide copies of the invoices associated with the deposition transcripts identified in Ms. Bernstein's affidavit. Docket No. 221. Mr. Dantowitz provided four invoices. Docket No. 222. Review of those invoices shows that the March 24, 2021 deposition was in fact a duplicate transcript of the Ronald Dantowitz deposition, less $87.50, which corresponds to line items concerning a videoconference connection. *Compare* Docket No. 185-2, at 5, *with* Docket No. 222-1, at 2. Defendant should not be responsible for paying the costs for duplicate deposition transcripts for successor counsel. Accordingly, I will reduce Ms. Bernstein's costs by the amount of the duplicate March 24, 2021 deposition transcript, a reduction of $1,287.35.

CONCLUSION

For the reasons detailed above, I award attorneys' fees and costs in the aggregate amount of $162,450.91, as summarized in Appendix A (attached).[19]


SO ORDERED,

/s/ Paul G. Levenson
PAUL G. LEVENSON
UNITED STATES MAGISTRATE JUDGE

November 2, 2023

---

[19] The parties are advised that under Rule 72(a) of the Federal Rules of Civil Procedure and Rule 2(b) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, any party seeking review by a district judge of these determination(s) and order(s) must serve and file any objections within fourteen days of being served a copy of this order, unless a different time is prescribed by the magistrate judge or the district judge. *See* Fed. R. Civ. P. 72(a). Such objections must specifically designate the order, or part, to be modified or set aside and the basis for objection. The district judge will set aside any portion of the magistrate judge's order that is found to be clearly erroneous or contrary to law. The parties are further advised that failing to follow the objection procedures of Rule 2(b) may preclude further appellate review. *See Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 4 (1st Cir. 1999); *Sunview Condo. Ass'n v. Flexel Int'l, Ltd.*, 116 F.3d 962, 964–65 (1st Cir. 1997).